# Exhibit
# "C"

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

GLENN KASPER

PLAINTIFF

V.                CIVIL ACTION NO. 3:15CV00613-WHB-JCG

THE BOARD OF SUPERVISORS
OF LAUDERDALE COUNTY, MS,
SHERIFF WILLIAM SOLLIE,
WESLEY STEPHENS, RUSTON
RUSSELL, JACOB MATHIS,
ANDY MATUSZEWSKI, THE
MISSISSIPPI HIGHWAY
PATROL, JEROME MOORE,
DEPUTY JUSTIN PUGH, AND
DEPUTY DYLAN ANDERSON,
AND OTHER UNNAMED
INDIVIDUALS, IN THEIR
PERSONAL AND BUSINESS
CAPACITIES

DEFENDANTS


DEPOSITION OF ANDY MATUSZEWSKI


Taken at the instance of the Plaintiff at Denson &
Associates, PLLC, 1931 23rd Avenue, Meridian,
Mississippi, on Friday,May 26, 2017, beginning at
12:38 p.m.




GINGER H. BROOKS, CCR #1165
CRR, RPR, CCR, CLR, RSA

```
 1    APPEARANCES:

 2

 3         JOSEPH A. DENSON, ESQ.
           Denson & Associates, PLLC
 4         1931 23rd Avenue
           Meridian, Mississippi 39301
 5         josephadenson@hotmail.com

 6

               COUNSEL FOR PLAINTIFF
 7

 8

           LEE THAGGARD, ESQ.
 9         Barry, Thaggard, May & Bailey, LLP
           505 Constitution Avenue
10         Meridian, Mississippi 39301
           thaggard@barrypalmerlaw.com
11

12             COUNSEL FOR DEFENDANTS

13

14

15    ALSO PRESENT:  Glenn Kasper

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX

2    Style and Appearances......................1

3    Index    ..................................3

4    Certificate of Deponent  .................45

5    Certificate of Court Reporter ............46

6                        EXAMINATIONS

7    Examination By Mr. Denson ................4

8                         EXHIBITS

9    Exhibit 1 Policies and Procedures ........12

10   Exhibit 2 Photograph .....................17

11   Exhibit 3 Photograph .....................19

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    ANDY MATUSZEWSKI,
 2    having been first duly sworn, was examined and
 3    testified as follows:
 4    EXAMINATION BY MR. DENSON:
 5         Q.   Deputy Matuszewski, can you give the
 6    Court your full name?
 7         A.   Andrew Stephen Matuszewski.
 8         Q.   All right.  Do you mind if I call you
 9    "Ski" during this deposition?
10         A.   No problem at all.
11         Q.   Okay.  Have you had a deposition before?
12         A.   I have.
13         Q.   And in what case?
14         A.   It was a civil case that I was a witness
15    on.
16         Q.   Was it related or unrelated to
17    Lauderdale County?
18         A.   It was.  I was a law enforcement officer
19    at the time, so it related to a car crash that
20    somebody had been involved in.
21         Q.   Okay.  Okay.  Ski, what I'm going to do
22    in the deposition, as I ask you questions, I'm
23    going to assume you understand my question if you
24    answer it, and at any point in time you don't
25    understand my question, just ask me to rephrase.
```

```
1      I would certainly have no problem doing that.
2              Anytime you need a break, let me know,
3      and we'll break.
4              And do you understand that you're here
5      on the case of "Glenn Kasper versus Lauderdale
6      County Board of Supervisors"?
7      A.    I do.
8      Q.    And have you talked to any of the
9      officers -- other than in the presence of your
10     counsel, Lee Thaggard here, have you talked to any
11     of the officers about the events that occurred
12     related to this case?
13     A.    Since when?
14     Q.    I guess since the day it happened.
15     A.    I'm sure there was some informal
16     discussions between the parties on the day of,
17     maybe the day after.  It's not uncommon for us to
18     discuss things that we did.
19     Q.    Okay.
20     A.    And I can't recall any content or whom
21     it would have been with or would not, but I can't
22     say that I have not.
23     Q.    Okay.  Now, do you recall having any
24     discussion with officers, other than in the
25     presence of your attorney here, after this lawsuit
```

```
 1    was filed?

 2          A.    No.

 3          Q.    Okay.  And what preparation, if any, did

 4    you make for this deposition?

 5          A.    Had a meeting with counsel.

 6          Q.    Did you review any notes, any statements

 7    or -- or the like?

 8          A.    Outside of the discussion with counsel?

 9          Q.    Yes.

10          A.    No.

11          Q.    Okay.  Did you review your statement

12    that you made to Lauderdale County?

13          A.    Again, not outside of the discussion

14    with counsel.

15          Q.    Well, I'm not -- I'm not there anymore.

16    I'm just asking, did you review your statement?

17          A.    Yes.

18          Q.    Okay.  Did you review any other

19    statements?

20          A.    No.

21          Q.    And what's the -- what's the year of

22    your birth?

23          A.    1972.

24          Q.    And your place of birth?

25          A.    Orlando, Florida.
```

```
 1          Q.   And the last four of your Social?
 2          A.   I'm sorry, sir.  I don't believe you're
 3     entitled to that.  That's my personal information,
 4     and I'm not here in a personal capacity.
 5          Q.   I understand.  Your counsel may advise
 6     you different.
 7               MR. THAGGARD:  That's fine.  You don't
 8     have to give it.
 9          Q.   (By Mr. Denson)  And where did you go to
10     high school?
11          A.   Clarkdale High School.
12          Q.   Any college?
13          A.   Some.
14          Q.   Where did you go?
15          A.   Meridian Community College and
16     University of Alabama.
17          Q.   Did you receive a certificate or diploma
18     from Meridian Community College?
19          A.   I did not.
20          Q.   What year did you go to Meridian
21     Community College?
22          A.   '90 and '91, if memory serves.
23          Q.   And University of Alabama, did you
24     receive any degree or certificate?
25          A.   I did not.
```

```
 1        Q.   What year did you go to University of
 2   Alabama?
 3        A.   1989.
 4        Q.   And are you married?
 5        A.   I am.
 6        Q.   And to whom are you married?
 7        A.   Alice Matuszewski.
 8        Q.   And do you have a cell phone that you
 9   use while on the job?
10        A.   I do.
11        Q.   And is that a work cell?
12        A.   Yes.
13        Q.   And what is that cell number?
14        A.   (601)604-7060.
15        Q.   And is that the same cell number you had
16   on the date of May 24th, 2014?
17        A.   I believe that's correct.
18        Q.   How long have you been working with
19   Lauderdale County as a deputy?
20        A.   Since the 18th of January, 1996.
21        Q.   And prior to working as a deputy, did
22   you attend police academy?
23        A.   I did.
24        Q.   And -- you said you did?
25        A.   Yes.
```

```
1          Q.   And where did you attend?
2          A.   The University of Southern Mississippi's
3     Gulf Park Campus in Long Beach, Mississippi.
4          Q.   In what year?
5          A.   1994.
6          Q.   What specialized training did you
7     receive at the police academy you just made
8     reference to?
9          A.   I'm not sure I follow what you mean by
10    "specialized."  You mean over and above any
11    training that is standard in the basic academy,
12    or --
13         Q.   Let me rephrase.  I strike that
14    question.
15              Did you receive any specialized training
16    at the academy?
17              MR. THAGGARD:  Object to form.
18              THE WITNESS:  We were all trained in the
19    basic law enforcement curriculum that's provided
20    by the State.
21         Q.   (By Mr. Denson)  Okay.  Anything over and
22    above basic law enforcement curriculum?
23         A.   Since?
24         Q.   At the --
25         A.   No.
```

