# Exhibit "D"

Ruston Russell 6/1/2017

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

GLENN KASPER

                                                    PLAINTIFF


V.                  CIVIL ACTION NO. 3:15CV00613-WHB-JCG


THE BOARD OF SUPERVISORS
OF LAUDERDALE COUNTY, MS,
SHERIFF WILLIAM SOLLIE,
WESLEY STEPHENS, RUSTON
RUSSELL, JACOB MATHIS,
ANDY MATUSZEWSKI, THE
MISSISSIPPI HIGHWAY
PATROL, JEROME MOORE,
DEPUTY JUSTIN PUGH, AND
DEPUTY DYLAN ANDERSON,
AND OTHER UNNAMED
INDIVIDUALS, IN THEIR
PERSONAL AND BUSINESS
CAPACITIES

                                                   DEFENDANTS


             DEPOSITION OF RUSTON RUSSELL


    Taken at the instance of the Defendants at Barry,
   Thaggard, May & Bailey, LLP, 505 Constitution
    Avenue, Meridian, Mississippi, on Thursday,
       June 1, 2017, beginning at 3:06 p.m.




             NIKKI L. LLOYD, CCR #1870

Ruston Russell 6/1/2017

```
 1     APPEARANCES:

 2

 3          JOSEPH A. DENSON, ESQUIRE
            Denson & Associates, PLLC
 4          1931 23rd Avenue
            Meridian, Mississippi 39301
 5          josephadenson@hotmail.com

 6

                  COUNSEL FOR PLAINTIFF
 7

 8

            LEE THAGGARD, ESQUIRE
 9          Barry, Thaggard, May & Bailey, LLP
            505 Constitution Avenue
10          Meridian, Mississippi 39301
            thaggard@barrypalmerlaw.com
11

12                COUNSEL FOR DEFENDANTS

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ruston Russell 6/1/2017

```
 1                     INDEX
 2   Style......................................1
 3   Appearances................................2
 4   Index   ...................................3
 5   Certificate of Deponent  .................84
 6   Certificate of Court Reporter ............85
 7
 8                  EXAMINATION
 9   By Mr. Denson .............................4
10
11                   EXHIBITS
12   Exhibit 1  4.03 Policy ...................23
13   Exhibit 2  Photograph ...................31
14   Exhibit 3  Photograph ...................32
15   Exhibit 4  Photograph ...................44
16   Exhibit 5  Response to Resistance  .......59
              Report
17
     Exhibit 6  Ruston Russell's  ............77
18            Statement
19   Exhibit 7  Copy of an Abstract of  ......80
              the Ticket by Ruston Russell
20
     Exhibit 8  Resisting Arrest  ............81
21            Affidavit by Ruston Russell
22
23
24
25
```

Ruston Russell 6/1/2017

```
 1              COURT REPORTER:  Would you raise your
 2    right hand, please.
 3              Do you swear or affirm the testimony you
 4    are about to give in this cause will be the truth,
 5    the whole truth and nothing but the truth, so help
 6    you God?
 7              THE WITNESS:  I do.
 8              COURT REPORTER:  Thank you.
 9                   RUSTON RUSSELL,
10    having been first duly sworn, was examined and
11    testified as follows:
12                   EXAMINATION
13    BY MR. DENSON:
14       Q.   Okay.  Deputy Russell, of course, you
15    know I'm Joseph Denson representing Mr. Glenn
16    Kasper in this matter.
17              Have you had a deposition before?
18       A.   Yes, sir.
19       Q.   Okay.  In what cases?
20       A.   I don't recall.  I had one on a civil
21    lawsuit with Stewart Parrish and the attorneys
22    over there by Dr. Anderson's office --
23       Q.   Okay.
24       A.   -- in the parking lot.
25              MR. THAGGARD:  Will Simmons, Bill
```

Ruston Russell 6/1/2017

```
 1    Hammock.
 2              THE WITNESS:  Right, correct.
 3         Q.   (By Mr. Denson)  Okay.  All right.  As we
 4    go through this deposition, at any point in time
 5    that I give you a question that's not clear to you,
 6    just ask me to repeat it and I'll certainly do that.
 7    And if you don't and you answer, I'm assuming you
 8    are answering the question -- recall the question
 9    that I just asked.
10         A.   Okay.
11         Q.   And, of course, if we need a break, let
12    me know.  We'll take one.  And you understand
13    we're here for the deposition of the case -- for
14    your testimony of the case of Glenn Kasper versus
15    Lauderdale County Board of Supervisors?
16         A.   Yes, sir.
17         Q.   Now, have you talked to -- and this --
18    this incident occurred May 25th, I believe, 2014,
19    correct?
20         A.   I --
21         Q.   Is that -- May 24th?
22         A.   24th, I believe, yes, sir.
23              MR. THAGGARD:  That's right.
24         Q.   (By Mr. Denson)  Shortly after the
25    incident happened -- since that time, have you
```

Ruston Russell 6/1/2017

```
 1    talked to any officers about your statements or any
 2    testimony in preparation of deposition?
 3         A.   No, sir.
 4         Q.   Other than your lawyer, have you talked
 5    to any other person in administration with
 6    Lauderdale County?
 7         A.   No, sir.
 8              MR. THAGGARD:  Are you talking about in
 9    preparation for his deposition?
10         Q.   (By Mr. Denson)  In preparation for your
11    deposition is what I'm saying.
12         A.   That's what I assumed.
13         Q.   Okay.
14         A.   Yes, sir.
15         Q.   Now, I know you're -- this lawsuit
16    involved you and some coworkers.  Did you and some
17    of your coworkers talk about the events that
18    occurred with Mr. Kasper on May 24th, 2014,
19    shortly after the event occurred?
20         A.   Did we talk about what happened?
21         Q.   Yeah.
22         A.   That day?
23         Q.   Correct.  Did y'all discuss it?
24         A.   Yes, sir, I'm sure we did.
25         Q.   And when would you say that discussion
```

Ruston Russell 6/1/2017

```
 1    took place?
 2         A.    That night while working on the reports.
 3         Q.    So was -- and where did you -- where did
 4    you do your report?
 5         A.    Lauderdale County Sheriff's Department.
 6         Q.    Was there a specific -- do you have an
 7    office where you did your report?
 8         A.    In the deputy's office.
 9         Q.    Okay.  So --
10         A.    It moves periodically.
11         Q.    Okay.  So there was -- there's a series
12    of other computers in there where other reports
13    can be done?
14         A.    Yes, sir.
15         Q.    And when you did that report, did you do
16    it on the same night of the incident?
17         A.    I don't recall.  I believe so.
18         Q.    Okay.  And when you did your report,
19    other officers were in that same room?
20         A.    Yes, sir.
21         Q.    And those were the officers who were
22    in -- who was also involved in the incident with
23    Mr. Kasper that occurred on May 24th, 2014?
24         A.    Yes, sir.
25         Q.    Now, when you say, y'all were -- I asked
```

Ruston Russell 6/1/2017

```
 1    about discussion.  Were y'all discussing in
 2    realtime as you were doing the report or after the
 3    report was done?
 4              MR. THAGGARD:  Object to form.
 5         Q.   (By Mr. Denson)  Let me back up.  When --
 6    when you make reference to having a discussion with
 7    your coworkers about the incident with Mr. Kasper,
 8    was that discussion before you did your report?
 9         A.   Afterwards.
10         Q.   After you did your report.
11              Now, after you -- while you were having
12    this discussion with the other coworkers, did you
13    notice if the other coworkers were still typing on
14    the computer?
15              MR. THAGGARD:  Object to form.
16         Q.   (By Mr. Denson)  Let me -- strike that.
17              How many versions of your statement
18    did -- did you print out before you submitted it
19    to your supervisors?  And when I say statement,
20    I'm referring to the statement that you submitted
21    related to the incident on May 24th, 2014.
22         A.   The question is how many did I print?
23         Q.   Yeah.  Did you have a rough draft then a
24    final copy?
25         A.   No, sir.  I printed a copy when it was
```

Ruston Russell 6/1/2017

 1   finalized.

 2        Q.   And did you -- did you read other

 3   officers' reports?

 4        A.   No, sir.

 5        Q.   Tell me about that discussion.  What

 6   was -- what statements did you make during the

 7   discussion with the other officers while the

 8   reports were being made?

 9        A.   I don't recall what was said while we

10   were typing.  I was typing.

11        Q.   Okay.  But other officers were talking

12   to you while you were typing?

13        A.   No.  There was general conversation, I'm

14   sure, in the room, not one on one.

15        Q.   Okay.  And the general conversation

16   was -- was dealing with the incident with

17   Mr. Kasper that had just taken place?

18        A.   I can't testify to what may have been

19   said three years ago.

20        Q.   Okay.  And have you reviewed any items

21   in preparation for this deposition?

22        A.   I reviewed my statement earlier today.

23        Q.   Other than typing this statement and

24   hitting print, have you seen it since that time?

25        A.   Before now?

Ruston Russell 6/1/2017

```
1          Q.   Before today, yes.
2          A.   Yes, I saw it last night.
3          Q.   Is that the only statement that you
4    reviewed?
5          A.   No, sir.
6          Q.   What other statements did you review?
7          A.   The -- Deputy Matuszewski's and Deputy
8    Mathis.
9          Q.   Did you review -- is there any reason
10   you did not review Deputy Dylan Anderson's
11   statement?
12         A.   I don't recall reviewing his statement.
13         Q.   Did you have a copy of Deputy Dylan
14   Anderson's statement?
15         A.   I'm sure it's in there, yes, sir.
16         Q.   You said that you reviewed your
17   statement last night.  Did you review Mathis'
18   statement and Matuszewski's statement last night
19   as well?
20         A.   Yes, sir.
21         Q.   And did you review all three of those
22   statements today?
23         A.   Yes, sir.
24         Q.   What year were you born?
25         A.   1977.
```

Ruston Russell 6/1/2017

```
 1        Q.   And where is that place of birth?

 2        A.   Anderson Hospital.

 3        Q.   What city and state?

 4        A.   Meridian, Mississippi.

 5        Q.   And did you grow up here?

 6        A.   Mostly, yes, sir.

 7        Q.   So is that Meridian High School where

 8   you graduated?

 9        A.   No, sir.

10        Q.   Where did you graduate from?

11        A.   I did not.

12        Q.   Did you get a GED?

13        A.   Yes, sir.

14        Q.   What year did you receive your GED?

15        A.   I do not know.

16        Q.   Any college?

17        A.   No, sir.

18        Q.   Any certificate earned after receiving

19   your GED?

20        A.   What type of certificate?

21        Q.   Any educational certificates outside of

22   police training.

23        A.   No, sir.

24        Q.   And are you married?

25        A.   Yes, sir.
```

Ruston Russell 6/1/2017

```
 1        Q.   Your spouse's name?

 2        A.   Diane Russell.

 3        Q.   And the cell number that you use for

 4   your job -- you use a cell phone for your -- for

 5   your employment?

 6        A.   General -- mostly use my personal

 7   number.

 8        Q.   Okay.  And what is that number?

 9        A.   (601)527-1621.

10        Q.   And have you been issued a -- a phone by

11   Lauderdale County to use?

12        A.   Yes.

13        Q.   What is that number?

14        A.   I could not tell you.

15        Q.   Now, this cell phone number that you

16   just gave me, is that the same cell number you had

17   on the date of May 24th, 2014?

18        A.   Yes, sir.

19        Q.   Have you ever been arrested?

20        A.   No, sir.

21        Q.   And when I say arrested, I mean cuffs

22   placed on you.

23        A.   Cuffs have been placed on me --

24        Q.   Okay.

25        A.   -- in training.
```

Ruston Russell 6/1/2017

```
 1        Q.    In training.

 2              Okay.  Have you ever been charged with a

 3    crime?

 4        A.    Other than traffic?

 5        Q.    Other than traffic.

 6        A.    No, sir.

 7        Q.    And how long have you been working as

 8    a -- working at Lauderdale County Sheriff's

 9    Office?

10        A.    Fourteen years.

11        Q.    That would put you starting at 2003?

12        A.    Yes, sir.

13        Q.    And where did you work before that?

14        A.    Meridian Police Department.

15        Q.    How long did you work at Meridian Police

16    Department?

17        A.    A year.  A year.

18        Q.    And the reason for your transfer?

19              MR. THAGGARD:  Object to form.

20        Q.    (By Mr. Denson)  What was the reason for

21    your departure from Meridian Police Department?