1   Q. -- academy.

2     And when you say "basic law enforcement

3 curriculum," what would that include, sir?

4   A. All of the basic statutes that we were

5 given information on, to include Mississippi code,

6 federal statutes, all of the things that one would

7 expect a law enforcement officer to be trained in,

8 such as emergency vehicle operations, first aid,

9 defensive tactics, firearms, arrest procedures,

10 things of that nature.

11   Q. Okay.  And have you received any

12 certifications since 1994?

13   A. Yes.

14   Q. In what -- in what area did you receive

15 certifications?

16   A. We'll be here all day.

17   Q. I know it's a long span.  Well, let me

18 be more specific.

19     Did you receive any certifications in

20 use of force training?

21   A. Outside of the law enforcement academy,

22 I don't recall any specific training on use of

23 force or response to resistance other than our

24 annual legal updates that we get through the

25 department.  I don't recall having been to a

1  school specifically for that purpose.

2      Q.   Okay.  When you say "annual legal

3  updates," what -- what is that?

4      A.   The department provides training for

5  whatever changes may occur in the legal statutes

6  of both the State of Mississippi and federal

7  statutes on an annual basis.  Continuing

8  education, if you will.

9      Q.   Now, is that at Lauderdale County?

10     A.   Usually, yes, sir.

11     Q.   And who -- who gives that training?

12     A.   It changes.  Just -- usually it's

13 members of the Office of the Attorney General, but

14 those personnel could change.  Depending on what

15 statutes change, it could be other organizations;

16 for example, the Care Lodge, if it's a domestic

17 violence issue, et cetera.

18     Q.   Okay.  Now, have there been -- have you

19 received any training as relates to safety

20 checkpoints?

21     A.   Not that I can recall, no.

22     Q.   Well, how did you learn how to operate

23 in a safety checkpoint?

24     A.   On the job.

25     Q.   And is that through some field officer?

1       A.   Yes, sir.  Understanding that when I

2   started, we didn't have a field training officer

3   program.  So you went to the academy, you came

4   back, you were assigned to a partner officer, and

5   you learned by watching them.

6       Q.   And the officer that you watched, do you

7   know if those officers would have any specific

8   training in safety checkpoints?

9       A.   I don't know the answer to that.

10       Q.   Are you familiar with Lauderdale County

11   Policy Number 4.03?

12       A.   Yes.

13       Q.   And the one that's in your hand has a

14   revision date of March 21st, 2007, correct?

15       A.   Yes.

16            MR. DENSON:  I want this marked as the

17   first numbered exhibit in this deposition.

18            (Exhibit 1 marked for identification.)

19       Q.   (By Mr. Denson)  And, Ski, I want to

20   direct your attention to page 3 of this document,

21   under the heading, "Environmental Conditions."  The

22   second sentence says, "When conducted at night, each

23   officer will be equipped with a flashlight and

24   traffic safety vest."

25            Is it your recollection that when you do

1    your traffic stops, that you are wearing your

2    traffic safety vest?

3        A.    I want to make sure I understood what

4    you said correctly, because you changed what you

5    said in the course of that question.  You asked me

6    about traffic stops.

7              Are you asking about a stop that I make

8    on my own or a roadside checkpoint?

9        Q.    Let me back up.  I appreciate that.

10             In your roadside safety checkpoints, is

11   it your recollection that you wear your safety

12   vest while performing those checkpoints at night?

13       A.    Yes.

14       Q.    And this document, is -- this is not

15   your first time seeing this document, correct?

16       A.    No, it is not.

17       Q.    And when was the last time you took a

18   look at this document?

19       A.    Before the last checkpoint that we had

20   on my shift, which has been in the last month or

21   so, I would think.

22       Q.    Okay.  So you -- you make a review of

23   this document how often?

24       A.    I try to do it -- any time that we're

25   going to have one that I'm going to be involved

1    in, I'm going to take a look at it before we do

2    that.  My position has changed since the time of

3    this event to today's date where this document and

4    the accompanying documentation that goes with it

5    is now my responsibility, so I have to.

6         Q.    Okay.  Now -- and that's -- is that

7    because you are a lieutenant now?

8         A.    I'm a sergeant, but yes.

9         Q.    You're a sergeant.  Okay.

10              And you said "other accompanying

11   documents."  What documents would you be making

12   reference to?

13        A.    Under the section on the same page that

14   you reference where it says "Reports," it says

15   that there's a written form approved by the

16   Sheriff for this purpose that has to be filed when

17   one of these checkpoints is completed.  That's the

18   report in question.

19        Q.    Okay.  Now, according to this policy,

20   you review -- you testified that you review it

21   pretty often.

22              Is it standard procedure to remove a

23   driver from his vehicle to perform a safety

24   checkpoint task?