22        A.    Just to come to work for the Sheriff's

23    Department.

24        Q.    So it was a voluntary departure?

25        A.    Yes, sir.
```

Ruston Russell 6/1/2017

1        Q.    Have you been suspended from any -- in
2    your last 14 years of work, have you been
3    suspended from duty at Lauderdale County Sheriff's
4    Office?
5        A.    No, sir.
6        Q.    Have you ever been fired from Lauderdale
7    County Sheriff's Office --
8        A.    No, sir.
9        Q.    -- during that time?
10            Have you received any notice of
11    complaints -- strike that.
12            Have you received any complaints while
13    an officer, official complaints from Lauderdale
14    County, while an officer for the last 14 years?
15            MR. THAGGARD:  Object to form.
16        Q.    (By Mr. Denson) Let me repeat that --
17    strike that.
18            Let me ask you another question:  Has
19    there been any complaints filed against you, to
20    your knowledge, regarding abuse of authority or
21    excessive force?
22            MR. THAGGARD:  Object to form.
23        Q.    (By Mr. Denson) He's -- he's just
24    objecting.  It doesn't mean you can't answer.
25            MR. THAGGARD:  That's fine.  You can

Ruston Russell 6/1/2017

```
 1    answer to the extent that you know.
 2              THE WITNESS:  Oh, could you rephrase
 3    that -- I mean, state it again, please.
 4         Q.   (By Mr. Denson)  Okay.  Since you've been
 5    employed at Lauderdale County Sheriff's Office, have
 6    you received any complaints, written or verbal,
 7    related to abuse of authority or excessive force?
 8         A.   Yes, sir.
 9              MR. THAGGARD:  Object to form.
10         Q.   (By Mr. Denson)  Have you received -- have
11    you ever received a -- a complaint for abuse of --
12    of authority?
13              MR. THAGGARD:  Object to form.
14         Q.   (By Mr. Denson)  Let me -- let me go back.
15    In your last 14 years of working with Lauderdale
16    County, have you received a complaint for abuse of
17    authority?
18              MR. THAGGARD:  Same objection; object to
19    form.
20              THE WITNESS:  I don't recall.
21         Q.   (By Mr. Denson)  Okay.  What about -- do
22    you know of any excessive force complaints filed
23    against you while working at Lauderdale County?
24         A.   No, sir.
25         Q.   Do you know of any abuse of authority
```

Ruston Russell 6/1/2017

```
 1    complaints filed against you while working at
 2    Lauderdale County Sheriff's Office?
 3              MR. THAGGARD:  Object to form.
 4              THE WITNESS:  No, sir.
 5         Q.   (By Mr. Denson)  Okay.  I asked you about
 6    demotions -- I'm sorry.  I asked you about
 7    suspensions, but has there ever been a reason for a
 8    demotion while you have been employed at Lauderdale
 9    County Sheriff's Department?
10         A.   No, sir.
11         Q.   What about reprimands?
12         A.   Yes.
13         Q.   And do you know -- well, before we get
14    there.  How many reprimands would you say you've
15    received in your 14 years?
16         A.   One.
17         Q.   And what was that reason; do you recall
18    it?
19         A.   Employees not happy.
20         Q.   Employee is not?
21         A.   Employees.
22         Q.   Okay.
23         A.   Not the public.
24         Q.   So is that in your capacity as a -- as
25    a -- are you a lieutenant?
```

Ruston Russell 6/1/2017

```
 1        A.    Lieutenant, yes, sir.

 2        Q.    So that was in your capacity as a

 3    lieutenant?

 4        A.    Yes, sir.

 5        Q.    And when was that reprimand?

 6        A.    I don't recall the date, sir.

 7        Q.    Do you recall the year; 2015, 2016?

 8        A.    I believe it was this year, the

 9    beginning of the year.

10        Q.    Do you have any knowledge of an abuse of

11    authority complaint filed against Andy

12    Matuszewski --

13             MR. THAGGARD:  Object --

14        Q.    (By Mr. Denson)  -- since he's been

15    employed at Lauderdale County?

16             MR. THAGGARD:  Object to form.

17             THE WITNESS:  No, sir.

18        Q.    (By Mr. Denson)  Do you have any knowledge

19    of an excessive force complaint issued by Lauderdale

20    County on a Dylan Anderson?

21             MR. THAGGARD:  Object to form.

22             THE WITNESS:  Do I have any knowledge?

23        Q.    (By Mr. Denson)  Yes.

24        A.    No, sir.

25        Q.    Do you have any knowledge of any
```

Ruston Russell 6/1/2017

```
 1    complaints regarding Wesley Stephens during his

 2    time that he was working at Lauderdale County?

 3         A.    What type of complaints?

 4         Q.    Abuse of authority.

 5               MR. THAGGARD:  Object to form.

 6               THE WITNESS:  I don't know about the

 7    abuse of authority.

 8         Q.    (By Mr. Denson)  What about excessive

 9    force?

10         A.    No, sir.

11         Q.    Do you know any -- other than Mr. Glenn

12    Kasper here, do you know any of the members of the

13    Kasper family?

14         A.    I do.

15         Q.    And what members do you know?

16         A.    Chris and Mark.

17         Q.    How do you know Chris Kasper?

18         A.    Initially?

19         Q.    Well, let me go back -- strike that --

20    that last question.

21               How long have you known Chris Kasper?

22         A.    Approximately 14 years.

23         Q.    And how did you come to know him?

24         A.    Through the Sheriff's Department.

25         Q.    Have you -- is that through an arrest?
```

Ruston Russell 6/1/2017

```
 1        A.   Yes, sir, many.

 2        Q.   When you say many, how many arrests

 3   would you --

 4        A.   I don't recall, sir.

 5        Q.   Over five?

 6        A.   Yes, sir.

 7        Q.   Over ten?

 8        A.   More than likely.

 9        Q.   Over 20?

10        A.   I wouldn't go that far.

11        Q.   And would -- would at least one of those

12   arres- -- arrests be DUI related?

13        A.   I believe so.

14        Q.   Have you ever arrested Chris Kasper for

15   any other reason other than DUI?

16        A.   Yes, sir.

17        Q.   And do you recall what was the basis for

18   the other arrests?

19        A.   Not in particular.

20        Q.   And you said there was at least one DUI

21   that you recall.  Do you recall a second DUI

22   arrest?

23        A.   No, sir.

24        Q.   And when you encountered Chris Kasper,

25   was that a -- well, do you recall those arrests
```

Ruston Russell 6/1/2017

```
 1   being violent or --
 2        A.   No, sir, never.
 3        Q.   -- or you having any problems?
 4        A.   No, sir.
 5        Q.   You mentioned another Kasper?
 6        A.   Mark.
 7        Q.   Mark Kasper.  And how long have you
 8   known Mark Kasper?
 9        A.   Just about the same.
10        Q.   So when you say about the same, 14
11   years?
12        A.   Yes, sir.
13        Q.   And how did you come to know Mark
14   Kasper?
15        A.   Calls through the Sheriff's Department.
16        Q.   Have you ever arrested Mark Kasper for a
17   DUI related crime?
18        A.   No, sir.  Not that -- not that I recall.
19        Q.   And when -- over the 14 years, when -- I
20   don't -- I don't think I've gotten there.  The
21   question is this:  Have you ever had to in
22   effect -- to effect an arrest of Mark Kasper?
23        A.   Have I --
24        Q.   Have you ever had to arrest Mark Kasper?
25        A.   Yes, sir.
```

Ruston Russell 6/1/2017

```
 1        Q.   And in arresting Mark Kasper, did you
 2   have to -- any time have to file a resistance
 3   report?
 4        A.   No, sir.
 5        Q.   And the question would be the same for
 6   Chris Kasper.  During any times of your arrests
 7   to -- of Chris Kasper, did you have to file a
 8   resistance report later?
 9        A.   No, sir.
10        Q.   Do you know any other members of the
11   Kasper family other than Mr. Glenn Kasper sitting
12   beside me?
13        A.   Mark Kasper's wife.  I'm not sure if
14   she's still his wife or not, but the lady he was
15   married to.
16        Q.   Okay.  Do you know her name?
17        A.   Connie Susan Moore Kasper.
18        Q.   And how long have you known Connie Susan
19   Moore Kasper?
20        A.   Approximately 14 years, I would assume.
21        Q.   And have you ever had to effect an
22   arrest of -- I'm just going to call her
23   Ms. Kasper?
24        A.   Have I ever arrested her?
25        Q.   Yes, sir.
```

Ruston Russell 6/1/2017

```
 1        A.   Yes.
 2        Q.   Was it for a DUI related crime?
 3        A.   That I arrested her for?
 4        Q.   Yes.
 5        A.   No, sir.
 6        Q.   Do you recall what reason you had to
 7   arrest Ms. Kasper?
 8        A.   No, sir.
 9        Q.   How many times would you say you
10   encountered Ms. Kasper as a law enforcement
11   officer over your 14 years?
12        A.   Many.
13        Q.   Many would be over ten?
14        A.   Yes, sir.
15        Q.   Is that ten plus arrests?
16        A.   From me personally?
17        Q.   From you.
18        A.   No, sir.
19        Q.   Okay.  Just ten encounters?
20        A.   Yes, sir.
21        Q.   Okay.  And as a law enforcement officer,
22   have you ever encountered Mr. Glenn Kasper here in
23   your capacity as a law enforcement officer other
24   than on May 24th, 2014?
25        A.   No, sir.
```

Ruston Russell 6/1/2017

```
 1        Q.   Chris Kasper, would you know him if you
 2   saw him?
 3        A.   Yes, sir.
 4        Q.   Mark Kasper, would you know him if you
 5   saw him?
 6        A.   Yes, sir.
 7        Q.   This is going to be my first exhibit
 8   here.  That's the 4.03 Policy.
 9             Okay.  What you have in your hand is
10   what's been marked as Exhibit 1 for this
11   deposition.  It's I believe Policy No. 4 --
12        A.   .03.
13        Q.   -- .03.
14             Okay.  And that's the -- that's the
15   checkpoint -- safety checkpoint policy for
16   Lauderdale County, correct?
17        A.   Yes, sir.
18             (Exhibit 1 marked for identification.)
19        Q.   (By Mr. Denson)  And let me -- let me see
20   here.  I'm going to show you Page 2 of -- of this
21   Exhibit 1.  Under Examination Procedures, it
22   identifies certain -- the specific procedures that
23   Lauderdale County says that their deputies should
24   use at a safety checkpoint, correct?
25        A.   Yes, sir.
```

Ruston Russell 6/1/2017

```
 1        Q.   And 1(a) under Initial Observations --
 2   first a -- and tell me if I'm wrong, but first the
 3   officer should determine if the driver had a
 4   driver's license, correct?
 5        A.   Yes, sir.
 6        Q.   And it goes 1(b), then you determine the
 7   status of the tag, correct?
 8        A.   Yes, sir.
 9        Q.   And then there's a determination whether
10   the occupant had seatbelts?
11        A.   Yes, sir.
12        Q.   I believe that's 1(c).
13             Okay.  And then there's secondary
14   considerations under No. 2(a), (b) and (c),
15   correct?
16        A.   Yes, sir.
17        Q.   And is -- is it your understanding that
18   this is what Lauderdale County requires their
19   deputies to follow every time a safety checkpoint
20   is made?
21        A.   Yes, sir.
22        Q.   Now, have you -- prior to today, have
23   you ever had a chance to see this specific
24   document here, Policy 4.03?
25        A.   Yes, sir.
```

Ruston Russell 6/1/2017

```
 1        Q.   And when was that?
 2        A.   I don't recall.
 3        Q.   Is -- is this something that you see
 4   during training or --
 5        A.   This policy?
 6        Q.   -- or what?
 7        A.   This policy?
 8        Q.   Yes.
 9        A.   I have read this policy.  I can't tell
10   you the date.
11        Q.   Would you say you read it in -- the
12   revision date on the policy shows March 21st,
13   2007.  Would you say you read it shortly after
14   that time?
15        A.   Yes, sir.
16        Q.   Okay.
17        A.   And -- yes.
18        Q.   Do you recall reading it at any time
19   around the date of May 4 -- 24th, 2014?
20        A.   No, sir.
21        Q.   Has -- do you know if Lauderdale County
22   gave you any training related to that particular
23   policy?
24        A.   I don't recall.
25        Q.   So is it your testimony you've never
```

Ruston Russell 6/1/2017

```
 1   been trained regarding safety checkpoints?
 2              MR. THAGGARD:  Object to form.
 3              THE WITNESS:  The policy or conducting a
 4   checkpoint?
 5        Q.   (By Mr. Denson)  Conducting a safety
 6   checkpoint -- strike that question.
 7              Is it -- is it your testimony that you
 8   have not been trained by Lauderdale County on the
 9   procedure to conduct a safety checkpoint?
10        A.   I still don't understand the question.
11   Are you talking about the policy or actually being
12   on the road training, doing --
13        Q.   No, I'm not dealing with the policy
14   right now.
15        A.   Okay.
16        Q.   I'm saying, is it your testimony that
17   you have not been trained by Lauderdale County
18   related to the procedures for a safety checkpoint?
19        A.   I've gone through the procedures, yes,
20   sir.
21        Q.   So you've been trained by Lauderdale
22   County?
23        A.   On the policy, yes.
24        Q.   On the policy.  And who gave you that
25   training, if you know?
```

Ruston Russell 6/1/2017

```
 1        A.    I don't recall.

 2        Q.    And when was that training given?

 3        A.    I don't recall.

 4        Q.    Was it given -- is it your testimony

 5   that that -- that you -- this safety checkpoint

 6   training was given after March 21st, 2007?

 7        A.    Yes, sir.

 8        Q.    Do you recall in what way it was given?

 9        A.    No, sir.

10        Q.    Was that a mock safety checkpoint when

11   the training was given?

12        A.    To the best of my knowledge, it was

13   verbal.

14        Q.    Okay.  What do you mean by that?

15        A.    Going over the policy.

16        Q.    Okay.  Was that done in a -- with a

17   group of deputies in a course?

18        A.    I have not been to a course, no, sir.

19        Q.    So are you saying this policy was just

20   read to you?

21        A.    Yes, sir, and we have written it.

22        Q.    But other than having the policy read to

23   you, that is the extent of what you understand as

24   to training by Lauderdale County for that policy?