25              MR. THAGGARD:  Object to form.

1        THE WITNESS:  I don't know that there's
2   a standard in dealing -- that you can say covers
3   everybody.  Each situation is different.  So the
4   majority of the motoring public, we don't have to
5   remove them from the vehicle.  There are times
6   when people do get removed from the vehicle based
7   on whatever violations they've committed or
8   further investigation that's warranted based on
9   the circumstances at the time.
10       Q.   (By Mr. Denson)  Okay.  I want to direct
11  your attention to the evening of May 24th, 2014.
12       It's my understanding you were at a
13  safety checkpoint at Allen Swamp and Pine Springs
14  Road, correct?
15       A.   It is.
16       Q.   And what was your capacity as a law
17  enforcement officer out there that day?
18       A.   I was just a supporting officer that was
19  present on the scene at the direction of the
20  senior officer, which would have been Lieutenant
21  Ruston Russell.
22       Q.   Okay.  And that was approximately 7:49,
23  7:50 that evening?
24       A.   I don't recall what time we started, but
25  I know that this event happened somewhere along

1    that time, yes.

2        Q.   Okay.  And when was the -- and was that

3    date, according to your recollection, daytime or

4    nighttime or what?

5        A.   There was still good visibility at the

6    time that this event occurred.

7        Q.   Okay.  I want to hand you an image here.

8           Is this the intersection of Pine Springs

9    and Allen Swamp Road?

10       A.   It does appear to be, yes.

11       Q.   Okay.  And is that the truck of Mr. --

12    does that appear to be the truck that -- the type

13    of truck that Mr. Kasper was driving on May 24th,

14    2014?

15          MR. THAGGARD:  Object to form.

16          THE WITNESS:  If you say it is, I'm

17    going to take your word for it.  I can't identify

18    this truck by this photograph, no.

19       Q.   (By Mr. Denson)  Okay.  But on May 24th,

20    2014, Mr. Kasper was driving a truck, correct?

21       A.   Yes.

22       Q.   Okay.  And that truck was a Ford,

23    correct?

24       A.   I believe that's also correct.

25       Q.   And it was an F-150?

1     A.   I can't answer that.  I don't recall
2  that.
3     Q.   Okay.  Now, when you first had an
4  encounter with Mr. Kasper -- well, strike that.
5          What were you doing prior to Mr. Kasper
6  arriving on the scene?
7     A.   I was standing on the centerline of
8  Allen Swamp Road just before the stop point where
9  the stop sign is checking vehicles as they
10 approached our location from the west.
11    Q.   Okay.  And can you mark where that place
12 would be on this image?
13         MR. DENSON:  Well, before that, let me
14 have this marked as the next numbered exhibit.
15         (Exhibit 2 marked for identification.)
16    Q.   (By Mr. Denson)  Okay.  You reference you
17 were standing, I believe you said the centerline?
18    A.   Yes, sir.
19    Q.   Can you mark on this picture here where
20 you were standing at on that day?
21    A.   With -- with this view, it's going to be
22 nearly impossible to do, and I'll explain.  I was
23 in the area that is covered by this vehicle that's
24 parked in this image, so there's -- and it's not
25 to scale.  I can't be exact where I was standing

1    at.  I don't have a mark to go off of.  But I know
2    I was in an area that you can't see because of
3    this vehicle.
4        Q.   Okay.  So the vehicle would be, in
5    your -- according to your testimony, sitting where
6    you were standing?
7            MR. THAGGARD:  Object to form.
8            THE WITNESS:  The vehicle's not sitting
9    where I was standing.  In this view, it obstructs
10   the location where I was standing.  If we were
11   looking at this from overhead, I could show you,
12   but we're looking at it looking down the roadway.
13           So I was to the rear of this vehicle on
14   the driver's side, which would be where the
15   centerline of the road is back over here.  You
16   can't see that point for me to show you where that
17   is because of the angle of this view.
18       Q.   (By Mr. Denson)  Okay.  Now, the second
19   picture I just handed to you, does that help any in
20   terms of providing what your location would be on
21   that May of -- May 24th, 2014?
22       A.   Without getting into specifics, because
23   I can't speak for certain, but, yes, there is no
24   longer obstructed, it's a two-dimensional image,
25   again, looking down the road rather than from

1    above.

2              So in the general area along what I

3    believe I can see to be the centerline right here

4    is where I would have been standing, back from the

5    stop line between a vehicle and a vehicle and a

6    half length is what my memory tells me is where I

7    was standing.  So it would be somewhere in this

8    area.

9         Q.   Okay.  Can you --

10             MR. DENSON:  Let me have this marked as

11   the next numbered exhibit.

12             (Exhibit 3 marked for identification.)

13        Q.   (By Mr. Denson)  Okay.  Now, Ski, can you

14   mark the location where you say you were standing?

15        A.   (Witness complies.)

16        Q.   Okay.  It may be better to use this one.

17        A.   All right.

18        Q.   Okay.  And prior to Mr. Kasper arriving

19   on the scene, what were you doing?

20        A.   As I mentioned earlier, vehicles would

21   approach from the west, and we'd stop and check

22   those as they came to our location.  I can't speak

23   to which vehicle I checked or -- because I don't

24   recall which ones were where.

25        Q.   Okay.  And when Mr. Kasper arrived on

1    the scene -- tell me exactly what was happening as

2    Mr. Kasper is approaching this intersection.

3        A.    Lieutenant Russell was standing at the

4    intersection near the stop line --

5        Q.    Can you -- and let me break you there.

6    Can you mark where Lieutenant Russell was

7    standing?

8        A.    This would be the better image to do

9    that with.

10       Q.    Okay.  So you'll be marking on

11   Exhibit --

12       A.    -- 2.

13       Q.    -- 2?  Okay.

14       A.    Yes, sir.  He would have been -- I'm

15   going to use his initials, "RR."  He would have

16   been right in the vicinity of the point where the

17   stop line and the centerline of the roadway comes

18   together.

19       Q.    Okay.

20       A.    All right.  So in this image, he would

21   have been a bit farther --

22            MR. THAGGARD:  "This image," you're

23   referring to Exhibit Number --

24            THE WITNESS:  Number 3.

25            MR. THAGGARD:  -- 3.

1              THE WITNESS:  It would have been closer

2      to that type of relationship.  So both of us on

3      the centerline of the roadway, him closer to the

4      intersection, myself a vehicle length to two

5      behind him, which is normal when we're doing these

6      types of checkpoints.  We would have multiple

7      vehicles approach, so you would flag the first one

8      in a line past you to the lead deputy, and you'd

9      take the one behind to help expedite the process

10     of traffic flow.