25        A.    Yes, sir.
```

Ruston Russell 6/1/2017

```
 1        Q.   Now, according to that policy, 4.03, is
 2   a driver required to exit his vehicle in order to
 3   perform the tasks that we went over in -- on Page
 4   2 of that Exhibit 1?
 5        A.   Are --
 6        Q.   According to that policy -- I'm asking
 7   you to turn to Page 2, which you've done.
 8        A.   Right.
 9        Q.   Initial Observations, is the driver
10   required to exit their vehicle for the initial --
11   for the initial observations?
12        A.   No, sir.
13        Q.   Is a driver required to exit their
14   vehicle for the part two?
15        A.   This one (indicating)?
16        Q.   For the secondary observations.
17        A.   They could be asked if there were signs
18   of impairment --
19        Q.   Okay.
20        A.   -- by the driver, yes, sir.
21        Q.   Other than signs of impairment, would
22   there be a reason to ask the driver to exit the
23   car?
24        A.   Also under (c), criminal activity.
25        Q.   And when you say, criminal activity,
```

Ruston Russell 6/1/2017

```
 1   what do you mean?
 2       A.   I just read what you asked.  It says
 3   criminal activity.
 4       Q.   Oh, I understand, but what I'm -- my
 5   question -- I'm asking you to interpret that for
 6   me.  When you see -- when it says criminal
 7   activity, what -- how do you interpret that?
 8       A.   There could be any list of criminal
 9   activity.
10       Q.   Okay.
11       A.   That's very vague.
12       Q.   Okay.  Now, on May 24th, 2014, you were
13   at a safety checkpoint at Allen Swamp and Pine
14   Springs Road, correct?
15       A.   Yes, sir.
16       Q.   And were you the lieutenant over that --
17   were you a lieutenant at that time?
18       A.   Yes, sir.
19       Q.   And were you the supervisor of that
20   safety checkpoint?
21       A.   Sergeant Cokel.
22       Q.   Are you saying Sergeant Cokel was the
23   supervisor?
24       A.   Yes, sir.
25       Q.   Okay.
```

Ruston Russell 6/1/2017

```
 1        A.   He was the shift sergeant on scene that
 2   night.
 3        Q.   What was your assignment at the safety
 4   checkpoint that night or that evening?
 5        A.   I was checking traffic on Allen Swamp
 6   Road that were traveling eastbound.
 7        Q.   When you say checking traffic --
 8        A.   Checking --
 9        Q.   -- explain for me.
10        A.   -- vehicles.
11        Q.   Doing the initial observation that we
12   just went over?
13        A.   Yes, sir.  Yes, sir.
14        Q.   And was that about 7- -- 7:49 p.m.?
15        A.   Yes, sir.
16        Q.   Was that, best of your recollection,
17   daytime or nighttime?
18        A.   Daytime.
19        Q.   And at the time Mr. Kasper showed up,
20   how many cars have gone through -- approximately
21   gone through that checkpoint -- strike that.
22             How long had that checkpoint been going
23   on before Mr. Kasper pulled up?
24        A.   I don't recall, sir.
25        Q.   This is going to be Exhibit 2 here.  I
```

Ruston Russell 6/1/2017

```
 1   want to show you a picture here.

 2        A.   Yes, sir.

 3             (Exhibit 2 marked for identification.)

 4        Q.   (By Mr. Denson)  Now, from -- from last --

 5   from the time that you were at Swamp -- Allen Swamp

 6   and Pine Springs Road, is this an accurate

 7   reflection of that -- of that location -- of the

 8   intersection of that location?

 9        A.   Of the intersection, yes, sir.

10        Q.   And is that -- the truck that's there in

11   Exhibit 2, do you recall if that's the same or

12   similar truck that Mr. Kasper had?

13        A.   Yes, sir.

14        Q.   Now, I want you, if you can, to explain

15   to me where you were.  I think your testimony is

16   you were on Allen Swamp Road checking traffic?

17        A.   Yes, sir.

18        Q.   I want you to draw on Exhibit 2 where

19   you were, if you can.  You got a pen?

20        A.   Yes, sir.

21        Q.   We've been having issues with thickness,

22   so it -- it may or may not show up.

23        A.   Well, it's hard to tell on this

24   diagram -- on this picture from this angle.

25   That's -- the truck is not where it was.
```

Ruston Russell 6/1/2017

```
 1        Q.   Okay.  Let me see if I can get you
 2   another picture.  Let me have this marked as
 3   Exhibit 3.
 4             Okay.  Let me show you what's been
 5   marked as Exhibit 3.  I believe it's another
 6   vantage point at that same intersection.  And on
 7   Exhibit 3, there is no vehicle.
 8        A.   Yes, sir.
 9             (Exhibit 3 marked for identification.)
10        Q.   (By Mr. Denson)  On Exhibit 3, can you
11   mark where you say you were located at the time you
12   saw Mr. Kasper first.
13        A.   Not the -- I can't mark it exactly,
14   because -- but it was around about in this area.
15        Q.   Okay.  Can you go ahead and make me a
16   stick figure and put Russell beside it.
17        A.   (Complying.)
18        Q.   Okay.  Let me see that.  Okay.  And at
19   the time you saw Mr. Kasper, were you -- did you
20   have a car that you were dealing with, a car or a
21   vehicle where you were checking traffic at that
22   vehicle?
23        A.   Did I?
24        Q.   Yes.
25        A.   No, sir.
```

Ruston Russell 6/1/2017

```
 1          Q.    Okay.  So tell me what happened.
 2     Mr. Kasper, of course, approached the
 3     intersection.
 4          A.    Yes, sir.
 5          Q.    And when he approached the
 6     intersection -- you have indicated on Exhibit 3
 7     where you were -- can you show me where Mr. Kasper
 8     stopped the first time?
 9               MR. THAGGARD:  Object to form.
10          Q.    (By Mr. Denson)  Can you show me on
11     Exhibit 3 where -- when you first encountered
12     Mr. Kasper -- the location of his truck when you
13     first encountered him?
14          A.    I still don't understand.  When I first
15     saw him?
16          Q.    Okay.  So when you saw him, he was,
17     what, a quarter mile out?
18          A.    He was down the road coming, yes, sir.
19          Q.    Okay.  Do you recall his truck slowing
20     down?
21          A.    Yes, sir.
22          Q.    And could you put on Exhibit 3 where his
23     truck was located when you noticed him slowing
24     down.
25          A.    No, sir.
```

Ruston Russell 6/1/2017

```
 1        Q.   Okay.  Can you put on Exhibit 3 the
 2   location of Mr. Kasper's truck at -- when you say
 3   he made a complete stop?
 4        A.   He -- I'm confused on the question,
 5   because at no point in time did Mr. Kasper ever
 6   make a complete stop.
 7        Q.   Okay.  I'll get back to that.  Were
 8   there other officers out there on the scene?
 9        A.   Yes, sir.
10        Q.   And do you recall where the other
11   officers were?
12        A.   Vaguely, yes, sir.  I know there were
13   two in the intersection, and Deputy Matuszewski
14   was somewhere right in here (indicating) to my
15   right.
16        Q.   Okay.  And the two in the intersection,
17   was that on Pine Springs Road?
18        A.   Yes, sir.
19        Q.   Now, at some point in time, you began to
20   communicate with Mr. Kasper, correct?
21        A.   Yes, sir, I attempted.
22        Q.   And I won't see the loc- -- I want you
23   to draw me the location of Mr. Kasper's truck when
24   you made your first communication with him.
25        A.   (Complying.)
```

Ruston Russell 6/1/2017

```
 1        Q.   Let me see that.  Okay.  And if you can,
 2   put a one inside that box there.
 3        A.   (Complying.)
 4        Q.   Now, what communication did you make to
 5   Mr. Kasper at that location?
 6        A.   I asked him to stop his vehicle.
 7        Q.   Okay.  And according to where you placed
 8   the mark where Mr. Kasper's vehicle was, is it in
 9   front of the stop sign on Allen Swamp or is it
10   after -- past the stop sign?
11        A.   We were right there in the general area
12   of the stop sign.
13        Q.   Okay.
14        A.   I can't -- I couldn't say whether I was
15   exactly in front of it or not.
16        Q.   Was Mr. Kasper's truck before the stop
17   sign or after the stop sign when you first
18   encountered him?
19        A.   When I began -- when I spoke?
20        Q.   Yeah.  When you first had communication
21   with him.
22        A.   He was coming by the stop sign.
23        Q.   Okay.  So he had not come through the
24   stop sign -- past the stop sign line yet?
25        A.   There's not a line in the road.
```

Ruston Russell 6/1/2017

1        Q.   Okay.  I'm going -- I want you to take a

2   look at Exhibit 2 here.  Do you see that white

3   spot there (indicating)?

4        A.   I can't tell what that is.  I don't

5   recall, there may be a faded line, but there's not

6   a big stop bar there that I recall.

7        Q.   Okay.  So is it your testimony that when

8   you had your first communication with Mr. Kasper

9   that he was in front of the -- strike that.

10           Is it your testimony that when you had

11   your first communication with Mr. Kasper that he

12   was approaching the stop sign or he had passed the

13   stop sign?

14        A.   Passed -- was passing the stop sign.

15        Q.   Passing the stop sign.

16           And on Exhibit 3, you -- you show that

17   there's a stop right close to the stop sign?

18        A.   Yes, sir.

19        Q.   And it is your testimony that he stopped

20   there?

21        A.   No, sir.

22        Q.   Okay.  But that's just the place where

23   you had your first encounter with Mr. Kasper?

24        A.   Yes, sir.  You asked where I spoke to

25   him first.

Ruston Russell 6/1/2017

```
 1        Q.   Okay.  And what words did you -- did
 2   you -- did you use when you spoke to him first at
 3   that location?
 4        A.   Stop.
 5        Q.   Okay.  And was Mr. Kasper's window up or
 6   down at that time?
 7        A.   Up.
 8        Q.   It was up.  And you're speaking to me in
 9   a low, calm tone.  Now, were you speaking at that
10   low, calm tone at the time you first asked
11   Mr. Kasper to stop his vehicle?
12        A.   I doubt it.
13        Q.   Okay.  Was it a holler at that time?
14        A.   Yes, sir, I'm sure.
15        Q.   Okay.  Now, did Mr. Kasper -- I want you
16   to indicate on this -- on Exhibit 3 or Exhibit 1
17   if you -- or Exhibit 2, if you can, where did
18   Mr. -- where did Mr. Kasper ultimately stop
19   according to your testimony?
20        A.   (Complying.)
21        Q.   Can you draw me a rectangle and, of
22   course, that line would be the front of his
23   vehicle?
24        A.   (Complying.)  You want me to draw a
25   vehicle?
```

Ruston Russell 6/1/2017

```
 1        Q.   Yes, no wheels, just a rectangle.
 2        A.   I'm trying to place this -- it's -- it's
 3   a bad picture.  That's the front of the vehicle.
 4        Q.   Okay.  Now, at this time, would you say
 5   he's on Pine Springs Road or he's on Allen Swamp
 6   Road, based on what you drew on Exhibit 2?
 7        A.   We were right there at the
 8   intersection -- the front.  It's a big
 9   intersection --
10        Q.   Uh-huh.
11        A.   -- and we were in the intersection.
12        Q.   Okay.  And do you recall where the
13   two -- you referenced there were two other
14   officers on Pine Springs Road.  Do you recall
15   where those two officers were at the time Mr. --
16   where you indicated Mr. Kasper's truck stopped?
17        A.   Yes, sir.  They were right here
18   (indicating).
19        Q.   And -- and for the record, you're
20   showing they're beyond what the picture is
21   indicating on Exhibit 2?
22        A.   Yes, sir.
23        Q.   How many feet would you say that
24   Mr. Kasper's truck was away from the other two
25   officers?
```

Ruston Russell 6/1/2017

```
 1        A.   I'd say 14, guessing roughly.
 2        Q.   Okay.  Now, you -- you started out
 3   saying that you saw Mr. Kasper's truck about a
 4   quarter mile out.  Did -- while he was
 5   approaching -- his truck was approaching the
 6   intersection, did you notice the truck speeding up
 7   or slowing down?
 8        A.   Slowing.
 9        Q.   And how many miles per hour would you
10   say that Mr. Kasper's truck was going at the time
11   that you first communicated with him?
12             MR. THAGGARD:  Object to form.
13             THE WITNESS:  I don't know how many
14   miles an hour he was going.
15        Q.   (By Mr. Denson)  Okay.
16        A.   It was slow.
17        Q.   Okay.  So you said you told Mr. Kasper
18   to stop.  At some point, Mr. Kasper did stop,
19   correct?
20        A.   Mr. Kasper did not, no, sir.
21        Q.   Mr. Kasper's truck never stopped?
22        A.   The truck did.
23        Q.   The truck did stop?
24        A.   Yes, sir.
25        Q.   How would you say the truck stopped?
```

Ruston Russell 6/1/2017

```
 1          A.   I put it in park and --
 2          Q.   And you told me his windows were up.
 3     How did you manage that?
 4          A.   Because I broke the window.
 5          Q.   Okay.  And how did you break it -- bust
 6     his window?
 7          A.   With my arm.
 8          Q.   And why did you do that?
 9          A.   Because I figured that Mr. Kasper was
10     fixing to strike the other two officers.
11          Q.   Okay.  Even though you just testified
12     that he was slowing down prior to getting to that
13     intersection, correct?
14          A.   No, prior to getting to the
15     intersection, he was slowing down.
16          Q.   Did he speed up after you encountered
17     him the first time?
18          A.   Yes, sir.
19          Q.   And why do you say he sped up?
20          A.   Repeat that question.
21          Q.   Why did you say Mr. Kasper sped up after
22     he approached the intersection?
23          A.   Because he sped up.
24          Q.   Did you hear an engine raise?
25          A.   I observed the vehicle speed up.
```

Ruston Russell 6/1/2017