11          Q.   (By Mr. Denson)  Okay.  And when

12     Mr. Kasper approached the intersection, did you

13     encounter Mr. Kasper first?

14          A.   I didn't have any interaction with him,

15     but his vehicle did get to me first because of my

16     physical location on the roadway.

17          Q.   And at the time Mr. Kasper's vehicle

18     passed you, did you have -- at that time, did you

19     have any interaction with Mr. Kasper?

20          A.   I did not, no.

21          Q.   Okay.  And what was Mr. Kasper's vehicle

22     doing at the moment that he passed?

23              Did you notice if Mr. Kasper was

24     hollering at you, screaming at you, or doing

25     anything at the time Mr. Kasper's vehicle passed

1    you?

2         A.    I did notice the one thing that caught

3    my eye was that -- or, excuse me -- two things.

4    He had something in his hand.  I thought that was

5    a driver's license, but I -- you know, wasn't slow

6    enough for me to be able to identify what it was,

7    but it was the right shape and size.

8              But what caught my attention more than

9    anything was that it appeared that he was raising

10   his driver's side window, which is exactly

11   opposite from what I'm used to seeing as people

12   approach law enforcement that are in the roadway

13   because -- for whatever reason, whether it be a

14   checkpoint or an accident scene or whatever, most

15   motorists will roll down a window and inquire what

16   direction they need to take, so this caught my

17   attention, and I glanced back to my left to make

18   sure that Lieutenant Russell, first of all, saw

19   the vehicle coming and -- and that he was aware

20   that this individual was coming towards him, which

21   I did.

22         Q.    Okay.  And, at this time, when you say

23   you saw Mr. Kasper raising his window up, was an

24   instruction given by you to roll the window down?

25         A.    I don't recall doing that, no.

1   Q. Okay. Was there any other deputy before

2 you farther west?

3   A. Not that I recall, no.

4   Q. Okay. And when Mr. Kasper passed you,

5 was he slowing down or speeding up?

6   A. I can't say with any degree of certainty

7 that he was doing either. It appeared to me that

8 he was maintaining the same speed at the point

9 that he passed my person.

10   Q. Okay. Prior to him getting to you, did

11 you notice whether Mr. Kasper's truck was going

12 faster or going slower before he reached you?

13   A. I can't say that I noticed that, no.

14   Q. Okay. But you didn't notice anything

15 out of the ordinary related to his speed as he was

16 approaching a roadblock or intersection?

17   A. Well, when he got to me, he was

18 traveling at the speed that he was traveling.

19 There's not much distance left between where I was

20 standing and the stop point. I would have

21 expected his vehicle to have had a slight nose

22 down attitude and to have been appearing to slow

23 at that close to the intersection, and that -- I

24 did not see that happening. I did not recall

25 seeing brake lights as the vehicle went past me.

1   This is abnormal.  Which caused, again, for me --
2   my concern to be heightened, and I called out to
3   Lieutenant Russell to be cautious because of this
4   vehicle coming at him that I wasn't certain was
5   going to stop.
6       Q.   All right.  So what happened next
7   according to your -- from your vantage point?
8       A.   I noticed as I looked at Lieutenant
9   Russell, that Deputy Stephens and Trooper Moore
10  were ahead of this vehicle in the center of Pine
11  Springs Road.
12      Q.   And can you indicate on -- I don't know
13  if it's going to be best Exhibit 3 or Exhibit 2.
14      A.   Three I think would be -- I don't know
15  that this is going to show the right view.  We're
16  going to work with 3 for this point.
17           Again, the depth is a bit off, but we'll
18  do the best we can with what we have.  I've used
19  the initials "WS" and "JM" for Wesley Stephens and
20  Jerome Moore.
21      Q.   Okay.
22      A.   And they were on the centerline of Pine
23  Springs Road directly in line with Allen Swamp
24  Road where it ties in.
25      Q.   Okay.  And Mr. Kasper's truck, where --

1    where was it when it -- it came to a stop?

2        A.    Truck stopped twice.

3        Q.    Okay.

4        A.    The first time that I realized that the

5    vehicle had stopped would have been just prior to

6    the stop point where the white line is on the

7    roadway.

8            So I think the best description of that

9    at this point is actually where you have this

10   vehicle photographed in Exhibit 2.

11       Q.    So that would be Stop Number 1 from your

12   perspective?

13       A.    Bear with me a moment.  I'm trying to

14   determine whether this is a stop line ahead of it.

15   I see another mark beside it.  I can't tell what's

16   what.

17            I'll tell you what we'll do.  Let's look

18   at -- let's look at Number 3 because I can see

19   where the line is in that one.  You can see the

20   white line is right here in the roadway.

21       Q.    And put a -- put an arrow to that to

22   indicate stop line.

23       A.    (Witness complies.)

24       Q.    Okay.

25       A.    Okay.  So when I first noticed that

1    Mr. Kasper's truck had stopped, the nose of the

2    vehicle would have been -- and, again, this is --

3    none of this is to scale, and I know we're working

4    with a two-dimensional linear drawing -- or

5    photograph rather than an overhead, but it would

6    have been somewhere in this area.

7    Q.   Okay.  Just put a "1" beside that -- or

8    inside of it.  That will be fine.

9    And you said -- and at this time -- this

10   is -- what was going on when Mr. Kasper stopped

11   here?

12   A.   I heard Lieutenant Russell saying "Stop"

13   to the driver of this vehicle.  When I had glanced

14   back initially, it caught my eye that the vehicle

15   was still continuing at a speed that surprised me.

16   I saw Lieutenant Russell facing my direction,

17   facing back west, standing with his body turned in

18   that direction and his arm out with his hand

19   extended into the lane of traffic, which is how we

20   generally will point at our hand as a stop

21   location so that the oncoming traffic can decipher

22   which deputy they need to stop at.  So, like, for

23   example, I'm back here, they need to go there, I'm

24   going to point at him, and he's going to stand

25   there with his hand out pointing at his hand,

1    "This is where you stop," which is what he was

2    doing.