```
 1        Q.    Okay.  And when you -- when you say you
 2   observed the vehicle speed up, what distance would
 3   you say the car went from the time the car was
 4   going -- Mr. Kasper's truck was going slow to the
 5   time it sped up?
 6        A.    I don't understand the question.
 7        Q.    After you say you heard -- you observed
 8   the car speeding up, was that a distance of
 9   two feet, five feet?
10        A.    I don't recall, sir.  It was -- it
11   happened this quick (demonstrating).  It didn't
12   get -- it didn't go far.
13        Q.    Okay.  So did you have to run alongside
14   the car?
15        A.    No, sir.
16        Q.    So even though your testimony is the car
17   sped up, you stayed still and you were still able
18   to be beside Mr. Kasper's truck?
19        A.    At no point --
20              MR. THAGGARD:  Object to form.  Go
21   ahead.
22              THE WITNESS:  At no point did I ever say
23   I stood still.
24        Q.    (By Mr. Denson)  Okay.  So did you walk
25   along Mr. Kasper's truck?
```

Ruston Russell 6/1/2017

```
 1        A.   Yes, sir.
 2        Q.   And was that a brisk walk or a casual --
 3   you were casually walking beside him?
 4        A.   Yes, sir.
 5        Q.   I'm sorry?  You said, yes, sir.  I'm not
 6   sure which one.
 7        A.   Casual.  I wasn't running.
 8        Q.   Okay.  So -- and even though it was a
 9   casual walk, what you're deeming to be
10   Mr. Kasper's truck speeding up, it didn't pass
11   you, the truck did not pass you while you were
12   walking?
13        A.   Because I got inside of it.
14        Q.   So did you get inside of it before it
15   sped up or did you get inside of it --
16        A.   As it was speeding up.
17        Q.   As it was speeding up.  So did you ever
18   begin to run?
19        A.   No, sir.
20        Q.   So even though you're saying you got in
21   it as the truck was speeding up, did your pace of
22   walking ever change?
23        A.   Yes, sir, right -- for a brief second,
24   yes.
25        Q.   For a second your pace of walking
```

Ruston Russell 6/1/2017

```
 1   changed?
 2        A.   Yes, sir.
 3        Q.   And other than telling Mr. Kasper -- you
 4   told me -- you said you asked Mr. Kasper to stop.
 5   When you first encountered him -- when you first
 6   communicated with him, was that the only time you
 7   asked him to stop?
 8        A.   To the best of my knowledge, yes, sir.
 9        Q.   So you broke, as you say, Mr. Kasper's
10   window.  What did you do after you broke
11   Mr. Kasper's window?
12        A.   I entered the vehicle through the
13   window, the open window, and I placed the vehicle
14   in park.
15        Q.   And while you were placing the vehicle
16   in park, what was Mr. Kasper doing?
17        A.   Screaming.
18        Q.   What was he saying?
19        A.   Nothing.
20        Q.   He was just screaming?
21        A.   Just screaming.
22        Q.   And at the time that you were
23   reaching -- obviously, you were reaching for the
24   gear shifter, correct?
25        A.   Yes, sir.
```

Ruston Russell 6/1/2017

```
 1        Q.   At the time you were reaching for the
 2   gear shifter, were you running alongside
 3   Mr. Kasper's truck?
 4        A.   No, sir.  I was leaning over the driver
 5   door.
 6        Q.   Okay.  So during this time, the truck
 7   was speeding up in your opinion?
 8        A.   Yes, sir.
 9        Q.   But you're still walking?
10        A.   Not at that point.  I was hanging inside
11   the vehicle.  My feet weren't even on the ground.
12        Q.   Are you saying the vehicle was -- was
13   dragging you?
14        A.   No, sir.  I wasn't being drug.
15        Q.   Would you mark this as Exhibit 4.
16             I want to show you what's been marked as
17   Exhibit 4 in this deposition.  Is this the same
18   side view that you had at the time you encountered
19   Mr. Kasper's truck on May 24th, 2014?
20        A.   Yes, sir.
21             (Exhibit 4 marked for identification.)
22        Q.   (By Mr. Denson)  And you see the truck
23   have some -- I think it's a side step or something.
24   Do you see that side --
25        A.   Running bars.
```

Ruston Russell 6/1/2017

```
 1        Q.   What do you call it?

 2        A.   Running bars.

 3        Q.   Running bars.  Is it your testimony that

 4   you -- you leaped onto the running bar while

 5   trying to put Mr. Kasper's vehicle in park?

 6        A.   No, sir.

 7        Q.   And when Mr. Kasper's vehicle went into

 8   park, did you feel a -- did the vehicle stop at

 9   that moment?

10        A.   Yes, sir.

11        Q.   Now, at any point in time, did you --

12   did you -- was the vehicle pushed forward or did

13   you seem -- did the vehicle seem to rock forward

14   viciously as a result of that vehicle being placed

15   in park by you?

16             MR. THAGGARD:  Object to form.

17        Q.   (By Mr. Denson)  Do you recall the vehicle

18   moving forward --

19        A.   It was --

20        Q.   -- after coming to an abrupt stop?

21        A.   It was -- it was an abrupt stop.  I

22   don't recall anything vicious.

23        Q.   Okay.  And your testimony is Mr. Kasper

24   is screaming.  What are you saying to Mr. Kasper

25   after you say you put the vehicle in park?
```

Ruston Russell 6/1/2017

```
 1        A.   I didn't say anything.  I opened the
 2   door from the inside.
 3        Q.   Okay.  Now, when -- when you saw
 4   Mr. Kasper -- saw and heard Mr. Kasper screaming,
 5   in your opinion, did you believe him to be a
 6   threat to you at this time?
 7             MR. THAGGARD:  Object to form.
 8             THE WITNESS:  Yes.  I believed he was a
 9   threat.
10        Q.   (By Mr. Denson)  Was he screaming -- did
11   you hear him screaming before you busted his window?
12        A.   He was yelling prior to.
13        Q.   He was yelling prior to?
14        A.   Right.
15        Q.   And what is it -- was he -- that you
16   recall him saying?
17        A.   As he was -- at what point in time?
18        Q.   Before -- immediately before you broke
19   his window.
20        A.   You can't get me.
21        Q.   You can't get me?
22        A.   Yes, sir.
23        Q.   Okay.  And what was your response?
24        A.   I had no response to that.
25        Q.   Okay.  So the next thing you said after
```

Ruston Russell 6/1/2017

```
 1    Mr. Kasper told you, you can't get me, according
 2    to your testimony, is what?
 3         A.   I don't believe I ever spoke to him
 4    after that.
 5         Q.   So you open Mr. Kasper's door.  And what
 6    did you do next?
 7         A.   Me?
 8         Q.   Yes.
 9         A.   I observed deputies fighting with
10    Mr. Kasper inside the vehicle.
11         Q.   And what deputies did you observe
12    fighting with Mr. Kasper?
13         A.   I believe it was Deputy Mathis and
14    Deputy Anderson.
15         Q.   Did these two deputies get in front of
16    you after you opened the door or how is it that --
17    how did these deputies begin to encounter
18    Mr. Kasper instead of you?
19         A.   I opened the door.  I was on the outside
20    of the door.
21         Q.   Okay.  And when you say you observed the
22    deputies fighting with Mr. Kasper, what -- were
23    the deputies punching Mr. Kasper?
24         A.   No, sir.
25         Q.   Were the deputies kicking -- kicking
```

Ruston Russell 6/1/2017

1    Mr. Kasper?

2         A.   No, sir.

3         Q.   When you say fighting, what do you mean

4    then?

5         A.   They were trying to get him out of the

6    vehicle.  He was kicking and flailing his arms.

7         Q.   When you say flailing his arms, explain

8    that for me.

9         A.   He was moving his -- he was swatting

10   them away, swinging.

11        Q.   And you say he was kicking as well?

12        A.   Yes, sir.

13        Q.   Now, at this time, Mr. Kasper was still

14   seated, correct?

15        A.   He's still in the seat.

16        Q.   He's still sitting down in his truck at

17   this time, correct?

18        A.   No.

19        Q.   Okay.  So is it your testimony that

20   after you opened the door, the two officers -- two

21   deputies go to assist Mr. Kasper, Mr. Kasper is

22   now standing up?

23        A.   No, sir.

24        Q.   If he's not sitting and he's not

25   standing up, what was Mr. Kasper doing?

Ruston Russell 6/1/2017

```
 1          A.    Laying over the center console.

 2          Q.    He was laying across the center console?

 3          A.    Yes, sir.

 4          Q.    Okay.  So would that be -- would that

 5     mean his head was in the passenger side of the --

 6     of his truck?

 7          A.    Center area.

 8          Q.    And did you ever see, at any time,

 9     Mr. Kasper kick an officer?

10          A.    He was just kicking.  I don't believe he

11     was actually -- I never saw him contact, but I had

12     a door between us.

13          Q.    So you had some obstruction of your

14     view?

15          A.    Yes, sir.

16          Q.    Did you notice if Mr. Kasper had his

17     seatbelt on?

18          A.    He did, because I know they were trying

19     to get the seatbelt unbuckled.  I could not --

20          Q.    And from your vantage point, you -- you

21     never saw an officer punch Mr. Kasper or kick

22     Mr. Kasper?

23          A.    No, sir.

24          Q.    Did you notice if the two deputies were

25     being rough with Mr. Kasper?
```

Ruston Russell 6/1/2017

```
 1        A.   No, sir.
 2        Q.   And these -- when I say two deputies,
 3   this would be Deputy Jacob Mathis and Deputy Dylan
 4   Anderson, correct?
 5        A.   Correct.
 6        Q.   Did you notice Jacob Mathis pulling on
 7   Mr. Kasper in any way?
 8        A.   Yes.
 9        Q.   And how would you describe that Jacob
10   Mathis was pulling on Mr. Kasper?
11        A.   Repeat that question, please.
12        Q.   How do you describe what Jacob Mathis
13   was doing?  You say he was pulling on Mr. Kasper.
14   What part of his body was he pulling on?
15        A.   I don't recall.  I just know they were
16   trying to pull him out of the vehicle.
17        Q.   Do you recall any officer tearing the
18   shirt of Mr. Kasper?
19        A.   No, sir.
20        Q.   And why you say -- at the time the
21   officers were fighting, as you say, with
22   Mr. Kasper, what -- what was the officers saying?
23   Were there any officers giving any instructions or
24   commands?
25        A.   They were, but I don't recall what they
```

Ruston Russell 6/1/2017

```
 1    were saying.
 2         Q.   Other than step out of the vehicle and
 3    stop, did you give any other instruction or
 4    command to Mr. Kasper?
 5         A.   No, sir.
 6         Q.   After you bust the window or, as you
 7    say, break the window of Mr. Kasper, did you give
 8    him an opportunity to get -- to get out on his
 9    own?
10         A.   Did I?  No, sir.  I opened the door.
11         Q.   So Mr. Kasper was never given an
12    opportunity to comply with the command, step out
13    of the vehicle?
14         A.   I believe -- my opinion?
15         Q.   Well, I'm just asking what happened that
16    day.  On that day, did you give Mr. Kasper an
17    opportunity to step out of the vehicle after you
18    placed the vehicle in park and opened the door?
19         A.   Yes, sir, he could have stepped out.
20         Q.   I'm not asking what he could have done.
21    My question is:  Did you give him the opportunity
22    to?
23         A.   Did I?  Yes, sir.
24         Q.   So after you placed the vehicle -- break
25    the window, place the vehicle in park, did you
```

Ruston Russell 6/1/2017

```
 1    step away and give him an opportunity to get out
 2    after you opened the door?
 3         A.   I never was around the door.
 4         Q.   I thought your testimony is that you
 5    opened the door.
 6         A.   I did, and there was a door between us
 7    the whole way.  You're insinuating that I was
 8    inside the doorway.  I was on the outside.
 9         Q.   Okay.  Just -- I'm not making any
10    insinuations.  My only -- my question is simply
11    this:  After you gave a command to Mr. Kasper, was
12    there a space where Mr. Kasper was allowed to just
13    step out of his car without assistance of
14    Lauderdale County deputies?
15         A.   Yes, sir.
16         Q.   And how much time passed to allow him to
17    get out of the car without the assistance of
18    Lauderdale County deputies?
19         A.   I don't -- I'd say brief.
20         Q.   When you say brief, (demonstrating) that
21    long?  I'm snapping my fingers.
22              MR. THAGGARD:  Object to form.
23         Q.   (By Mr. Denson)  When you say brief, are
24    you saying one second?
25         A.   I don't recall.  It was not long,
```

Ruston Russell 6/1/2017

```
 1   because of his actions.
 2        Q.   His actions of screaming after you break
 3   his window?
 4        A.   And jumping toward the passenger side of
 5   the vehicle.
 6        Q.   You placed the vehicle in -- you break
 7   the window, place the vehicle in park.  At that
 8   moment, you're telling me Mr. Kasper immediately
 9   jumped towards the passenger side of his car?
10        A.   Yes, sir.
11        Q.   And this was done while he was
12   sitting -- while he was strapped by his seatbelt?
13        A.   Yes, sir.
14        Q.   Is your testimony at any time that
15   Mr. Kasper was -- was grabbing his steering wheel
16   in order to avoid getting out (demonstrating)?
17        A.   Not like that.
18        Q.   Is it your testimony that he was
19   grabbing his steering wheel at all?
20        A.   He did, yes, sir.
21        Q.   At what point in time did he grab his
22   steering wheel?
23        A.   After they got the seatbelt off.
24        Q.   After the seatbelt came off?
25        A.   Yes, sir.
```

Ruston Russell 6/1/2017