3        Q.   Okay.  And Mr. Kasper stopped at Stop 1?

4        A.   At point 1, which was prior to that

5    point.

6        Q.   Okay.

7        A.   Prior to the point that he got to

8    Lieutenant Russell.

9        Q.   Okay.  And, at that time, you did notice

10   brake lights?

11       A.   Yes.

12       Q.   Okay.

13       A.   And then I had turned my head -- you

14   know, I saw the vehicles, okay, it's stopping,

15   maybe they just didn't know what was going on,

16   something's happening, but I had heard Lieutenant

17   Russell call out to the driver.

18            I pivoted my head back to the west

19   because there was a vehicle trailing Mr. Kasper,

20   there was another vehicle coming, and followed

21   suit with the same action to make sure that that

22   vehicle knew where to stop, which in this case I

23   was the one standing there with my hand out, so

24   they didn't get dazzled by the lights of the

25   vehicles or other things that would cause them to

1    be distracted and perhaps hit Mr. Kasper's

2    vehicle.

3            So my attention was drawn to that

4    vehicle.  Once I realized that they were slowing,

5    going to stop, I heard the sound of an engine -- I

6    don't want to use the term "racing," but

7    accelerating, okay, rather than the other way

8    around which I would expect, which would be no

9    further sound.

10           So I turned my head back around, which

11   is when I saw the vehicle lunge forward toward the

12   intersection which would have been in the

13   direction of Deputy Stephens and Trooper Moore.

14   When I saw that, my focus was completely off of

15   the second vehicle at this point, and that's when

16   Lieutenant Russell impacted the window of

17   Mr. Kasper's vehicle with his elbow.

18       Q.   Okay.  And the second location of the

19   vehicle stop, show that on Exhibit 3 for me.

20       A.   Would have been across the head of the

21   stop line.  I'll mark that as 2.

22       Q.   Okay.  And you said you heard -- you

23   heard the engine, I believe you said "race"?

24       A.   I didn't want to use that term.  That

25   sounds like what you would hear at a racetrack.

1    The engine noise increased.  It accelerated.

2         Q.   Okay.  And after the engine noise

3    accelerated, what happened?

4         A.   Lieutenant Russell was, at this point,

5    giving loud shouted verbal commands to the driver

6    to stop.  In that same instant is when Lieutenant

7    Russell impacted the driver's side front window

8    with his elbow causing it to shatter, and then the

9    truck came to a stop the second -- this was -- the

10   truck was actually moving, engine race- -- engine

11   sound increased, I turned, saw the vehicle moving,

12   heard the shouted commands, saw and heard the

13   window break, then the vehicle stops the second

14   time at this location.

15        Q.   Okay.  And -- and that would be the

16   truck is on the stop line?

17        A.   It was a straddle of it, yes, sir.

18        Q.   Okay.  And how far -- of course, you

19   can't do it on Exhibit 3, but how far would you

20   say Wesley Stephens and Jerome Moore was away from

21   that stop line as you indicated on Exhibit 3?

22        A.   The width of the lane of traffic,

23   because they were standing on the centerline of

24   Pine Springs Road.

25        Q.   Okay.

1      A.    Now, let me -- let me clarify.  They
2    were standing on the center of Pine Springs Road
3    when I initially saw them.  When this second
4    movement happened with the truck, I can't tell you
5    the depth, because I don't know if they were
6    closing toward this issue or whether they were
7    still standing where they were.  My focus was on
8    the truck at that point.  I couldn't see -- I
9    couldn't tell you the depth of how far out they
10   were.  That's where they were the last time I saw
11   them, which was just before this vehicle lunged
12   forward.
13      Q.    Okay.  And when you say the vehicle
14   "lunged forward," describe that for me.
15      A.    A vehicle comes to a stop, the motor
16   races, the vehicle moves forward, which is what
17   took place in this case, in an abrupt manner.
18   That's not what we're accustomed to seeing when
19   people are moving from point to point, even just
20   in flowing traffic coming to a multi-stop
21   intersection like this one is, much less a
22   roadside safety checkpoint.
23      Q.    Now, did you see the brake lights on
24   the -- on this truck at the second stop location?
25      A.    I can't recall that I did or I didn't.

1  My focus was on the driver compartment at that

2  point.

3      Q.   Okay.  And so you don't know how the

4  vehicle came to a stop?

5      A.   I do not.

6      Q.   All right.  So -- but we do know the

7  vehicle at a stop -- is at a stop straddling a

8  stop line?

9      A.   Yes, sir.

10     Q.   What happened next?

11     A.   I had already left the location where I

12 was and closed with the vehicle in question.

13          Deputy Russell -- excuse me, Lieutenant

14 Russell was hands in the vehicle.  I came around

15 his person toward the front of the vehicle, which

16 was not yet completely stopped, it was still

17 moving a little bit, in case it continued into the

18 roadway.  So I came around him to what would be

19 known as the A pillar, the front corner of where

20 the windshield comes down and meets the body of

21 the truck, facing back toward the driver, so I

22 could see the driver.  There was nobody beyond him

23 from my location.  I literally reached up and

24 grabbed the hood of the truck to be able to feel

25 the movement and know if the vehicle was going to

```
 1    surge toward these other officers again.

 2              As I made that turn coming around

 3    Lieutenant Russell's person, I was able to pick up

 4    where Deputy Stephens and Trooper Moore were,

 5    which was they were closing on our location as

 6    well, so now they were less than a lane width

 7    away.

 8        Q.   So they were approaching --

 9        A.   Yes, sir.

10        Q.   -- Mr. Kasper's vehicle?

11        A.   By this point in time, yes.

12        Q.   Now, let me stop you there.  You say you

13    had your hand on the hood?

14        A.   Yes, sir.  Well, the cowling just above

15    the hood.

16        Q.   On the cowling.  Okay.

17        A.   Yes, sir.

18        Q.   And you were trying to gauge how fast

19    the vehicle was going or the like?

20        A.   Well, and hold on to the vehicle so if I

21    had to, you know, cause the vehicle to come to a

22    stop either mechanically or by some type of

23    intervention with the driver, I would be able to

24    do so.

25        Q.   Okay.  While your hand was holding on to
```

1    the hood, were you drug by the vehicle in any way?