```
 1        Q.   Now, typically, when you pull a person
 2   over and you ask them to get out, how much time do
 3   you allow them to comply with your command?
 4            MR. THAGGARD:  Object to form.
 5            THE WITNESS:  I don't know that there's
 6   a set time.
 7        Q.   (By Mr. Denson)  Okay.  Has there ever
 8   been a time that you had to break a window doing a
 9   road -- doing a safety checkpoint?
10        A.   I don't recall.
11        Q.   Did you use your Taser that night?
12        A.   Yes, sir.
13        Q.   At what point in time did you decide to
14   use your Taser?
15        A.    While Mr. Kasper was still in the
16   vehicle.
17        Q.   And what exactly was Mr. Kasper doing at
18   the time you removed your Taser?
19        A.   He was holding -- grabbing onto things
20   in the vehicle to keep from being removed.
21        Q.   At the time that you broke Mr. Kasper's
22   window, what crime had he committed?
23        A.   Disregard for a traffic device.
24        Q.   And what traffic device would you be
25   making reference to?
```

Ruston Russell 6/1/2017

```
 1        A.   Myself or the stop sign across from me
 2   that we were going through.
 3        Q.   So is it your testimony you were giving
 4   commands to stop?
 5        A.   Yes, sir.
 6        Q.   And disregard for a traffic device, is
 7   that a ticket?  Is that a citation type crime?
 8        A.   It's a misdemeanor offense.
 9        Q.   Normally, would you give a citation for
10   that offense?
11        A.   Yes, sir.
12        Q.   Would you -- would you normally ask a
13   person to step out of a vehicle for that offense?
14        A.   No, sir.
15        Q.   So at this time Mr. Kasper was charged
16   with -- had -- in your opinion, he had committed
17   the crime of disregard of a traffic device.  And
18   why, at this time, would you ask him to step out
19   of the vehicle?
20        A.   While he -- you lost me, sir.  I'm
21   sorry.
22        Q.   Okay.  I'll go back.  I asked you what
23   offense had Mr. Kasper been charged prior to you
24   breaking his window.
25        A.   Right.
```

Ruston Russell 6/1/2017

```
 1        Q.   You said disregard of a traffic device.
 2   And my question is:  What reason would Mr. Kasper
 3   have to -- that you believe Mr. Kasper needed to
 4   exit his vehicle after you broke his window?
 5        A.   After I broke his window?
 6        Q.   Yes.
 7        A.   Okay.  Because you said before -- why
 8   did I feel he needed to?
 9        Q.   Yes, for that misdemeanor charge.
10        A.   Because I didn't know what was going on
11   with Mr. Kasper at the time.
12        Q.   Okay.
13        A.    I was concerned about impairment or any
14   other number of things why he was acting the way
15   he was acting.
16        Q.   Okay.  Did you smell any alcohol?
17        A.   I did not, no, sir.
18        Q.   And, typically, when -- and are you a
19   DUI officer?  Were you a DUI officer at that time?
20        A.   No, sir.
21        Q.   Have you ever been a DUI officer?
22        A.   No, sir.
23        Q.   Did you call a DUI officer over?
24        A.   He was on scene.
25        Q.   When you say you were concerned about
```

Ruston Russell 6/1/2017

```
 1    impairment, based on that concern, couldn't you
 2    have just called a DUI officer over to explore the
 3    impairment?
 4         A.   There was a DUI officer with him.
 5         Q.   I believe your testimony is after you
 6    break the window, you put the car in park, two
 7    officers came when you opened the door.
 8         A.   Yes, sir.
 9         Q.   And that was after you had asked him to
10    exit the car?
11         A.   No.  I did not state that.
12         Q.   Okay.  When did you ask him to exit the
13    car?
14         A.   I did not.
15         Q.   You never asked him to exit the car?
16         A.   No, sir.
17         Q.   Why did you feel there was a need for
18    him to exit the car?
19         A.   For our safety and his.  I felt that he
20    needed to, but I never asked him anything except
21    to stop.
22         Q.   Okay.  Why didn't you just ask
23    Mr. Kasper to get out of the car?
24         A.   At what point?
25         Q.   After you break his window -- after you
```

Ruston Russell 6/1/2017

```
 1    broke his window and you say you put the car in
 2    park, why didn't you just ask Mr. Kasper,
 3    Mr. Kasper, please exit your vehicle?
 4         A.   The other deputies were ordering him out
 5    of the vehicle.
 6         Q.   But it's -- it's your testimony you
 7    didn't smell any alcohol, correct?
 8         A.   No, sir.
 9         Q.   From your vantage point, after you
10    opened the door, did you see any drugs or drug
11    paraphernalia in the truck that would evidence use
12    of -- recent use of drugs?
13         A.   At that point in time?
14         Q.   Yes.
15         A.   I couldn't hardly see in the vehicle,
16    sir.
17         Q.   And a Deputy Wesley Stephens, was he out
18    there at the time?
19         A.   Yes, sir.
20         Q.   And do you recall what he was doing?
21         A.   They were checking a vehicle on Pine
22    Springs Road, he and Trooper Moore.
23         Q.   So let me get back -- so -- to this
24    point.  So you tased Mr. Kasper --
25         A.   Yes, sir.
```

Ruston Russell 6/1/2017

```
 1        Q.    -- while he was sitting in his vehicle?

 2        A.    While he was laying in his vehicle, yes,

 3   sir.

 4        Q.    While he was laying in his vehicle.

 5              Mark that as the next exhibit.

 6              COURT REPORTER:  That will be 5.

 7              (Exhibit 5 marked for identification.)

 8              MR. DENSON:  Okay.

 9              MR. THAGGARD:  You better look and make

10   sure you want all of that.

11              MR. DENSON:  I was just going to say, I

12   think you got some of the ones I need.

13              MR. THAGGARD:  It's more than one copy.

14   It looks like about a copy and a half.

15              MR. DENSON:  Yeah, that's what I was

16   looking for, the other portion of it.  All right.

17              MR. THAGGARD:  You're welcome.

18        Q.    (By Mr. Denson)  Thank you.  Appreciate

19   it, Lee.

20              All right.  Lieutenant Russell, this is

21   your response to resistance report, correct?

22        A.    Yes, sir.

23        Q.    And on Page 2, it's identified as LC19,

24   it shows you indicated that Taser probes came into

25   the left side -- I'm sorry.  The --
```

Ruston Russell 6/1/2017

```
 1         A.    Right abdomen.
 2         Q.    -- right abdomen.  That would be the
 3   portion of Mr. Kasper's abdomen that was furthest
 4   in the car, correct -- closest in the car?
 5         A.    It was the closest to me.
 6         Q.    The right side of his body?
 7         A.    Yes, sir.
 8         Q.    So let me -- let me get this straight.
 9   Your testimony is you tasered Mr. Kasper while
10   laying in his -- in his truck and the right side
11   of his abdomen was closest to you?
12         A.    You're not --
13         Q.    I'm -- I'm just thrown off.
14         A.    He's laying on his back --
15         Q.    He's laying on his back?
16         A.    -- with his feet out of the window.  The
17   right side of his abdomen, I'm in the corner, was
18   at the steering wheel area.  It was the closest to
19   me.
20         Q.    Okay.  And you're saying that's because
21   he was laying on his back?
22         A.    At that time, yes, sir.
23         Q.    With the right side of his body facing
24   the steering wheel?
25         A.    Yes, sir.  The steering wheel was to his
```

Ruston Russell 6/1/2017

```
 1   right.
 2        Q.   And how many times did you tase him?
 3        A.   How many cartridges or applications?
 4        Q.   I'm not sure if I know the difference.
 5   When you say applications, what do you mean?
 6        A.   How many times the Taser was cycled.
 7        Q.   All right.  How many times was the Taser
 8   cycled?
 9        A.   During the whole incident or at this
10   time?
11        Q.   At this time.
12        A.   Once.
13        Q.   Once.  And when you say cycled, what do
14   you -- what do you mean by that?
15        A.   The five second cycle when you pull the
16   trigger.
17        Q.   Okay.  So that means the probes were
18   released into Mr. Kasper?
19        A.   Yes, sir.
20        Q.   And you had the trigger pressed for five
21   seconds?
22        A.   No, sir.  I pressed and released it.  It
23   automatically goes for five seconds.
24        Q.   For five seconds.
25             Okay.  And this was while he was laying
```

Ruston Russell 6/1/2017

```
 1    down and his feet are out of the door?

 2         A.   Yes, sir.

 3         Q.   Did you tase him another time -- well,

 4    let me back up.  Did you cycle -- was there

 5    another cycle?

 6         A.   Yes, sir.  Once he was out of the

 7    vehicle.

 8         Q.   And -- well, I'll get to that.  How did

 9    Mr. Kasper ultimately get out of his vehicle?

10         A.   Deputies Anderson and Mathis pulled him

11    from the vehicle.

12         Q.   And the seatbelt that he had on, how

13    did -- how was that released; do you know?

14         A.   I -- I don't know.

15         Q.   Okay.  So when Mr. Kasper -- when

16    Mr. Kasper ultimately was removed from his

17    vehicle, where was he placed?

18         A.   On the ground.

19         Q.   Is that face down on the ground?

20         A.   I don't recall how they were.  They

21    were --

22         Q.   Well, what was your vantage point once

23    Mr. Kasper got out of the vehicle?

24         A.   I still had the door between us.

25         Q.   Okay.  Was the door ever closed by you?
```

Ruston Russell 6/1/2017

```
 1        A.    Eventually.  They had him in custody
 2   when I closed the door.
 3        Q.    You said there was another cycle of the
 4   Taser?
 5        A.    Yes, sir.
 6        Q.    And when did that second cycle occur?
 7        A.    When he was on the ground.
 8        Q.    Is that a second probe -- second set of
 9   probes that went out?
10        A.    No, sir.  Only one cartridge was used.
11   You can reenergize those probes.
12        Q.    So is that what happened, the probes
13   were reenergized?
14        A.    Yes, sir.
15        Q.    And this is while Mr. Kasper was -- at
16   this time, he would be laying on top of the
17   probes, correct?
18        A.    I don't recall how they were, but --
19   well, I don't recall how they were.
20        Q.    Other officers, in their statements --
21   and you say you read their statements -- said that
22   he was in prone -- I think it's p-r-o-n-e --
23   position?
24        A.    Yes, sir.
25        Q.    Is that your testimony as well, that
```

Ruston Russell 6/1/2017

```
 1   Mr. Kasper was taken out of the truck and put in
 2   prone position?
 3        A.   I don't know how he -- they were
 4   initially.  That's how they ended up, in a prone
 5   position, yes, sir, handcuffed.
 6        Q.   When you recycled or it was a second
 7   cycle of the Taser, what position was Mr. Kasper
 8   in?
 9        A.   I don't recall.
10        Q.   You don't recall if he was already in
11   prone position when you cycled it the second time?
12        A.   No, sir.  They were still fighting.
13        Q.   And when you say fight -- still
14   fighting, Mr. Kasper is now outside of the
15   vehicle?
16        A.   Yes, sir.
17        Q.   He's now on the ground?
18        A.   Yes, sir.
19        Q.   And you say he's fighting with how many
20   deputies at this time?
21        A.   Two.
22        Q.   Still two deputies?
23        A.   Yes, sir.
24        Q.   And while Mr. Kasper was outside in
25   prone position, do you recall Mr. Kasper ever
```

Ruston Russell 6/1/2017

```
 1    punching any officer?
 2         A.   No, sir.
 3         Q.   Do you recall him ever kicking any
 4    officer?
 5         A.   No, sir.
 6         Q.   Now, there were -- there was a knee
 7    placed into the lower abdomen -- lower part of
 8    Mr. Kasper's body by Deputy Anderson, correct?
 9         A.   I don't recall that, no, sir.
10         Q.   Do you recall any hits by the deputies
11    to Mr. Kasper?
12         A.   None at all, no, sir.
13         Q.   How do you contend that the handcuffs
14    were placed on Mr. Kasper?  What do you say is
15    happening -- well, strike that.
16              How do you describe what is happening
17    while handcuffs are being placed on Mr. Kasper
18    after he was put in prone position?
19              MR. THAGGARD:  Object to form.
20              THE WITNESS:  What did I see happening?
21         Q.   (By Mr. Denson)  Yes.
22         A.   Him refusing to give them his hands,
23    pulling away.
24         Q.   And when you say pulling away --
25         A.   His hands.
```

Ruston Russell 6/1/2017

```
 1        Q.   Pulling his hands away.  Do you recall
 2   his hands ever being over his face?
 3        A.   I don't recall, sir.
 4        Q.   Do you recall where his hands were at
 5   any given time?
 6        A.   No, sir.  I -- once they were out of the
 7   vehicle, I didn't get in -- in the -- that.
 8        Q.   Did you leave after the -- after the
 9   second cycle of the Taser, is it your testimony
10   that you were no longer involved in the arrest of
11   Mr. Kasper?
12        A.   I was again.
13        Q.   Okay.
14        A.   Not at that initial time, no, sir.
15        Q.   Okay.  All right.  When did -- when did
16   you become involved again with Mr. Kasper on that
17   evening?
18        A.   Deputies were trying to remove him from
19   one vehicle and place him in another, and
20   Mr. Kasper refused to get out of the vehicle.
21        Q.   Okay.  And what if anything did you do?
22        A.   I entered through the driver door and
23   deployed a drive stun which is no cartridges, no
24   probes to his back.
25        Q.   Okay.  That's just a Taser being placed
```

Ruston Russell 6/1/2017