2         A.   No, sir.

3         Q.   Did you -- did your person move in any

4    way as a result of holding on to the vehicle at

5    this time?

6         A.   I had to move to stay with it.

7         Q.   Okay.  How many steps, if you recall,

8    you took?

9         A.   I can't recall.  It was not far.

10        Q.   Okay.  Would you say three steps?

11        A.   I -- I'm not going to speculate.  I

12   don't recall.  It -- it was not -- it was not the

13   distance of this room.  I can use that as a gauge.

14   It was less than that.

15        Q.   This room is about 30 feet.

16        A.   That would be fair.

17        Q.   Did you -- did you run alongside of the

18   truck?

19        A.   No, sir.

20        Q.   So this entire time that you were -- how

21   many -- how many -- however many steps it were,

22   you were walking along with the truck?

23        A.   Yes, sir.

24        Q.   Okay.  And is this after Stop Location

25   Number 2 or before Stop Location Number 2 as

```
1    indicated on Exhibit 3?
2         A.   Would have been between 1 and 2.
3         Q.   Okay.  So when you say you "heard the
4    vehicle lunge forward," you were at the A pillar
5    of the truck at this time?
6         A.   Yes, sir.  Not when it lunged forward.
7    Once it -- you have to understand the move --
8    there were two stages of movement.
9              The vehicle stopped, it lunged forward,
10   then that acceleration stopped but the vehicle
11   didn't stop, it was still moving, but at a very
12   much slower rate at that point.  Okay?  So there
13   was a stop, sudden movement, then a slower
14   movement.
15        Q.   Okay.  Then stopped and straddled the
16   stop line?
17        A.   Yes, sir.
18        Q.   So while at the A pillar of the truck,
19   what did you do next?
20        A.   As I moved around behind Lieutenant
21   Russell, I drew my service weapon, had it next to
22   my holster beside my leg out of the way because
23   there were officers around me.  When I grabbed the
24   cowling of the vehicle forward of the A pillar,
25   had the vehicle continued -- this is a deadly
```

1    force incident.  We had a vehicle going towards

2    officers refusing to stop.  People were in

3    imminent threat of harm.  If the movement had

4    continued, my intention was to use whatever force

5    was necessary to stop that threat.  Turns out

6    didn't have to.  The vehicle came to a stop.  I

7    was able to reholster my weapon, and that was the

8    end of my physical contact with the issue at all.

9    I didn't have any physical contact with

10   Mr. Kasper.  I didn't have any further physical

11   contact with his vehicle.

12       Q.   Now, when you say you drew your weapon,

13   you drew your weapon and pointed it to Mr. Kasper?

14       A.   I did not.  Never addressed the weapon

15   toward anyone.

16       Q.   Okay.  So what do you -- what do you

17   mean when you say "drew your weapon"?

18       A.   Simply removed it from the holster that

19   I carry it in and had it beside my leg where to --

20   where if the opportunity -- or the situation

21   presented itself that it became necessary, I could

22   then present the weapon.

23       Q.   And at this time you have your weapon

24   next to you, are you walking with the truck?

25       A.   Backwards.

```
1          Q.    Walking backwards with the truck?
2          A.    Yes, sir.
3          Q.    And the fact that you're walking at a --
4     is your walking distinguished from a jog, correct?
5          A.    I would say yes.
6          Q.    Okay.
7          A.    Slower.
8          Q.    So you were not walking at five miles
9     per hour at this time backwards?
10         A.    It's an arbitrary number.  I can't tell
11    you how fast a five-mile-an-hour-walk looks.  I'm
12    telling you I was not running, I was not jogging.
13    I was taking several quick step backwards, and
14    then the vehicle came to rest.
15              This whole conversation that we've had
16    over the last few minutes is about something that
17    lasted split seconds.  It didn't take very long at
18    all for this -- all this sequence of events to
19    occur.
20         Q.    Okay.  And prior -- between the vehicle
21    in one location, moved from one loc- -- Location
22    Number 1 as indicated on Exhibit 3 and Location
23    Number 2, what utterances or statements did you
24    hear come from Mr. Kasper?
25         A.    I couldn't discern what he was saying.
```

1    There was a loud noise coming from inside the

2    vehicle.  It was obviously him, but I couldn't

3    make sense of it.  It was -- you know, there was

4    other vehicles, other people, verbal commands

5    being given by Lieutenant Russell that were quite

6    loud, so I can't speak with any authority about

7    what Mr. Kasper may have or may not have said.

8        Q.   Okay.  And what verbal commands were

9    given by Lieutenant Russell that you were able to

10   discern and understand between Vehicle Location

11   Number 1 and Number 2?

12       A.   I -- I heard him repeatedly say, "Stop,"

13   and, "Stop the truck."  Now, beyond that, I

14   can't -- I can't tell you with any certainty.

15       Q.   Okay.  And the truck did stop, correct?

16       A.   Twice, yes, sir.

17       Q.   And you gave some testimony earlier, you

18   said Mr. -- Lieutenant Russell reached into the

19   vehicle?

20       A.   Yes, sir.

21       Q.   And this is after -- I believe your word

22   was he "impacted" the window; he reached into the

23   vehicle?

24       A.   Yes, sir.

25       Q.   What was going on at the time that

1    Lieutenant Russell reached into the vehicle?

2         A.    Inside the vehicle you're asking?

3         Q.    Between -- between Mr. Kasper and

4    Lieutenant Russell.

5         A.    There was this verbal back and forth

6    between the two of them, Lieutenant Russell giving

7    commands and whatever Mr. Kasper was responding.

8    I couldn't hear that clearly.

9         Q.    Okay.  Now, at this A pillar vantage

10   point, were you able to see Mr. Kasper put the car

11   in "Park"?

12        A.    I was not.

13        Q.    Were you able to see the -- the gear

14   changer?

15        A.    I -- I -- I can't recall that I did.  I

16   know I heard the vehicle put into gear.  You can

17   hear it.  It's a distinct (indicating), and it

18   stops.  The vehicle motion, the vehicle rocked

19   back and forth a touch when that happened, and

20   that's when I became aware that the vehicle was no

21   longer moving forward at that point.

22        Q.    Okay.  Now, earlier you indicated that

23   it was a -- there was a dangerous -- I may not be

24   using the exact words, but something close to it

25   was a -- a dangerous situation.