```
 1   on his body?
 2        A.   Yes, sir.  Yes, sir.
 3        Q.   Okay.  And what exactly was Mr. Kasper
 4   doing at the time that you deployed the dry (sic)
 5   stun?
 6        A.   Drive stun.
 7        Q.   Drive stun?
 8        A.   Yes, d-r-i-v-e.
 9        Q.   Okay.  Drive stun.  At the time you
10   deployed the drive stun, what was Mr. Kasper --
11   Mr. Kasper's actions?
12        A.   He was kicking at the deputies and
13   placing his feet on the inside of the car.
14        Q.   Okay.  And what if -- what happened
15   after the drive stun?
16        A.   He immediat- -- immediately exited the
17   vehicle.
18        Q.   All right.  Did he walk voluntarily from
19   that vehicle?
20        A.   No, sir.
21        Q.   How did he get from that vehicle to the
22   next location?
23        A.   To the best of my knowledge, they had to
24   carry him.
25        Q.   Now, to get Mr. Kasper into the first
```

Ruston Russell 6/1/2017

1    vehicle that he was in, did you observe how he was

2    placed into that vehicle?

3          A.   No, sir.

4          Q.   Now, before you deployed that drive stun

5    that you say caused Mr. Kasper to exit the

6    vehicle, do you recall any officer requesting

7    Mr. Kasper to exit the vehicle verbally?

8          A.   Yes, sir.

9          Q.   And which officer made that request?

10         A.   I don't recall.  I could hear them

11   ordering him out of the vehicle.

12         Q.   That evening, did you hear -- did you

13   get a chance to hear Mr. Kasper's speech?  Did you

14   hear him talk?

15         A.   No, sir.

16         Q.   Did you see any injuries on his person

17   after -- did you see any bleeding or evidence of

18   injuries after Mr. Kasper exited his truck?

19         A.   Yes, sir.

20         Q.   And what injuries did you see?

21         A.   The best of my knowledge, he had

22   abrasions to his face.  Photos were taken of the

23   two probe entries.

24         Q.   Okay.  Now, when you say he had

25   abrasions to his face, did you see how those

```
 1    injuries -- well, what do you mean by abrasions to
 2    his face?
 3         A.   I remember he was bleeding from his
 4    face.  I couldn't tell you exactly where.
 5         Q.   Was that before or after he exited his
 6    truck?
 7         A.   That was after he exited his truck.
 8         Q.   Okay.  Now, these abrasions to his face,
 9    is that -- did you notice that before he was
10    placed in prone position or after he was placed in
11    prone position?
12         A.   I didn't notice it until afterwards.
13         Q.   Well, I -- when did you notice it?
14    What -- exactly what point did you notice the
15    abrasions on Mr. Kasper's face?
16         A.   At the jail.
17         Q.   At the jail?
18         A.   Yes, sir.
19         Q.   So did you go to the jail with Dylan
20    Anderson?
21         A.   No, sir.
22         Q.   Were you there at the same time
23    Mr. Anderson was at the jail?
24         A.   I don't --
25              MR. THAGGARD:  Object to form.
```

Ruston Russell 6/1/2017

```
 1              THE WITNESS:  I don't recall if he was
 2    there when I went.
 3         Q.   (By Mr. Denson)  Okay.  When did you go
 4    back to the jail and observe Mr. Kasper?
 5         A.   After -- it was that same evening before
 6    Mr. Kasper got out.  I went and took pictures of
 7    the Taser probe, where the Taser probes hit him.
 8         Q.   Okay.  So did you -- did you see --
 9    well, strike that.
10              At the time you took pictures of
11    Mr. Kasper, did he have a shirt on or off?
12         A.   I believe it was off.
13         Q.   Was the shirt torn?
14         A.   Yes, sir.
15         Q.   And -- the shirt was draped around
16    his -- draped around the top of his shorts,
17    correct?
18         A.   I believe so.
19         Q.   What was Mr. Kasper's demeanor at the
20    jail while you were taking the pictures?
21         A.   Quiet.
22         Q.   Okay.  Now, were these pictures taken
23    immediately after he was booked in or sometime
24    later?
25         A.   I believe it was later, but I can't tell
```

Ruston Russell 6/1/2017

```
 1    you exactly.
 2         Q.   Do you recall Mr. Kasper ever asking you
 3    about a drug test, requesting a drug test?
 4         A.   I don't recall Mr. Kasper ever speaking
 5    to me.
 6         Q.   After this incident -- after you made
 7    your report, were you interviewed by any of your
 8    superior officers?
 9         A.   No, sir.
10         Q.   Did you notice if Mr. Kasper had
11    bloodshot eyes at the time you were taking
12    pictures?
13         A.   Did I notice?
14         Q.   Did you notice bloodshot eyes?
15         A.   Not to my knowledge.
16              MR. DENSON:  Can we take a break for a
17    little bit?
18              MR. THAGGARD:  Sure.
19              (Brief recess.)
20         Q.   (By Mr. Denson)  Okay.  Lieutenant
21    Russell, I want to go back to -- to the time where
22    Mr. Kasper's vehicle was placed in park by -- as
23    your testimony said, by your hand.  Okay.  Is it
24    your testimony that Mr. Kasper did not press his
25    brakes?
```

Ruston Russell 6/1/2017

```
 1        A.   No, sir.
 2        Q.   That's not your testimony?  You -- at
 3   this time, you can't -- you can't tell the Court
 4   whether Mr. Kasper was pre- -- was pressing his
 5   breaks simultaneously with -- let me start back
 6   over.
 7             At this time, you can't tell the Court
 8   whether Mr. Kas- -- Kasper was pressing his brakes
 9   simultaneous with you reaching into his vehicle,
10   correct?
11        A.   Yes, sir.  I cannot testify to that.
12        Q.   And also you can't testify that you
13   reaching into his vehicle was the reason the
14   vehicle stopped, correct?
15        A.   That is why it stopped at that time
16   because I put it in park.
17        Q.   But you didn't -- you weren't looking at
18   his -- Mr. Kasper's feet?
19        A.   No, sir.  I couldn't see his feet.
20        Q.   So you can't say the sole reason
21   Mr. Kasper's truck stopped was because you
22   break -- you broke his window and reached into his
23   window?
24        A.   I can't testify to any breaking.  I
25   don't know that it --
```

Ruston Russell 6/1/2017

```
 1          Q.   When I say breaking, I mean you busted
 2     his window?
 3          A.   Right.
 4          Q.   And did you see Deputy Matuszewski --
 5     Matuszewski at the time?
 6          A.   At that time?
 7          Q.   Yes.
 8          A.   No, sir.
 9          Q.   What deputies did you see in the
10     immediate vicinity of Mr. Kasper's car at the time
11     that you break his window?
12          A.   Deputy Stephens and Trooper Moore.
13          Q.   And according to your statement, Deputy
14     Stephens and Trooper Moore were speaking to young
15     females in a black car?
16          A.   Yes, sir.
17          Q.   Now, was that black car sitting to the
18     right side of Pine Springs -- no, Allen Swamp
19     Road?
20          A.   (Nonverbal response.)
21          Q.   Was that black car in the middle of the
22     street?
23          A.   It was in the northbound line -- lane of
24     Pine Springs.
25          Q.   So in the -- in the middle of the
```

Ruston Russell 6/1/2017

```
 1    street?
 2              MR. THAGGARD:  Object to form.
 3              THE WITNESS:  It was in the northbound
 4    lane.
 5         Q.  (By Mr. Denson)  Okay.  And do you recall
 6    the black car that the two -- where the two young
 7    females were in, if -- if that car was ever moved as
 8    a result of Mr. Kasper's truck coming through the
 9    intersection, as you say?
10         A.  I don't recall.
11         Q.  Do you recall hearing two young females
12    screaming when -- during the time that you were --
13    you burst Mr. Kasper's driver's side window?
14         A.  No, sir.
15         Q.  Do you recall seeing two young females
16    running?
17         A.  No, sir.
18         Q.  But your testimony is that these two
19    young females were, according to your statement,
20    standing beside or standing around Deputy Stephens
21    and Trooper Moore?
22         A.   That is not in my statement, no, sir.
23    They were in a vehicle, a black car, in the
24    northbound lane.
25         Q.  Okay.
```

Ruston Russell 6/1/2017

```
 1        A.    One driving, one in the passenger.
 2        Q.    Now, were any messages -- text messages
 3   on -- strike that.
 4              On May 24th, 2014, did you communicate
 5   with any of the officers that were at the scene
 6   through text messaging immediately after this
 7   incident?
 8        A.    Not to my knowledge.
 9        Q.    Has that been done before, where a --
10   after an incident, you and the officers
11   communicate by text messaging?
12              MR. THAGGARD:  Object to form.
13              THE WITNESS:  I don't understand the
14   question.  I -- we communicate by text message on
15   a regular basis.
16        Q.    (By Mr. Denson)  Okay.  And when was
17   Mr. Kasper identified as Glenn Kasper; do you know?
18        A.    I don't know, sir.
19        Q.    Did you -- your testimony has not been
20   that a license was removed from his person during
21   the incident, correct?
22        A.    I did not remove one.
23        Q.    When you -- when you opened the door,
24   did you know him as Glenn Kasper?
25        A.    I never met him before in my life.
```

Ruston Russell 6/1/2017

```
 1        Q.   So you did not know him as Glenn Kasper
 2   when you opened the door?
 3        A.   No, sir.
 4        Q.   Did you know him -- did you believe he
 5   was some other Kasper, Mark or Chris?
 6        A.   No, sir.
 7        Q.   Do you recall any other officers making
 8   reference to Mr. Kasper as one of the regulars?
 9        A.   No, sir.  I never heard that.
10        Q.   And according to your statement, after
11   Mr. Kasper's -- Mr. Kasper was handcuffed, he was
12   actually physically picked up and placed into
13   Deputy Mathis' vehicle?
14             Let me have this marked as the next
15   numbered exhibit.
16        A.   I believe I said when they changed
17   vehicles.  I don't -- I don't know if they carried
18   him to the first -- the first initial time or not.
19        Q.   The first vehicle was Mathis' vehicle or
20   Anderson's vehicle?
21        A.   The first vehicle was Mathis' vehicle,
22   yeah.
23        Q.   Okay.
24        A.   They had to carry him from Mathis' --
25             MR. THAGGARD:  Wait.  You got to -- let
```

Ruston Russell 6/1/2017

```
 1    her finish mark- -- let her mark the exhibit.
 2             COURT REPORTER:  Okay.  It will be 6.
 3             (Exhibit 6 marked for identification.)
 4             MR. DENSON:  Okay.  All right.  Thank
 5    you.
 6             MR. THAGGARD:  All right.  Now, I
 7    interrupted you, so if you had something else to
 8    say --
 9             MR. DENSON:  That's okay.
10             MR. THAGGARD:  No, no.  If I interrupted
11    you and you have something to say to finish your
12    sentence, then finish it.  If you were done, then
13    fine --
14             THE WITNESS:  Okay.
15             MR. THAGGARD:  -- but I stopped you.
16             THE WITNESS:  I'm done.
17        Q.   (By Mr. Denson)  I'm -- I'm going to get
18    to it anyway.  Thank you, Lee.
19             I believe this may be the -- I think
20    that's an indention in the second paragraph.  One
21    moment here.
22             MR. THAGGARD:  What's the exhibit
23    number?
24             COURT REPORTER:  7 -- 6.  I'm sorry.
25             MR. DENSON:  6.
```

Ruston Russell 6/1/2017

```
 1              MR. THAGGARD:  It's all right.
 2         Q.   (By Mr. Denson)  Okay.  Seven lines up on
 3    your statement there, after your counsel gets an
 4    opportunity to review it, I want you to tell me what
 5    that reads.
 6         A.   Deputies had to physically pick Kasper
 7    up and place him into Deputy Mathis' vehicle.
 8         Q.   So -- so after they put handcuffs on
 9    him, he went into Mathis' vehicle --
10         A.   Yes, sir.
11         Q.   -- first?
12         A.   Yes, sir.
13         Q.   So he didn't walk to his vehicle?
14         A.   Correct.
15         Q.   And I don't believe you explained in
16    your statement, but was there any reason that
17    Mr. Kasper was not allowed to walk to his vehicle?
18         A.   I don't recall that he would.  I was not
19    dealing with him at that time.
20         Q.   Okay.  But you did observe him being
21    carried --
22         A.   Obviously, yes, sir.
23         Q.   -- to his vehicle -- to Mathis' vehicle?
24         A.   Yes, sir.
25         Q.   And since you made that observation, can
```

Ruston Russell 6/1/2017

```
 1    you -- you say what Mr. Kasper was doing at this
 2    time?
 3         A.    Yelling, screaming.
 4         Q.    Screaming or yelling?
 5         A.    Just more of a scream.
 6         Q.    How many officers picked him up to put
 7    him in Mathis' vehicle?
 8         A.    Only two dealt with him.
 9         Q.    And how did they pick him up?
10         A.    I don't recall.
11         Q.    Let me see that statement again.
12         A.    Yes, sir.
13         Q.    Did you see Mr. Kasper enter Deputy
14    Mathis' vehicle?
15         A.    No, sir.
16         Q.    What were you doing at this time when
17    Mr. Kasper was being -- was being physically
18    picked up and placed into Mathis' vehicle?
19         A.    To the best of my knowledge, I went to
20    my car to see if I had bandaids and something to
21    wipe the blood off of my arms.
22         Q.    Okay.  After Mr. Kasper was placed in
23    Deputy Mathis' car, did anyone make an attempt to
24    identify who he was?
25         A.    They -- I'm sure Mathis or Anderson did.
```

Ruston Russell 6/1/2017

```
 1     I'm not sure.  I did not.