1    A.   Very much.

2    Q.   But we don't have -- you didn't have a

3  car that was racing towards an officer, correct,

4  or driving speedily towards an officer?

5         MR. THAGGARD:  Object to form.

6         THE WITNESS:  It's been my experience

7  that speed is arbitrary.  Person versus a vehicle,

8  person always loses.  It doesn't take rapid

9  movement to cause serious bodily injury and/or

10  death.

11    Q.   (By Mr. Denson)  Okay.

12    A.   We've had people killed by vehicles that

13  were barely moving, so the concern about what

14  speed the vehicle was traveling and whether that

15  constitutes a threat or not doesn't bear witness

16  here.

17    Q.   Now, you would agree with me that if the

18  accelerator -- accelerator was pressed by

19  Mr. Kasper as you described earlier, between

20  point 1 on Exhibit 3 and point 2, as you

21  described, the vehicle would have went past the

22  stop line if brakes were not pressed, correct?

23    A.   If he pressed the accelerator and then

24  not pressed the brakes or the transmission be put

25  into gear, then at some point, yes, it would have

1    crossed that line.

2        Q.   Okay.  So -- so it's -- it's your

3    testimony that the vehicle stopped by the hands of

4    Mr. Kasper?

5            MR. THAGGARD:  Object to form.

6            THE WITNESS:  I don't know that.

7        Q.   (By Mr. Denson)  Okay.  And you said after

8    the window was impacted, the vehicle ultimately

9    stopped, you had no other -- and you put your

10   service weapon back -- you had no other interaction

11   with Mr. Kasper?

12       A.   That's correct.

13       Q.   But were you able to observe the

14   interaction between Mr. Kasper and the officers?

15       A.   There was a moment at which point they

16   were working at getting Mr. Kasper out of the

17   vehicle that I saw the backs of several officers

18   at the door, but I -- there was enough bodies

19   there to deal with one individual that it didn't

20   require my participation at that point.  The

21   vehicle was stopped.  I -- I couldn't do anything

22   to help or -- or hurt the situation at that point,

23   and there was another driver behind this vehicle

24   whose safety I needed to attend to, because this

25   situation could still escalate, and nobody was

1   back there tending to that because all these other

2   officers were involved.

3            So I actually, again, circled this whole

4   situation and came back to the driver toward the

5   rear and was talking to that individual, getting

6   their identification, making sure that they were

7   who they said they were.  And by the time I

8   handled that and turned back around, Mr. Kasper

9   was in custody.

10      Q.   Okay.  Now, did you hear any officer

11  make a statement to this effect, and I quote, "He

12  is one of our regulars"?

13      A.   I didn't hear that.

14      Q.   Did you make a statement to the effect,

15  and I quote, "He is one of our regulars"?

16      A.   If I didn't hear it, I very well

17  couldn't have said it, either.  No, sir.

18      Q.   Okay.  Now, Ski, has there ever been a

19  time where you were involved in a traffic stop --

20  strike that.

21            Has there ever been a time that you've

22  been involved in a safety checkpoint that a

23  driver's window was shattered?

24      A.   Other than this one?

25      Q.   Other than this one we're dealing with

1    today.

2        A.    I can't say that I recall.

3        Q.    Has there ever been a time that a -- you

4    were in a checkpoint and a driver rolled through

5    the checkpoint?

6        A.    Yes.

7        Q.    And notwithstanding that, there was no

8    shattering of the window?

9        A.    Not that I can recall.

10       Q.    Is that the standard protocol of

11   Lauderdale County Sheriff's Department to shatter

12   a window of a driver during a safety checkpoint?

13       A.    I think you asked and answered your own

14   question, Counselor.  This was a unique

15   circumstance.  The individual was moving toward

16   other deputies.  He had closed the window, which I

17   previously testified is abnormal.  Normally, if a

18   vehicle did these types of actions, we would be

19   able to reach into the window to resolve the

20   problem.  That was not the case here.

21       Q.    When you say "reach into the window to

22   resolve the problem," what are you making

23   reference to?

24       A.    Either by putting the vehicle into

25   "Park," taking the keys out, any number of things

1    that an officer could do to stop the threat that
2    was presenting.
3              MR. DENSON:  One moment.  Let me see if
4    we can finish up real quick.
5              (A short break was taken.)
6         Q.   (By Mr. Denson)  Ski, do you know or have
7    you -- strike that.
8              Have you had an encounter with any other
9    Kaspers during your tenure as a law enforcement
10   officer that you can readily recall?
11        A.   Other than this one, there -- there are
12   several other people by the name of Kasper that
13   I'm familiar with, but as -- as far as in the
14   conduct of my duties, no.
15        Q.   What about -- what about Chris Kasper?
16   Have you had an encounter with him in a previous
17   DUI arrest?
18        A.   Not to my recollection, no.
19        Q.   What about a Mark Kasper?
20        A.   There's a -- I don't believe so.  The --
21   the one that I -- I'm familiar with, there's an
22   Alan Kasper was a football coach that I had when I
23   was in school.
24        Q.   Okay.
25        A.   Now, I don't know if there's any

1    connection, familial or otherwise, between them.

2              MR. DENSON:  No further questions of

3    this witness.

4                  (Time Noted:  1:34 p.m.)