 2          Q.   Do you know?

 3          A.   No, sir.

 4               Can you mark that as the next numbered

 5     exhibit.

 6               COURT REPORTER:  That will be 7.

 7               (Exhibit 7 marked for identification.)

 8          Q.   (By Mr. Denson)  Okay.  And did you call

 9     dispatch that evening for -- to call this arrest in?

10          A.   I don't know who called it in, sir.

11          Q.   Okay.  I want to show you a copy -- or

12     certified copy of the abstract of a ticket that

13     you wrote of Mr. Kasper from Justice Court.

14          A.   Okay.

15          Q.   And that is a -- is that disregarding

16     traffic device?

17          A.   Yes, sir.

18          Q.   And that was dismissed, correct,

19     according to that abstract?

20          A.   Yes, sir.

21          Q.   And, now, on May 24th, 2014, you

22     believed that Mr. Kasper violated the law of

23     disregarding a traffic device, correct?

24          A.   Yes, sir.

25          Q.   But you later decided to dismiss that
```

Ruston Russell 6/1/2017

```
 1   charge?
 2        A.   Yes, sir.
 3        Q.   What was your reason for deciding to
 4   dismiss this charge?
 5        A.   He had a persuasive attorney.
 6        Q.   So his attorney was the reason that you
 7   dismissed that charge?
 8        A.   Yes, sir.  He asked for help.
 9        Q.   And mark that as the next numbered
10   exhibit.
11             After your lawyer takes a look at it,
12   I'm going to show you what's been marked as
13   Exhibit 8.  It's a copy of the official abstract
14   from Justice Court indicating -- on there it
15   indicates a ticket of resisting arrest --
16        A.   Yes.
17        Q.   -- that was written by you, correct?
18        A.   That was an affidavit filed by me, yes,
19   sir.
20             (Exhibit 8 marked for identification.)
21        Q.   (By Mr. Denson)  An affidavit filed by
22   you.  And that was for the charge of resisting
23   arrest, correct?
24        A.   Yes, sir.
25        Q.   And it was dismissed through Justice
```

Ruston Russell 6/1/2017

```
 1    Court when Mr. Kasper ultimately came to court?
 2         A.   Against my knowledge, this was done at a
 3    later date.  That was not agreed upon between the
 4    County Attorney nor his attorney.  I don't know
 5    who dismissed it.
 6         Q.   Okay.  All right.  So somehow -- your
 7    position is somehow in the Court it just got
 8    dismissed?
 9         A.   Yes, sir.
10         Q.   Okay.
11         A.   Because initially it was a guilty plea
12    on the resisting arrest.
13         Q.   Now, on Exhibit 7, there's a citation
14    number?
15         A.   Yes, sir.
16         Q.   And on Exhibit 8, there is no citation
17    number?
18         A.   That was an affidavit.
19         Q.   Oh, so that's why we don't have a
20    citation number?
21         A.   Yes, sir.  It wasn't done on a citation.
22              (Sotto voce discussion between Mr.
23    Kasper and Mr. Denson.)
24              MR. DENSON:  Okay.  Let me take a short
25    break.  I can't -- I can't whisper, not well
```

Ruston Russell 6/1/2017

```
 1   anyway.
 2            (Brief recess.)
 3       Q.   (By Mr. Denson)  The affidavit on the
 4   resisting arrest, did you -- do you keep a copy of
 5   affidavits that you -- that you file?
 6       A.   No, sir.
 7       Q.   So to be clear, you wouldn't have a copy
 8   of the affidavit that was for the resisting arrest
 9   that occurred on 5/24/2014?
10       A.   No, sir.
11            MR. DENSON:  Okay.  All right.  I tender
12   the witness.
13            MR. THAGGARD:  I don't have any
14   questions.
15            MR. DENSON:  All right.
16            MR. THAGGARD:  Read and sign.
17            COURT REPORTER:  So you're ordering a
18   copy then?
19            MR. THAGGARD:  Oh, yes.
20             (The witness was excused.)
21             (Time Noted:  5:28 p.m.)
22
23   ORIGINAL:  JOSEPH A. DENSON, Esquire
24   COPY:  LEE THAGGARD, Esquire
25
```

Ruston Russell 6/1/2017

```
 1              CERTIFICATE OF DEPONENT
 2  DEPONENT:  RUSTON RUSSELL
    DATE:  JUNE 1, 2017
 3  CASE STYLE:  GLENN KASPER vs. THE BOARD OF
    SUPERVISORS OF LAUDERDALE COUNTY, MS, ET AL
 4  ORIGINAL TO:  JOSEPH A. DENSON, Esquire
             I, the above-named deponent in the
 5  deposition taken in the herein styled and numbered
    cause, certify that I have examined the deposition
 6  taken on the date above as to the correctness
    thereof, and that after reading said pages, I find
 7  them to contain a full and true transcript of the
    testimony as given by me.
 8             Subject to those corrections listed
    below, if any, I find the transcript to be the
 9  correct testimony I gave at the aforestated time
    and place.
10  Page      Line                    Comments
    ____      ____      _____
11  ____      ____      _____
    ____      ____      _____
12  ____      ____      _____
    ____      ____      _____
13  ____      ____      _____
    ____      ____      _____
14  ____      ____      _____
    ____      ____      _____
15  ____      ____      _____
    ____      ____      _____
16  ____      ____      _____
    ____      ____      _____
17
18        This the ____ day of _____, 2017.
19             _____
                    RUSTON RUSSELL
20  State of Mississippi
    County of _____
21
          Subscribed and sworn to before me, this the
22  _____ day of _____, 20___.
23  My Commission Expires:_____
24             _____
                    Notary Public
25
```

Ruston Russell 6/1/2017