5                 SIGNATURE/NOT WAIVED

6

7    ORIGINAL:  JOSEPH A. DENSON, ESQ.

8    COPY:  LEE THAGGARD, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF DEPONENT
 2    DEPONENT:  ANDY MATUSZEWSKI
      DATE:  May 26, 2017
 3    CASE STYLE:  GLENN KASPER vs. THE BOARD OF
      SUPERVISORS OF LAUDERDALE COUNTY, MS, ET AL.
 4    ORIGINAL TO:  JOSEPH A. DENSON, ESQ.
             I, the above-named deponent in the
 5    deposition taken in the herein styled and numbered
      cause, certify that I have examined the deposition
 6    taken on the date above as to the correctness
      thereof, and that after reading said pages, I find
 7    them to contain a full and true transcript of the
      testimony as given by me.
 8             Subject to those corrections listed
      below, if any, I find the transcript to be the
 9    correct testimony I gave at the aforestated time
      and place.
10    Page      Line                    Comments
      ____      ____      _____
11    ____      ____      _____
      ____      ____      _____
12    ____      ____      _____
      ____      ____      _____
13    ____      ____      _____
      ____      ____      _____
14    ____      ____      _____
      ____      ____      _____
15    ____      ____      _____
      ____      ____      _____
16    ____      ____      _____
      ____      ____      _____
17
18         This the ____ day of _____, 2017.
19                          _____
                            ANDY MATUSZEWSKI
20    State of Mississippi
      County of _____
21
           Subscribed and sworn to before me, this the
22    _____ day of _____, 2017.
23    My Commission Expires:
24    _____    _____
25                                    Notary Public
```

1           CERTIFICATE OF COURT REPORTER

2           I, Ginger H. Brooks, Court Reporter and

3    Notary Public, in and for the State of

4    Mississippi, hereby certify that the foregoing

5    contains a true and correct transcript of the

6    testimony of ANDY MATUSZEWSKI, as taken by me in

7    the aforementioned matter at the time and place

8    heretofore stated, as taken by stenotype and later

9    reduced to typewritten form under my supervision

10   by means of computer-aided transcription.

11          I further certify that under the

12   authority vested in me by the State of Mississippi

13   that the witness was placed under oath by me to

14   truthfully answer all questions in the matter.

15          I further certify that, to the best of

16   my knowledge at the time of taking this

17   deposition, I am not in the employ of or related

18   to any party in this matter and have no interest,

19   monetary or otherwise, in the final outcome of

20   this matter.

21          Witness my signature and seal this the

22   8th day of June, 2017.

23                    _____

                        GINGER H. BROOKS, #1165

24                        CRR, RPR, CCR

    My Commission Expires:

25   September 18, 2017

Lauderdale County Sheriff's Department
Law Enforcement
Policies and Procedures

| Subject: Roadside Safety Checkpoints | Policy Number: 4.03 |
|---|---|
| Issue Date: July 26, 2002 | Revision Date: March 21, 2007 |
| Approval Authority<br>Title and Signature: *Sheriff William D. "Billy" Sollie* | |

## POLICY:

It is the policy of the Lauderdale County Sheriff's Department to help ensure public safety by attempting to ensure that all drivers are properly licensed and all vehicles appear to be in good working order and are equipped with lawfully mandated safety features. The department recognized the value of roadside safety checkpoints to identify vehicles and/or drivers illegally traversing the roads of the county. To this end, the following guidelines have been established to govern the use of such checkpoints.

## DEFINITION:

For the purposes of this policy, the following terminology will apply:

Checkpoint - A brief stop of the traffic for the purpose of uniformly checking for violations of law pertaining to validity of the driver's operators license, validity of the vehicle's license, occupant restraints, and working safety equipment (headlights, taillights, brake lights, turn signals, etc.)

Department – The Lauderdale County Sheriff's Department

Officer – Any sworn officer or deputy sheriff of the Lauderdale County Sheriff's Department

Sheriff – Sheriff of Lauderdale County

Chief Deputy – Chief Deputy as appointed by the Sheriff of Lauderdale County.

Ranking officer – Deputy Sheriff of the department with rank of sergeant or above.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.



EXHIBIT 1
A. Matuszewski
5/26/17
Ginger H. Brooks
CCR, CRR, RPR, RSA

## SITE SELECTION AND SUPERVISION:

The location, dates, and times of the checkpoints shall be determined by ranking officers of the department.  The safety of officers, safety of the public, history of motor vehicle collisions in the area, and minimum disruption of traffic will be the primary factors considered when choosing a site of a checkpoint.  Once the checkpoint is properly authorized, the ranking officer shall be responsible for the direction and control of the checkpoint.  The ranking officer may temporarily delegate this responsibility to a subordinate if the ranking officer is briefly unavailable.

## EXAMINATION PROCEDURES:

The checkpoint will operate with the officers temporarily stopping each pre-authorized vehicle which travels through the checkpoint.  The driver of each vehicle will be briefly observed to determine:

1. Initial Observations
   a) Driver's license (status)
   b) Vehicle license (status)
   c) Use of occupant restraints
   d) Motor vehicle safety equipment
   e) Proof of insurance subsequent to any other traffic offense

2. Secondary Observations
   a) Motor vehicle operation violations
   b) Signs of driver impairment
   c) Criminal activity

Every effort will be made by the officers manning the checkpoint to keep the length of each vehicle stop as brief as possible.  Any driver found in violation of any traffic law may be cited or arrested in compliance with applicable law.

This does not preclude any arrest based on probable cause of any other criminal law violation that the officer may discover.

## CHECKPOINT AVOIDANCE:

It is probable that some drivers operating a vehicle illegally will notice the checkpoint in advance and attempt to avoid traveling through it.  If officer availability permits, a patrol

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

vehicle may be stationed near the checkpoint for the purpose of stopping vehicles which are obviously attempting to avoid traveling through it. Drivers of vehicles stopped subsequent to this shall be observed and/or examined according to the examination procedure listed above.

## ENVIRONMENTAL CONSIDERATIONS:

Checkpoints will be conducted during day and night hours. When conducted at night, each officer present will be equipped with a flashlight and traffic safety vest. Marked units present will activate their emergency lighting, taking care not to blind other drivers.

Checkpoints will not be conducted in inclement weather, including but not limited to rain, ice, snow, fog.

Checkpoints will not be conducted if the surface of the roadway is determined to be unsafe due to precipitation.

Checkpoints will not be conducted in areas where visibility is limited, including but not limited to curves and valleys.

## REPORTS:

The ranking officer of the checkpoint shall report the results on written forms approved by the Sheriff for such purpose. This shall include the total number of vehicles traveling through the checkpoint, the selection of vehicle stopped, the number and type of citations issued.

## ROADSIDE SAFETY CHECKPOINTS:

This policy shall in no way be confused with roadside sobriety checkpoints, which are totally different. The guidelines for conducting roadside sobriety checkpoints are covered in policy 4.02 of this manual.

RESTRICTED LAW ENFORCEMENT DATA
This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.



EXHIBIT 2
A. Matuszewski
5/26/17
Ginger H. Brooks
CCR, CRR, RPR, RSA



EXHIBIT 3
A. Matuszewski
5/26/17
Ginger H. Brooks
CCR, CRR, RPR, RSA