```
 1              CERTIFICATE OF COURT REPORTER
 2              I, Nikki L. Lloyd, Court Reporter and
 3    Notary Public, in and for the State of
 4    Mississippi, hereby certify that the foregoing
 5    contains a true and correct transcript of the
 6    testimony of RUSTON RUSSELL, as taken by me in the
 7    aforementioned matter at the time and place
 8    heretofore stated, as taken by stenotype and later
 9    reduced to typewritten form under my supervision
10    by means of computer-aided transcription.
11              I further certify that under the
12    authority vested in me by the State of Mississippi
13    that the witness was placed under oath by me to
14    truthfully answer all questions in the matter.
15              I further certify that, to the best of
16    my knowledge, I am not in the employ of or related
17    to any party in this matter and have no interest,
18    monetary or otherwise, in the final outcome of
19    this matter.
20              Witness my signature and seal this the
21    13th day of June, 2017.
22
23
24    _____
              NIKKI L. LLOYD, CCR #1870
25    My Commission Expires:
```

Lauderdale County Sheriff's Department
Law Enforcement
Policies and Procedures

| Subject: Roadside Safety Checkpoints | Policy Number: 4.03 |
|---|---|
| Issue Date: July 26, 2002 | Revision Date: March 21, 2007 |
| Approval Authority Title and Signature: *Sheriff William D. "Billy" Sollie* | |

POLICY:

It is the policy of the Lauderdale County Sheriff's Department to help ensure public safety by attempting to ensure that all drivers are properly licensed and all vehicles appear to be in good working order and are equipped with lawfully mandated safety features. The department recognized the value of roadside safety checkpoints to identify vehicles and/or drivers illegally traversing the roads of the county. To this end, the following guidelines have been established to govern the use of such checkpoints.

DEFINITION:

For the purposes of this policy, the following terminology will apply:

Checkpoint - A brief stop of the traffic for the purpose of uniformly checking for violations of law pertaining to validity of the driver's operators license, validity of the vehicle's license, occupant restraints, and working safety equipment (headlights, taillights, brake lights, turn signals, etc.)

Department – The Lauderdale County Sheriff's Department

Officer – Any sworn officer or deputy sheriff of the Lauderdale County Sheriff's Department

Sheriff – Sheriff of Lauderdale County

Chief Deputy – Chief Deputy as appointed by the Sheriff of Lauderdale County.

Ranking officer – Deputy Sheriff of the department with rank of sergeant or above.

RESTRICTED LAW ENFORCEMENT DATA
This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.



EXHIBIT 1
WIT: Russell
DATE: 6/1/17
Brooks Court Reporting

Law Enforcement Policies and Procedures, 4.03  Roadside Safety Checkpoints

## SITE SELECTION AND SUPERVISION:

The location, dates, and times of the checkpoints shall be determined by ranking officers of the department.  The safety of officers, safety of the public, history of motor vehicle collisions in the area, and minimum disruption of traffic will be the primary factors considered when choosing a site of a checkpoint.  Once the checkpoint is properly authorized, the ranking officer shall be responsible for the direction and control of the checkpoint.  The ranking officer may temporarily delegate this responsibility to a subordinate if the ranking officer is briefly unavailable.

## EXAMINATION PROCEDURES:

The checkpoint will operate with the officers temporarily stopping each pre-authorized vehicle which travels through the checkpoint.  The driver of each vehicle will be briefly observed to determine:

1. Initial Observations
   a) Driver's license (status)
   b) Vehicle license (status)
   c) Use of occupant restraints
   d) Motor vehicle safety equipment
   e) Proof of insurance subsequent to any other traffic offense

2. Secondary Observations
   a) Motor vehicle operation violations
   b) Signs of driver impairment
   c) Criminal activity

Every effort will be made by the officers manning the checkpoint to keep the length of each vehicle stop as brief as possible.  Any driver found in violation of any traffic law may be cited or arrested in compliance with applicable law.

This does not preclude any arrest based on probable cause of any other criminal law violation that the officer may discover.

## CHECKPOINT AVOIDANCE:

It is probable that some drivers operating a vehicle illegally will notice the checkpoint in advance and attempt to avoid traveling through it.  If officer availability permits, a patrol

RESTRICTED LAW ENFORCEMENT DATA
This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Page 2 of 3

Law Enforcement Policies and Procedures, 4.03  Roadside Safety Checkpoints

vehicle may be stationed near the checkpoint for the purpose of stopping vehicles which are obviously attempting to avoid traveling through it.  Drivers of vehicles stopped subsequent to this shall be observed and/or examined according to the examination procedure listed above.

## ENVIRONMENTAL CONSIDERATIONS:

Checkpoints will be conducted during day and night hours.  When conducted at night, each officer present will be equipped with a flashlight and traffic safety vest.  Marked units present will activate their emergency lighting, taking care not to blind other drivers.

Checkpoints will not be conducted in inclement weather, including but not limited to rain, ice, snow, fog.

Checkpoints will not be conducted if the surface of the roadway is determined to be unsafe due to precipitation.

Checkpoints will not be conducted in areas where visibility is limited, including but not limited to curves and valleys.

## REPORTS:

The ranking officer of the checkpoint shall report the results on written forms approved by the Sheriff for such purpose.  This shall include the total number of vehicles traveling through the checkpoint, the selection of vehicle stopped, the number and type of citations issued.

## ROADSIDE SAFETY CHECKPOINTS:

This policy shall in no way be confused with roadside sobriety checkpoints, which are totally different.  The guidelines for conducting roadside sobriety checkpoints are covered in policy 4.02 of this manual.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Page 3 of 3



EXHIBIT 2
WIT: Russell
DATE: 6/1/17
Brooks Court Reporting



EXHIBIT 3
WIT: Russell
DATE: 6/14/17
Brooks Court Reporting





EXHIBIT 4
WIT: Russell
DATE: 6|11|17
Brooks Court Reporting

## LAUDERDALE COUNTY DETENTION FACILITY
## RESPONSE TO RESISTANCE REPORT

DATE: 5/24/14  TIME: 1949  LOCATION: Allen Sharp / Pine Springs Road
DEPUTY/OFFICER'S NAME: Lt. Austen Russell _____ CASE #: 2014-07567
ON SCENE/NOTIFIED SUPERVISOR(S): _____

NUMBER 6 AND NAMES OF OTHER DEPUTIES/OFFICERS PRESENT: Trooper Moore H-24, Deputy Mathis L-15
Deputy Anderson L-27, Deputy Stevens L-18, Deputy Thomas L-19, Deputy Matuszewski
ANY OTHER DEPUTIES/OFFICERS USE FORCE Y/N  IF YES, ADDITIONAL FORMS ATTACHED: Y/N
ANY DEPUTIES/OFFICERS INJURED: Y/N  IF YES, NAME(S): Lt. Austen Russell
DESCRIBE INJURIES TO DEPUTY/OFFICER: Small cuts on right arm
_____

DEPUTY/OFFICER TREATED BY: FIRE DEPT _____ AMBULANCE ✓ HOSPITAL _____
ATTENDING PHYSICIAN _____ JAIL MEDICAL STAFF _____

NATURE OF INCIDENT: 10-53, 10-55 _____
INCIDENT TYPE/REASON FOR USE OF FORCE (circle appropriate responses below):

Hostage Taker  Suicidal  (Violent/Combative Offender)  (Barricaded)  (Resistive)  Restraint (for Offender's safety)  Accidental  Other
AT THE TIME OF THE INCIDENT, THE SUBJECT WAS (check appropriate responses below):
__✓ Under the influence of alcohol/illegal drugs/prescription drugs  __✓ Mentally impaired __ Other: _____
CHARGES FILED AGAINST OFFENDER: Diagnosed by Health Dept, DUI, Resisting Arrest
Disorderly Conduct X 5 _____ SUSPECT BOOKED: Y/N

### OFFENDER INFORMATION
NAME: Glenn Dell Kasper _____ ADDRESS: 8990 Massey Est Dr
PHONE NUMBER: _____ SSN: ███████ 2696  DATE OF BIRTH: ██████ 68
SEX: M/F  HEIGHT: 5'5"  WEIGHT: 180  RACE: W  DISABILITY(S): _____
DESCRIBE OFFENDER CLOTHING (heavy, light, thin, loose etc.): light
ANY INJURIES TO OFFENDER PRIOR TO USE OF FORCE: Y/N
ANY INJURIES AFTER USE OF FORCE: Y/N _____
_____

OFFENDER TREATED BY:  FIRE DEPT N/A  AMBULANCE N/A  HOSPITAL N/A
ATTENDING PHYSICIAN N/A  JAIL MEDICAL STAFF N/A
TRANSPORTED BY: __ AMBULANCE ✓ SHERIFF'S DEPT __ OTHER _____ ADMITTED Y/N

OTHER OFFENDERS/WITNESSES ON SCENE: Y/N
OFFENDERS/WITNESS (circle one) NAME: _____ PHONE # _____
OFFENDERS/WITNESS (circle one) NAME: _____ PHONE # _____

Form #31 | 1 | Revised 2/10

EXHIBIT 5
WIT: Russell
DATE: 6/1/17
Brooks Court Reporting

# LAUDERDALE COUNTY DETENTION FACILITY
## RESPONSE TO RESISTANCE REPORT

LEVELS OF RESISTANCE and CORRESPONDING LEVELS OF CONTROL/FORCE (check all that apply)

☐ LEVEL 1   COMPLIANT: _____

   COOPERATIVE CONTROLS: _____

☐ LEVEL 2   PASSIVELY RESISTANT: _____

   CONTACT CONTROLS: _____

☑ LEVEL 3   ACTIVELY RESISTANT: _refused To eat his meals_

   COMPLIANCE (chemical, takedown, taser etc.): _TASER_

☐ LEVEL 4   ASSAULTIVE (bodily harm): _____

   DEFENSIVE TACTICS (impact weapon, closed hand etc.): _____

☐ LEVEL 5   ASSAULTIVE (serious threat of bodily harm or death): _____

   DEADLY FORCE: _____

APPLICATION AREAS

Place a number in the location of the application of force on the diagram to the left.

Using the numbered area below, describe the type of force corresponding with the number on the diagram.

*Example: 1. TASER Probe*

1. _TASER Probe_
2. _____
3. _____
4. _____
5. _____
6. _____

POST-INCIDENT OBSERVATION

IMMEDIATELY FOLLOWING INCIDENT: _Hysterical_

15 MINUTES FOLLOWING INCIDENT: _Hysterical_

30 MINUTES FOLLOWING INCIDENT: _Hysterical_

☑ NARRATIVE/INCIDENT REPORT ATTACHED     ☑ SUPPLEMENTAL TASER/CHEMICAL SPRAY FORM ATTACHED

☑ PHOTOGRAPHS TAKEN BY: _Deputy Anderson_     ☑ PHOTOGRAPHS ATTACHED

| | | |
|---|---|---|
| REPORTING DEPUTY/OFFICER SIGNATURE | | DATE 5/25/14 |
| SUPERVISOR SIGNATURE | LY | DATE 02 OCT 14 |
| DIVISION COMMANDER SIGNATURE | LY | DATE 02 OCT 14 |
| CHIEF DEPUTY'S SIGNATURE | | DATE 10/2/14 |
| SHERIFF'S SIGNATURE | | DATE 1/27/15 |

Form #31                                     2                          Revised 2/10

## LAUDERDALE COUNTY DETENTION FACILITY
## RESPONSE TO RESISTANCE REPORT

# Taser/Chemical Spray Supplemental Form

DEPUTY/OFFICER NAME: _Reuben Russell_          CASE # _An14007567_

TASER SECTION (complete if applicable)
TASER SERIAL NUMBER: _X00-526Z379_
AIR CARTRIDGE TYPE(S) USED ☐ 15-ft XP  ☒ 25-ft XP  ☐ 35-ft XP  ☐ Other _____
AIR CARTRIDGE SERIAL NUMBER(S): _H26-297993_
NUMBER OF AIR CARTRIDGES FIRED: _1_  NUMBER OF CYCLES APPLIED (non drive-stun): _1_
USAGE (check one): ☐ Arc Display Only  ☐ Laser Display Only  ☐ Drive Stun Only  ☒ Taser Air-Cartridge Application
APPROXIMATE TARGET DISTANCE AT TIME OF DART LAUNCH: _3_ feet  NEED FOR ADDITIONAL CARTRIDGE? ☒N
DISTANCE BETWEEN THE TWO PROBES: _4_ inches  DID DART CONTACTS PENETRATE THE SUBJECT'S SKIN? Y/N
IF AIR CARTRIDGE DEPLOYMENT WAS UNSUCCESSFUL WAS A DRIVE-STUN FOLLOW-UP USED? Y/N
DID THE DEVICE RESPOND SATISFACTORILY? Y/N
WERE PROBES REMOVED ON SCENE? Y/N IF YES, REMOVED BY: _____
DID TASER APPLICATION CAUSE INJURY: Y/N IF YES, NOTE INJURY IN APPROPRIATE SECTION OF USE OF FORCE REPORT
WAS TASER USE (circle one) SUCCESS/FAILURE  IF FAILURE, WHY? _____

CHEMICAL SPRAY SECTION (complete if applicable)
NUMBER OF TIMES SUBJECT WAS SPRAYED: _____
APPROXIMATE DISTANCE FROM SUBJECT: _____
WAS SPRAY EFFECTIVE? Y/N          WAS SUBJECT DYE TESTED? Y/N
OBSERVED EFFECTS ON:
    EYES: ☐ Closure  ☐ Tears  ☐ No Effect        SKIN: ☐ Redness  ☐ Burning        ☐ No Effect
    NOSE: ☐ Discharge  ☐ Irritation  ☐ No Effect   CHEST: ☐ Coughing  ☐ Labored Breathing  ☐ No Effect

REPORTING DEPUTY/OFFICER SIGNATURE: _____        DATE _5/25-14_
SUPERVISOR SIGNATURE: _____                      DATE _02OCT14_
DIVISION COMMANDER SIGNATURE: _____              DATE _02OCT14_
CHIEF DEPUTY'S SIGNATURE: _____                  DATE _10/6/14_
SHERIFF'S SIGNATURE: _Billy Sollie_                        DATE _1/27/15_

Form #31                                    3                        Revised 2/10

LC_00020

# LAUDERDALE SHERIFF'S DEPT.

PRINT DATE: 05/25/2014          **NUMBER: 2014007567**          Page  4

Agency:  LCSD
Incident No:  2014007567

Author:  RUSSELL, RUSTON L-6
Title:  LT. RUSSELL'S STATEMENT
Date Entered:  5/25/2014

Report Type:  I

On 05/24/2014 I, Lt. Russell, was working a road side safety checkpoint at the intersection of Allen Swamp Road and Pine Springs Road.  I was standing on Allen Swamp Road when a white Ford pickup approached the intersection east bound.  The vehicle drove past me and I yelled for the driver to stop.  The driver stated "you are trying to stop me illegaly" as he was rolling his window up. The vehicle continuing to roll forward toward the intersection.  The driver turned completely sideways in the vehicle and was facing me through the driver window.  He yelled "what do you want" through the closed window and I replied that I wanted him to stop the vehicle and he replied "you cant get me".  The vehicle then lunged forward.  (When the vehicle lunged forward, Trooper Moore and Deputy Stevens were standing in Pine Springs Road directly in front of the vehicle speaking to two young females in a black car.)  As the vehicle lunged into the intersection I struck the driver window with my right forearm, shattering the window.  I immediately leaned into the window of the vehicle and placed the vehicle into park.  I then opened the door from the inside handle.  As this took place the driver, who was later identified as Glenn Kasper, was screaming hysterically.  Deputy Mathis and Deputy Anderson entered the doorway to remove Kasper from the vehicle.  Kasper was fighting to keep Deputy Mathis from releasing the seatbelt.  After the seatbelt was unbuckled, Kasper grabbed the center console.  He then held onto the driver seat then the steering wheel to keep from being removed from the vehicle.  I then deployed the taser striking Kasper in the abdomen.  He released everything and was removed from the vehicle.  Kasper continued yelling hysterically.  Once he was placed on the ground Kasper continued fighting with Deputies.  I cycled the taser again to assist the deputies in getting him cuffed.  During the struggle one of the taser probes had fallen out so there was no effect on Kasper after he was removed from the vehicle. Deputies had to physically pick Kasper up and placed him into Deputy Mathis' vehicle.

Deputy Mathis attempted to remove Kasper from his vehicle and place him in Deputy Anderson's vehicle for transport to the Lauderdale County Jail.  Kasper would not get out of the vehicle.  Kasper was yelling and pulling away.  I then entered the rear of the vehicle from the opposite side and deployed a drive stun to Kasper.  Kasper then exited the vehicle and began fighting with Deputy Mathis and Deputy Anderson.  He was eventual subdued and placed in Deputy Anderson's vehicle and transported to the jail.



EXHIBIT  6
WIT:  Russell
DATE:  6 1 17
Brooks Court Reporting

STATE OF MISSISSIPPI
ABSTRACT OF COURT RECORD
LAUDERDALE COUNTY JUSTICE COURT
MERIDIAN, MS 39301
(601) 482-9879

COUNTY: LAUDERDALE                         AGENCY CODE:  0038

                                           CITATION NO:074942000

DEFENDANT

DRIVERS LICENSE NUMBER: ███████674        STATE: MS DOB: ███/1963
NAME:   KASPER GLENN DELL                  RACE:  W  SEX: M
ADDRESS: 8990 MASSEY ESTATES DRI

        MERIDIAN MS 39305

VEHICLE INFORMATION

REGISTRATION (TAG) NO:  LB5 121    STATE: MS  YEAR: 2001
VEHICLE MODEL YEAR:        MAKE: FORD   TYPE: P/T

VIOLATION

CHARGED WITH: DISREGARD OF TRAFFIC DEVICE        % BAC: 00000
                                                 SPEED:    ZONE:

DATE OF VIOLATION: 05/24/2014  COURT DATE: 01/13/2015 HWY/OR STREET:
CHARGES WERE FILED BY: RUSSELL RUSTON        BADGE NO:  L006

DEFENDANT ENTERED A PLEA OF:
DEFENDANT WAS FOUND: DISMISSED
Judgement of Court: DISMISSED

BY JUDGE: DARRELL THEALL
REMARKS BY COURT:

_____

DEFENDANT WAS FINED $          PLUS ASSESSMENTS OF $

SENTENCED TO: _____

        BAIL FORFEITED ( )        APPEALED     ( )
        FINE PAID      ( )        TIME SERVED  ( )

I CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF MY COURT RECORD AS

RECORDED IN DOCKET:  2014  PAGE:  6576      03

SIGNED: _____       TITLE: _____

EXHIBIT 7
WIT: Russell
DATE: 6/1/17
Brooks Court Reporting

BOOK: 2014 PAGE: 6582

STATE OF MISSISSIPPI
ABSTRACT OF COURT RECORD
LAUDERDALE COUNTY JUSTICE COURT
MERIDIAN, MS 39301
(601) 482-9879

COUNTY: LAUDERDALE

AGENCY CODE:   0038

CITATION NO:

DEFENDANT

DRIVERS LICENSE NUMBER: ▉▉▉674          STATE: MS DOB: ▉▉/1963
NAME:   KASPER GLENN DELL                RACE:  W  SEX: M
ADDRESS: 8990 MASSEY ESTATES DRI

        MERIDIAN MS 39305

VEHICLE INFORMATION

REGISTRATION (TAG) NO:  LB5 121   STATE: MS  YEAR: 2001
VEHICLE MODEL YEAR:      MAKE: FORD   TYPE: P/T

VIOLATION

CHARGED WITH: RESISTING ARREST

% BAC: 00000
SPEED:    ZONE:

DATE OF VIOLATION: 05/24/2014  COURT DATE: 01/13/2015 HWY/OR STREET:
CHARGES WERE FILED BY: RUSSELL RUSTON      BADGE NO:  L006

DEFENDANT ENTERED A PLEA OF:
DEFENDANT WAS FOUND: DISMISSED
Judgement of Court: DISMISSED

BY JUDGE: DARRELL THEALL
REMARKS BY COURT: #2014050116

DEFENDANT WAS FINED $        PLUS ASSESSMENTS OF $

SENTENCED TO: _____

         BAIL FORFEITED  ( )        APPEALED      ( )
         FINE PAID       ( )        TIME SERVED   ( )

I CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF MY COURT RECORD AS

RECORDED IN DOCKET: 2014  PAGE:  6582

SIGNED: _____      TITLE: _____

EXHIBIT  8
WIT: Russell
DATE: 6|1|17
Brooks Court Reporting