**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**GLENN KASPER**                                                              **PLAINTIFF**

**v.**                                               **CIVIL ACTION NO. 3:15cv613-WHB-JCG**

**THE BOARD OF SUPERVISORS OF**
**LAUDERDALE COUNTY, MS et al.**                              **DEFENDANTS**

**MEMORANDUM BRIEF IN SUPPORT OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant, the Board of Supervisors of Lauderdale County, MS, and

Jacob Mathis, Andy Matuszewski, Ruston Russell, William Sollie, Wesley Stephens, and Dylan

Anderson, each in their official capacities, (collectively the "Defendant"), and files this its

Memorandum Brief in Support of its Motion for Summary Judgment, and in support thereof,

respectfully show unto the Court as follows:

## A.  STANDARD OF REVIEW

Summary judgment is mandatory "against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)

(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  Summary Judgment. . . shall be

rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law." Little, 37 F.3d at 1075

(quoting Fed.R.Civ.P. 56(c).

## B.  THE PLAINTIFF'S CLAIMS

On August 21, 2015, Plaintiff filed this lawsuit relative to his an encounter which he had

with certain law enforcement officers in Lauderdale County on May 24, 2014.  <u>See</u> ECF No. 1.

Plaintiff filed an Amended Complaint on December 21, 2015.  <u>See</u> ECF No. 11.  At the outset, it

is appropriate to note that in paragraph 5 of his original and his Amended Complaint, Plaintiff's

counsel has included a typographical error which indicates that Plaintiff's encounter with law

enforcement occurred on May 24, 2015; more specifically, Plaintiff alleges that on or about May

24, 2015, he allegedly was encountered "by Lauderdale County Sheriff's Department deputies at

the intersection of Allen Swamp Road and Pine Springs Road." <u>See</u> ECF No. 11, para. 5.

However, it is clear from the remainder of the Complaint and its supporting documents that the

encounter actually occurred on May 24, 2014.  For instance in paragraph 8, Plaintiff alleges that

on January 13, 2015, he appeared in Justice Court regarding charges stemming from the

encounter.  He confirms that he was convicted of 2 counts of disorderly conduct related to the

encounter and attached the abstracts of such Judgments as a part of Composite Exhibit "B" to his

Amended Complaint.[1]  Those Abstracts reflect that the "Date of Violation" was May 24, 2014.

Then in paragraph 11, Plaintiff alleges that "on May 25, 2014 ... as a result of the Defendants

action, he was required to pay a towing fee..." and attached a tow bill dated May 25, 2014 as

Exhibit ""C" to his Amended Complaint.  He also attached as Exhibit "A" to his Amended

Complaint, the Statement of an alleged witness, who recalls that the incident occurred during

"Memorial Day weekend in 2014."  It is undisputed that the date of Plaintiff's encounter with

law enforcement officers was May 24, 2014.

      As stated, Plaintiff alleges that on or about May 24, 2015, he allegedly was encountered

"by Lauderdale County Sheriff's Department deputies at the intersection of Allen Swamp Road

and Pine Springs Road." According to the complaint, Plaintiff observed defendant Deputy

---

[1]<u>Id</u>. at Exh. "B", pages 23-24 of 27.

Russell, but "no signal, hand or otherwise, was given indicting that [Plaintiff] should stop beyond compliance with rules of the road." After briefly stopping at the intersection, Plaintiff allegedly had his driver's side window "smashed by a Lauderdale County Deputy."

Plaintiff also claims that there was "no probable cause for [his] arrest," and that he was "grabbed, pulled, by several Deputies, and removed from his vehicle head first." He alleges further that "Lauderdale County Deputies immediately continued to use excessive force by ripping Plaintiff's shirt completely off and repeatedly assaulting him, specifically smashing his head into the pavement." Plaintiff also contends that he was tased by the deputy and placed into the deputy's patrol car. Thereafter, Plaintiff maintains that he was transported to the "Lauderdale County Detention Center," where he allegedly was "immediately strip searched and the two taser barbs were removed from this person." Plaintiff subsequently was charged with several misdemeanor violations, and the court later dismissed all charges "except Counts I and II of Disorderly Conduct." He asserts that he sustained loss of income as a result of the incident.

In his Amended Complaint (ECF No. 11), Plaintiff Kasper asserts 12 claims relative to an encounter he had with law enforcement officers on May 24, 2014: (i) a general claim of violation pursuant to 42 U.S.C. § 1983 and § 1988, (ii) unconstitutional prior restraint pursuant to 42 U.S.C. § 1983 and 1988, (iii) false arrest pursuant to 42 U.S.C. § 1983, (iv) wrongful detention and confinement pursuant to 42 U.S.C. § 1983, (v) a violation pursuant to 42 U.S.C. § 1983 arising out of strip search at the Lauderdale County Detention Facility, (vi) malicious prosecution, (vii) false arrest and false imprisonment, (viii) assault and battery, (ix) intentional infliction of emotional distress, (x) deprivation of property without due process pursuant to 42 U.S.C. § 1983, (xi) conversion, and (xii) failure of Lauderdale County to implement appropriate policies, customs and practices relative to the use of force and unreasonable seizures of persons

and property.  In addition to compensatory damages, Plaintiff requests an award of punitive damages, declaratory judgment and injunctive relief.  *See* ECF No. 11 at 18.

The Defendants, including the law enforcement officers in their individual capacities, filed their Answer denying all liability on January 20, 2016.  See ECF No. 21.  Then, on August 5, 2016, the individual Defendants moved for Summary Judgment based, among other things, on qualified immunity.  See ECF Nos. 33 and 34.  By Order entered on October 5, 2016, the Court granted summary judgment on all individual capacity claims against Jacob Mathis, Andy Matuszewski, Ruston Russell, Sheriff William Sollie, Wesley Stephens, and Dylan Anderson.  See ECF No. 37.

Lauderdale County is the only remaining defendant in this case.  The Lauderdale County Board of Supervisors is the governing Board for Lauderdale County; no individual Board member has been sued in this case.

"For purposes of liability, a suit against a public official in his official capacity is in effect a suit against the local government entity he represents."  Mairena v. Foti, 816 F.2d 1061 (5th Cir. 1997). There is no distinction between claims against Lauderdale County and an official capacity defendant.  See also, Kentucky v. Graham, 472 U.S. 159 (1985).  Thus the official capacity claims against Jacob Mathis, Andy Matuszewski, Ruston Russell, Sheriff William Sollie, Wesley Stephens, and Dylan Anderson are claims against Lauderdale County itself.

In the Answer, the Defendant asserts affirmatively that it is entitled to dismissal based on, among other things, the applicable statute of limitations, and various provisions of the Mississippi Tort Claims Act.  See ECF No. 21, Tenth, Nineteenth, Twenty-Sixth, Twenty-Eighth Twenty-Ninth, Thirty-Second, Thirty-Third Defenses at 2-3, 11, 12, 13.

In the Answer, the Defendant also asserts affirmatively that the Plaintiff's claims

constitute an impermissible collateral attack on his 2015 convictions, including for disorderly conduct, stemming from his encounter with law enforcement officers on May 24, 2014 and are therefore barred pursuant to Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364, 129 L.Ed. 2d 383 (1994). See ECF No. 21, Thirty-Fourth Defenses at 13.

Plaintiff Kasper testified by deposition in this case. (Exh. "A"). He claimed that when he approached the intersection of Allen Swamp Road and Pine Springs Road, he did not recognize that officers were conducting a safety checkpoint or roadblock. Id. at 70-71, 105. He admitted that he did not stop for the checkpoint and insisted that under the Constitution, law enforcement officers could not stop him without probable cause. Id. at 105-107. As he approached the officers in the roadway, he thought they were "violating his constitutional rights" because they did not have the right to stop him, and he was not required to stop. Id. at 105-107. He also confirmed that he was convicted for more than one charge stemming from the incident, and that although some charges were expunged, a charge of disorderly conduct (Book 2014 at 6579) from the incident still stands. Id. at 120-126.

Dalton House, the operator of the vehicle trailing Mr. Kasper, recognized that the officers were conducting a safety checkpoint. (Exh. "B" at 57). Notably he recalled that once he reached an officer to be checked and provided his license and registration, it took him only about 3 seconds to be checked. Id. at 49-50.

Chief Deputy Ward Calhoun has provided an extensive affidavit (Exh. "I"), which details Sheriff's Department ("Department") policies and the Department's status as an accredited law enforcement agency:

> 5.    The types of law enforcement policies are vast, and include but certainly are not limited to, hiring, training, professional conduct, rules of conduct, ethics, firearms training, response to resistance (use of force), TASER use, roadside safety checkpoints, booking and internal affairs. All policies of the

Lauderdale County Sheriff's Department must be approved by Sheriff Sollie. More specifically, the Lauderdale County Sheriff's Department has (but not limited to) the following formal policies (attached as exhibits hereto with reference to Bates numbers):

| | |
|---|---|
| LC_00987-990 | Policy 2.05 - Code of Ethics; |
| LC_00991-993 | Policy 2.07 - Written Directives; |
| LC_00995-999 | Policy No. 2.08 - Internal Affairs, with its accompanying Official Personnel Complaint (Bates No. LC_01000-1002); |
| LC_00021-26 | Policy 2.09 - Training & Proficiency Testing; |
| LC_01003 | Policy No. 2.12 - Professional Conduct; |
| LC_00374-388 | Policy 2.14 - Rules of Conduct; |
| LC_01004-1008 | Policy No. 3.17 - Field Training & Evaluation Program; |
| LC_00051-55 | Policy 4.03 - Roadside Safety Checkpoints, with associated forms; |
| LC_00056-73 | Policy 5.01 - Response to Resistance & Deadly Force, with associated forms; and |
| LC_00074-77 | Policy 5.01.01 - TASER Use. |

In addition and relative to operations in the Lauderdale County Detention Facility (Lauderdale County Jail), the Lauderdale County Sheriff's Department has (but not limited to) the following formal policies (attached as exhibits hereto with reference to Bates numbers):

| | |
|---|---|
| LC_00078-80 | Policy 2.01 - Prisoner Admission and Booking; and |
| LC_00389 | Lauderdale County Detention Facility Reasonable Suspicion Assessment Form (For authorization in strip searches of traffic and misdemeanor arrestees). |

(Exh. I at paras. 1-5). He points out applicable provisions of each policy to include that training on Response to Resistance (Use of Force) is conducted at least annually, and also relative to Department investigation of complaints. He adds that:

13.     TASER Use is covered in more detail in Policy Number 5.01.01

(LC_00074-77).   Among other things, the policy makes clear that only sworn deputies and correctional officers who have completed the agency approved training course may carry a TASER, and that all users shall be retrained annually or as prescribed by law or the TASER manufacturer's guidelines. (LC_00074-75). At a minimum, the Lauderdale County Sheriff's Department conducts such training annually.  Deputies are to "spark-test" the TASER at the beginning of each shift to ensure safety operation of the TASER; this involves of a 5-second trigger pull which appears on data download reports along with data reflecting the actual application of a TASER to a subject or animal. (LC_00076). Among other reasons, the TASER may be used "to restrain or control a subject that is engaging in or exceeding verbal resistance (refusing to comply or respond to a lawful command)". (LC_00076).  The Policy also requires that a Response to Resistance and Supplemental Report be completed after any application to a subject or an animal.  (LC_00077). Photos are required and the TASER must be provided to the training coordinator or appropriate TASER instructor for a data download. (LC_00077).

14.   Following deputies' response to resistance by Plaintiff at the roadside safety checkpoint on May 24, 2014, Deputies Russell, Mathis and Anderson completed Response to Resistance forms (LC_000018-20, 00358-361) as required by policy, to include a "Taser/Chemical Spray Supplemental Form" (LC_000020) by Deputy Russell to include the submission of his TASER for a data download (*see* TASER Evidence/Synch Report (LC_000015-17)), which confirms that he activated his TASER 3 times on May 24, 2014 (LC_000017) during the encounter with Plaintiff after 7pm (1900 hours).  The Response to Resistance Reports and other documents associated with the arrest of Plaintiff on May 24, 2014 were reviewed as required by policy, and there was no indication that the deputies acted inappropriately or in violation of policy.

15.   The Lauderdale County Sheriff's Department has voluminous policies relative to the operation of the Lauderdale County Detention Facility (Lauderdale County Jail).  As indicated above, those policies include Policy 2.01 - Prisoner Admission and Booking (LC_0078-80), and Lauderdale County Detention Facility Reasonable Suspicion Assessment Form (For authorization in strip searches of traffic and misdemeanor arrestees) (LC_00389). Policy 2.01 provides that the admission process is designed to, among other things, "prevent the entry of contraband or weapons into the jail." (LC_00078). The Policy continues by emphasizing that "the booking process requires significant documentation and the completion of numerous sequential steps to ensure office and inmate safety...", to include completion of a "**pat/frisk** search upon admission to the booking area and remove handcuffs/restraints (unless prisoner is combative) and return the handcuffs to the AO ["Arresting Officer"] and secure prisoner to the booking bench or booking desk with attached leg irons or handcuffs.... (LC_00079).  The Policy does not direct or require a strip search for misdemeanor arrestees; rather, before a strip search may be conducted of a misdemeanor offender (including traffic offenses) to "establish reasonable suspicion that the arrestee possesses a weapon, evidence of a crime, controlled substances, or other

contraband, or is a threat to himself or the safety of others", then the searching correctional officer is required to complete a Lauderdale County Detention Facility Reasonable Suspicion Assessment Form (Bates No. LC_00389), which must be also approved by a jail Shift Supervisor/Sergeant before the strip search may be conducted.  Relative to Mr. Kasper, his booking records indicate that he was subjected to a pat search, and that no strip search was conducted.  However if (as Plaintiff has alleged in this case) a strip search had been conducted of Plaintiff as a misdemeanor offender who was waiting in booking awaiting release on bond, then the searching correctional officer would have been required to complete a Lauderdale County Detention Facility Reasonable Suspicion Assessment Form (Bates No. LC_00389) to establish the requisite reasonable suspicion as mentioned above, and the search would have also required written approval of a jail Shift Supervisor/Sergeant. Other potential jail Shift Supervisors could include higher ranking officials such as a lieutenant, captain or major.

16.     The Sheriff has approved sound law enforcement policies.  The Department (as directed by the Sheriff) has a constant focus on careful screening of potential law enforcement employees, proper training, constant training, the development and adherence to sound law enforcement policies, and the imposition of appropriate disciplinary action when policies are violated.

(Exh. I at paras 1-17).

Both Sheriff Sollie and Lieutenant Ruston Russell (Exhs. "H" and "J") provide a detailed explanation of the Department Policy 4.03 for Roadside Safety Checkpoints.  The Sheriff's Department Policy No. 4.03 sets forth the policy reasons ("help ensure public safety by attempting to ensure that all drivers are properly licensed and all vehicles appear to be in good working order and are equipped with lawfully mandated safety feature") that the Sheriff's Department conducts roadside safety checkpoints, to include the examination procedures for such checkpoints. See Exh. "H", para. 4 (Exh. "1").

As reflected by the Affidavit of Sheriff Sollie, Plaintiff was indeed arrested on or about May 24, 2014; the incident occurred when Plaintiff failed to stop at a properly conducted and authorized law enforcement safety checkpoint.  See Exh. "H", paras. 3-7.  Plaintiff refused to stop his automobile at the checkpoint and accelerated it in a manner that almost ran over one or

more of the officers participating in the safety checkpoint.  Id., para. 4-6 (including Exhibit "4"

thereto (officer statements)).  As a result of his misconduct in that regard, Plaintiff was arrested

and taken into custody utilizing an amount of force reasonable and necessary under the

circumstances.  Id.  Mr. Kasper was charged with several misdemeanor offenses, which resulted

two convictions for disorderly conduct, [one of] which still stand.  Id.  As set forth above,

Plaintiff asserts in paragraph 8 of his Amended Complaint that on January 13, 2015, he appeared

in Justice Court regarding charges stemming from the encounter, and that he was convicted of 2

counts of disorderly conduct; he attached the abstracts of such Judgments as a part of Composite

Exhibit "B" to his Amended Complaint.[2]

Sheriff Sollie did not personally participate in the roadside safety checkpoint on May 24,

2014.  See Exh. "H", para. 1.  He also did not personally participate in the arrest of Mr. Kasper

on that date.  Id.  Sheriff Sollie was not personally involved with Mr. Kasper in any way on May

24, 2014.  Id., para. 8.  He was not present at the scene of his arrest and did not participate in any

use of force with him that day.  Id.  He also was not present when Mr. Kasper was booked into

the Lauderdale County Detention Facility that day.  Id.

Lieutenant Russell has been employed with the Department since 2003.  (Exh. "D" at 13.)

Prior to that time, he worked for one year with the Meridian Police Department.  Id.  He left the

Meridian Police Department voluntarily.  Id.  During his fourteen years of work for the

Lauderdale County Sheriff's Department, he has never been fired or suspended.  Id. at 14.

During that fourteen-year of employment, he did not recall there being any complaints filed

against him for abuse of authority.  Id. at 14-16.  He also did not know of any excessive force

---

[2]See Amended Compl., Exh. "B", pages 23-24 of 27.

complaints filed against him during that period of time. *Id*. at 15. He has never been demoted at the Department. *Id*. at 16. He did receive one reprimand during the fourteen-year period in early 2017 relative to a complaint by a fellow employee. *Id*. at 16-17.

Lieutenant Russell has no knowledge of any abuse of authority complaint against Deputy Matuszewski since he has been employed by the Department, or any excessive force complaint against Deputy Dylan Anderson. *Id*. at 17. He has no knowledge of any complaints for either abuse of authority or excessive force against Wesley Stephens while he was employed by the Department. *Id*. at 17-18.

Although Lieutenant Russell was well familiar with several members of the Kasper family in his capacity as a law enforcement officer (Exh. "D" at 18-23), he had not previously encountered Plaintiff Glenn Kasper in his capacity as a law enforcement officer other than on May 24, 2014. *Id*. at 22.

Lieutenant Russell is familiar with Policy 4.03 which pertains to Roadside Safety Checkpoints. *Id*. at 23-27. He testified that he had been trained by Lauderdale County related to the procedures for a safety checkpoint and had been trained on the policy. *Id*. at 26.

During the safety checkpoint in question, Lieutenant Russell was checking traffic on Allen Swamp Road that was traveling eastbound. *Id*. at 30. It was daytime when Mr. Kasper arrived. *Id*. Lieutenant Russell provided detailed testimony regarding his interaction with Mr. Kasper as well as that of other officers at the checkpoint. *Id*. at 30-80. In so doing, he identified the Response to Resistance Report which he completed (Exh. "D" at 59) and described his use of a TASER with Mr. Kasper. *Id*. at 58-70.

Russell also testifies via affidavit as follows:

4.      The Lauderdale County Sheriff's Department has a policy (Policy No. 4.03) established by Sheriff Sollie for the conduct of roadside safety checkpoints.  A true and correct copy of Policy No. 4.03 which was in effect on May 24, 2014 is attached hereto as Exhibit "1".  Prior to that date, I had been trained on the policy and understood its contents and procedures.  In accordance with Policy No. 4.03, the roadside safety checkpoint in question was authorized by me as the Shift Lieutenant to be conducted by stopping ("detaining") every vehicle at the intersection of Pine Springs Road and Allen Swamp Road on May 24, 2014 between the hours of 18:30 p.m. (6:30 p.m.) and 21:10 p.m. (9:10 p.m.), but with Sergeant Cokel serving as the ranking officer at the checkpoint.  Attached hereto as Exhibit "2" is a true and correct copy of the completed "Authorization for [such] Roadside Safety Checkpoint."

5.      As required by Policy No. 4.03, at the conclusion of the roadside safety checkpoint, the ranking officer (Sergeant Cokel) prepared a report setting forth the results of the roadside safety checkpoint; attached hereto as Exhibit "3" is a true and correct copy of the "Report of Roadside Safety Checkpoint" for the roadside safety checkpoint conducted at the intersection of Pine Springs Road and Allen Swamp Road on May 24, 2014 between the hours of 18:30 p.m. and 21:10 p.m.  As indicated in such Report, the participating officers stopped every vehicle traversing the checkpoint for a total of 43 vehicles stopped.  Also as indicated in the Report, a total of 6 persons were arrested which included a total of 12 charges.

6.      During the course of the conduct of the roadside safety checkpoint, the vehicle operators who arrived at the checkpoint clearly seemed to understand that we were conducting a safety checkpoint and almost all of the operators stopped voluntarily.  The vast majority of the vehicles were stopped momentarily (and without incident) just long enough for officers to complete the observations detailed in Policy 4.03.

7.      Only one vehicle operator refused to stop and even moved dangerously in the direction of two officers standing to the front of the vehicle in the highway.  More specifically during the course of the roadside safety checkpoint on May 24, 2014, we had an encounter with Mr. Kasper which resulted in his arrest on numerous charges including Disorderly Conduct (3 counts), Resisting Arrest and DUI 1st.  Attached hereto as Exhibit "4" is a true and correct copy of the Incident Report relative to the encounter and arrest of Mr. Kasper on May 24, 2014 which includes (but is not limited to) my written statement, as well as the written statements of Deputy Jacob Mathis, Deputy Andy Matuszewski and Deputy Dylan Anderson.  Attached hereto as Exhibit "5" is a true and correct copy of the Arrest Record completed at the Lauderdale County Detention Facility (County Jail) when Mr. Kasper was booked on May 24, 2014.  The Incident Report and Arrest Record reflect that the time of Mr. Kasper's arrest was 19:49 hours (7:49 p.m.) on May 24, 2014.

8.      During the encounter with Mr. Kasper on May 24, 2014, Deputies Mathis, Anderson and I responded to Mr. Kasper's resistance, removed him from

his vehicle and after a struggle on the ground, were able to place him in restraints. Following our response to Mr. Kasper's resistance at the roadside safety checkpoint on May 24, 2014, Deputies Mathis, Anderson and I completed Response to Resistance forms (LC_000018-20, 00358-361) as required by policy, to include a "Taser/Chemical Spray Supplemental Form" (LC_000020) which I completed. I also submitted my TASER for a data download (*see* TASER Evidence/Synch Report (LC_000015-17)), which confirms that I applied the TASER 3 times on May 24, 2014 (LC_000017) during the encounter with Plaintiff after 7pm (1900 hours). The second time I applied the TASER, I pulled the trigger a short time after Mr. Kasper was removed from the vehicle but while Mr. Kasper was struggling to avoid the application of handcuffs; however, one of the TASER prongs was no longer attached to his body so the TASER had no effect. The third time I applied the TASER was a "drive stun" (without deploying prongs) with the TASER touching Mr. Kasper's body as a pain compliance measure to gain his cooperation to move from one law enforcement vehicle to another.

        9.     Mr. Kasper has asserted in this case that he essentially was a victim of misidentification and that some unidentified officer at the checkpoint believed him to be one of his brothers, who have had extensive encounters with law enforcement over the years. I am very familiar with Mr. Kasper's brothers and recognize them immediately; however, I did not know Glen Kasper, did not recognize him, and certainly did not believe him to be one of the other Kasper brothers when I encountered him on May 24, 2014. I did not know who he was. However within a short period of time and while he was still at the site of the checkpoint, Dispatch noted Mr. Kasper's identity (from either a report of the license number from his truck or from his driver's license, either supplied by an officer at the scene). Attached hereto as Bates LC_00362-00373 are Computer Aided Dispatch (CAD) electronic pages relative to the conduct of the safety checkpoint. CAD page LC_00363 reflects that at 19:53:57 hours (approximately 7:54 p.m.), Dispatcher Barbara Wilroy made an entry that "subject tased...." However CAD page LC_00363 also reflects that approximately 2 minutes later at 19:55:42 (approximately 7:56 p.m.), Dispatcher Wendell Sorrell made an entry that "Glen Kasper has been tased per L06" [me]. At that moment, I still did not know who Mr. Kasper was; however, Dispatch had already obtained sufficient information to identify him in dispatch records. Consistent with that entry, CAD page LC_00365 reflects that seconds later at 19:55:55 (approximately 7:56 p.m.), Dispatcher Barbara Wilroy made an entry confirming that Glen Kasper had a valid drivers license; she would have reported that information to officers at the site of the checkpoint. CAD page LC_00373 reflects that approximately 7 minutes later, Deputy Dylan Anderson reported to Dispatch that he was departing the checkpoint enroute to the jail at 20:02:56 hours (approximately 8:03 p.m.) and that he reported arriving at the jail at 20:17:07 hours (approximately 8:17 p.m.). Deputy Anderson's drive to the jail was a shorter distance than Mr. Kasper has reported traveling that evening from Enterprise, MS to the site of the safety checkpoint.

        10.    On January 13, 2015, Mr. Kasper was convicted of two charges of

Disorderly Conduct/Failure to Obey under Mississippi Code § 97-35-7; Mr. Kasper has attached the Abstracts of judgments regarding those convictions as Exhibit B to his Amended Complaint at pages 23-24 of 27.  The abstracts reflect that the date of each violation was May 24, 2014 and the  warrant numbers were 2014050115 and 2014050113.

(Exh. "J" at paras. -10).

Deputy Matuszewski has been employed by the Department since January 18, 1996.  (Exh. "C" at 8).  He completed the Police Academy at the University of Southern Mississippi in Longbeach in 1994.  *Id.* at 8-9.  They were trained in the basic law enforcement curriculum provided by the State of Mississippi.  *Id.* at 9.  Since that time, he has received extensive training and certifications to include continuing education on an annual basis regarding legal updates and response to resistance.  *Id.* at 10-11.  He recalled that he learned how to operate a safety checkpoint on the job and that he was familiar with Policy No. 4.03. *Id.* at 11-12.  During his deposition, he recalled that the last time he had reviewed the policy was before the last checkpoint that the Department had on his shift.  *Id.* at 13.  He testified that any time the Department is going to have a safety checkpoint that he is going to be involved in, he reviews Policy 4.03 before participating in the checkpoint.  *Id.* at 13-14.

He recalled the roadside safety checkpoint which was conducted on May 24, 2014 at Allen Swamp and Pine Springs Road, and that there was good visibility at the time that the event with Mr. Kasper occurred.  *Id.* at 15-16.  Deputy Matuszewski worked as a supporting officer at the checkpoint.  *Id.* at 15.  Just prior to the encounter with Mr. Kasper, Deputy Matuszewski was standing on the centerline of Allen Swamp Road just before the stop sign and checking vehicles as they approached the checkpoint from the west.  *Id.* at 17.  Lieutenant Russell was standing at the intersection near the stop line.  *Id.* at 20.  Mr. Kasper's vehicle did reach Deputy Matuszewski first, but continued toward Lieutenant Russell.  *Id.* at 21.  Deputy Matuszewski

noticed two unusual things: the driver had something in his hand approximately the size of a driver's license; the driver was raising his driver side window which was the opposite of what is expected for people to do as they approach a checkpoint; and he did not recall seeing brake lights as the vehicle passed him. *Id.* at 21-23. The lack of brake lights did cause him to be concerned because he was not certain if the vehicle was going to stop and Lieutenant Russell, Deputy Stevens and Trooper Moore were ahead of the vehicle in the roadway. *Id.* at 24.

Deputy Matuszewski testified regarding the encounter with Mr. Kasper. *Id.* at 26-41. He did not recall in participating in another roadside safety checkpoint during which a driver's window was shattered. *Id.* at 41-42. He would not agree that shattering the window was a "standard protocol" of the Sheriff's Department, but rather testified that the particular event with Mr. Kasper was a "unique circumstance." *Id.* at 42.

Both Deputies Mathis and Anderson were graduates of the Mississippi Law Enforcement Training Academy. (Exh. "E" at 12-13; Exh. "F" at 11). Both were familiar with Policy 4.03 and had been trained on the policy. (Exh. "E" at 20-22; Exh. "F" at 20-21). Both testified they had been trained on use of force (response to resistance), with Anderson making specific references to the Department's Response to Resistance Policy. (Exh. "E" at 13-14; Exh. "F" at 22-23, 63). Anderson was not aware of there being any complaints filed against him for abuse of authority or excessive force. (Exh. "F" at 77). Mathis testified there were no complaints filed against him for abuse of authority or excessive force. (Exh. "E" at 111).

The Defendant now moves for summary judgment based the various applicable statute of limitations, the Mississippi Tort Claims Act, <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), and <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978).

## C.  **ARGUMENT**

The Plaintiff  has have sued the defendants pursuant to 42 U.S.C. § 1983.  The two essential elements of a § 1983 claim are: (1) the conduct complained of was committed by a person acting under the color of State law; and (2) this conduct deprived a person of rights, privileges, or immunities secured by the constitution or laws of the United States.  Parratt v. Taylor, 451 US 527 (1980); Deshaney v. Winnebago County Dept. Of Social Services, 489 U.S. 1989 (1999).  The focus of  § 1983 is on the misuse of power, possessed by virtue of state law and made possible only because the wrong doer is clothed with the authority of state law.  Johnson v. Lucas, 786 F.2d 1254, 1257 (5th Cir. 1986); Rankin v. City of Wichita Falls, Texas, 762 F.2d 444, 448 (5th Cir. 1985).  Section 1983 provides remedies for Constitutional violations and not ordinary torts.  Just because a government official is alleged to have committed a tortious act that violated the constitution, that alone does not make it a constitutional tort.  Daniels v. Williams, 474 U.S. 327, 329-336, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986).  The actions complained of must be of such a nature to raise the ordinary tort to the level of a constitutional tort.  Love v. King, 784 F.2d 708, 712 (5th Cir. 1986).  Negligence claims are not actionable.  Daniels v. Williams, 474 US 327, 333 (1986).  Remedy for a violation of a duty of care must be sought in state court under traditional tort law principles.  Baker v. McCollon, 443 US 137, 146 (1979).

As referenced above, the Court has already dismissed the Plaintiff's claims against the individual defendants.  Plaintiff provides no independent basis of the County's liability and his claim fails under Monell v. Department of Social Services, 436 U.S. 658, 691-95, 98 S. Ct. 2018, 56 L.Ed. 2d 611 (1978) and City of Los Angeles v. Heller, 106 S.Ct. 1571 (1986).

The County presumes that Plaintiff's Fifth Amendment claim is for alleged deprivation of due process. However, his claims of a violation of the Fifth Amendment due process clause cannot be brought in this lawsuit directly against a Defendant because none are federal employees. "The Fifth Amendment, has 'never been held to have become applicable to the States through the incorporation doctrine.'" Sullivan v. Boyd Tunica, Inc., 2007 U.S. Dist. LEXIS 11499, *16-17, 2007 WL 541619 (N.D. Miss. Feb. 16, 2007) (citing Brown v. City of Hazlehurst, 741 So. 2d 975, 985 (Miss. Ct. App. 1999) (citing Pruett v. Dumas, 914 F. Supp. 133, 136 (N.D. Miss. 1996)). "The Fifth Amendment restricts the power of the federal government and does not apply to state actions." Pruett, 914 F. Supp. at 136. See also, Morin v. Caire, 77 F.3d 116, 120 (5th Cir. 1996) (finding the due process guarantee does not apply to actions of individuals or of a municipal government).

Plaintiff's prior-restraint challenge fails.  Alexander v. United States, 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993)). Prior restraints "involve 'administrative and judicial orders [such as temporary restraining orders and permanent injunctions] forbidding certain communications when issued in advance of the time that such communications are to occur.' " Alexander, 509 U.S. at 550, 113 S.Ct. 2766). There is no such factual or legal issue in this case.

To the extent that Kasper asserts a claim pursuant to the Fourteenth Amendment. However, the Fourteenth Amendment protects pretrial detainees from excessive force, but claims arising during the initial arrest or apprehension of a free citizen are governed by the Fourth Amendment. Dawson v. Anderson County, Tex., 769 F.3d 326, 328-29 (5th Cir. 2014). Thus, the Fourteenth Amendment claims also fail.

Plaintiff argues that his was deprived of her Fourth Amendment right to be secure against

unreasonable seizures. ("[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."). Graham v. Connor, 490 U.S. 386, 394, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443. The Supreme Court and the Fifth Circuit have long held that Fourth Amendment violations occur only through intentional conduct. See Brower v. Cnyt. of Inyo, 489 U.S. 593, 597, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)(successful Fourth Amendment claims establish "a governmental termination of freedom of movement through means intentionally applied."); Young v. City Killen, 775 F.2d 1349, 1353 (5th Cir. 1985)("the constitutional right to be free from unreasonable seizure has never been equated by the [Supreme] Court with the right to be free from a negligently executed stop or arrest").

There is no question that Deputies used force against the Plaintiff. However, this Court has already determined that Plaintiff's claims fail against the individuals. Because he has no independent claim against the County itself, Plaintiff's claims also fail under City of Los Angeles v. Heller, 106 S.Ct. 1571 (1986) and thus should be dismissed. Again, there is no separate basis for liability against the County itself.

Lauderdale County is entitled to summary judgment because the Plaintiffs allegations and proof fall far short of the threshold requirements for municipal liability. There is no vicarious liability under 42 U.S.C. § 1983. This was reaffirmed by the Supreme Court in the context of a supervisory liability claim in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009) (there is no vicarious liability under § 1983 or Bivens; the term "supervisory liability" is a "misnomer").

In fact, it has long been established that there is no vicarious liability under section 1983. See Monell v. Department of Social Services, 436 U.S. 658, 691-95, 98 S. Ct. 2018, 56 L.Ed. 2d

611 (1978). The plaintiff's proof includes nothing regarding any enforcement of some policy or practice resulting in a constitutional deprivation.   In Board of County Commissions of Bryan County, Oklahoma vs. Brown, 117 S. Ct. 1382 (1997), the Court clarified the parameters of municipal liability.   There, the Court overturned the Fifth Circuit's decision upholding a jury verdict in a § 1983 excessive force case, after the jury had determined that Bryan County's "'hiring policy' and 'training policy' were 'inadequate as to amount to deliberate indifference to the constitutional needs of the Plaintiff.'" Id. at 1387.

In overturning the verdict, the Court cited and summarized the major cases and basic principles of municipal liability under § 1983 as follows: there is no *respondeat superior* liability under § 1983, so that a municipality may not be held liable merely because it employs a tortfeasor; rather, the plaintiff must establish that a municipal policy or custom caused his injury. Id. at 1388.  The Court went on to hold:

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

Id.

In the Bryan County case, the plaintiff alleged her injuries were caused by a sheriff's act of hiring his nephew's son (Burns) as a reserve deputy sheriff.  Prior to the hire, the sheriff had obtained information on Burns' rather extensive criminal history, but had not carefully reviewed it.  Burns went to work as a reserve deputy, and, in the course of a traffic stop, forcefully pulled plaintiff from her vehicle and threw her to the ground, causing her severe injury.  Id. at 1386-87.

Brown filed suit, claiming that the governmental entity should be held liable for failing to adequately review Deputy Burn's background and to properly train him in the use of force.  Id. at 1387.  The Supreme Court held Bryan County could not be liable for plaintiff's injury because, "in enacting § 1983, Congress did not intend to impose liability on a municipality unless deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights."  Id. at 1386.  The Supreme Court determined that a local government entity could not be held liable on a single decision of a policymaker.  Id. at 1387.

The principals discussed in Bryan County are dispositive of Plaintiff's constitutional claims against Lauderdale County.  "Where a plaintiff claims the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  Id. at 1389.  "That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; plaintiff will simply have shown that the employee acted culpably."  Id.

Therefore, in order to recover against Lauderdale County, plaintiff must establish a causal connection between the alleged denial of a constitutional right by Facility staff and some respective policy or custom of Lauderdale County  which evinces "deliberate indifference."  City of Canton v. Harris, 489 U.S. 378, 379, 109 S. Ct. 1197, 1199 (1989); Mouille v. City of Live Oak, 977 F.2d 924, 929 (5th Cir. 1992); McCollum, 2000 WL 1146706 at *3-4, 5; Davis, 1999 WL 604821 at *3.  In the words of the United States Supreme Court, "as our decision in Canton makes clear, "deliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  Bryan County, 109

C. St. at 1391.  The Plaintiff has forwarded no proof of such an inadequate policy or custom of

Lauderdale County.  Certainly and moreover, the Plaintiff can point to no evidence which would

suffice to demonstrate "deliberate indifference" on the part of Lauderdale County.  Based on the

foregoing, there can be no municipal liability in this case.

Relative to Policy 4.03, it certainly passes Constitutional analysis.  As the Mississippi

Court of Appeals has recently observed, "it is well settled that routine traffic stops are justifiable

because they are only minimally intrusive and the checkpoints themselves are 'very effective' in

determining whether drivers are properly licensed." Rogowski v. State, 145 So. 3d 1232, 1235

(Miss. Ct. App. 2014), cert. denied (Miss. 2014) (quoting Dale v. State, 785 So. 2d 1102, 1106

(Miss. Ct. App. 2001.  As the court also noted, "[d]river's licensing and highway safety are

interests justifying routine traffic checks." Rogowski, 145 So. 3d at 1235 (citing City of

Indianapolis v. Edmond, 531 U.S. 32, 39-40, 121S.Ct. 447, 148 L.Ed.2d 333 (2000); see also

Delaware v. Prouse, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) ("'[q]uestiong of

all oncoming traffic at roadblock-type stops' to verify driver's licenses and registrations would be

a lawful means [under the Fourth Amendment] of furthering the vital interest in highway

safety"); Collins v. Ainsworth, 382 F.3d 529, 537-546 (5th Cir. 2004) (applying Prouse and

Edmonds); Jackson v. Epps, 2015W.L.847457 at *14 (S.D. Miss. Feb. 26, 2015) ("there is no

question that a safety checkpoint is constitutionally valid").

The evidence reflects that the roadside safety checkpoint was valid under the Fourth

Amendment.  As a result of Mr. Kasper's own misconduct, he was arrested and taken into

custody.  As explained by Chief Deputy Calhoun, the Department has a detailed policy regarding

Response to Resistance and all officer are trained at least annually on the subject.  The Plaintiff

cannot come forward with evidence in this case sufficient to establish liability for the County.

Plaintiff has failed to establish that an official policy or custom motivated or otherwise resulted in any alleged deprivation.  Deviating from a policy does not show that the policy was the moving force behind the action in question.  Minor v. Jackson Municipal Airport Auth., 2015W.L.4869696 at *2 n.2 (S.D. Miss. Sep. 13, 2016) (citing McKinley v. Yarber, 2015W.L.6554772 at *2 (S.D. Miss. 2015)); Riley v. Jackson Co. Sheriff's Dept., 2005 W.L. 1683983 at *5 (S.D. Miss. July 19, 2005) (allegations that ineffective training caused deviation from use-of-force policy was insufficient to establish liability, and also contrary to extensive evidence provided regarding officer's training).  This is insufficient to establish liability under Monell.  Municipalities cannot be found liable on a theory of vicarious liability.

### Heck v. Humphrey

In addition, the Plaintiff's claims constitute an impermissible collateral attack on his 2015 convictions for disorderly conduct and are therefore barred pursuant to Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364, 129 L.Ed. 2d 383 (1994). Plaintiff's allegations of false arrest, wrongful detention and confinement, conversion, malicious prosecution, deprivation of property, false arrest and false imprisonment, and intentional infliction of emotional distress question the validity of Plaintiff's 2015 convictions, one of which he admits still stand.  However pursuant to the Unites States Supreme Court's decision in Heck v. Humphrey, because Plaintiff cannot show that his conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a Federal Court's issuance of a writ of habeas corpus", his claims are not cognizable under § 1983. Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364, 2372, 129 L. Ed. 2d 383 (1994).

In Heck, the § 1983 Plaintiff was convicted of involuntary manslaughter in Indiana state

court and sentenced to a 15-year term of imprisonment.  Heck, 114 S. Ct. at 2368.  He filed his §

1983 lawsuit in federal court while his appeal from his conviction was pending in the Indiana

courts, alleging that he had been the victim of a conspiracy by county prosecutors and a police

investigator to destroy exculpatory evidence and to use an illegal  voice identification procedure

at his trial.  Id.  The district court dismissed his § 1983 action on the ground that the issues raised

therein directly implicated the legality of his confinement.  The district court's decision was

timely appealed to the United States Court of Appeals for the Seventh Circuit.  Id.  While his

appeal to the Seventh Circuit was pending, the Indiana Supreme Court affirmed his conviction

for involuntary manslaughter.  Subsequently, the Seventh Circuit affirmed the District Court's

dismissal of his §1983 action.  Heck v. Humphrey, 994 F.2d 355, 257 (7th Cir. 1993), aff'd, 512

U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994).

Although the United States Supreme Court affirmed the Seventh Circuit's judgment, it

rejected the analysis utilized by the Seventh Circuit.  See Boyd v. Biggers, 31 F.3d 279, 282-83

(5th Cir. 1994) (containing excellent discussion of Supreme Court analysis in Heck v.

Humphrey).  In that regard, the Fifth Circuit observed as follows:

> The Court agreed, however, that Heck could not proceed with his § 1983 action.
> Using the common law tort of malicious prosecution as an analogy to aid in
> interpretation of § 1983, the Court concluded that
>
> > In order to recover damages for allegedly unconstitutional
> > conviction or imprisonment or for other harm caused by actions
> > whose unlawfulness would render a conviction or sentence invalid,
> > a § 1983 plaintiff must prove that the conviction or sentence has
> > been reversed on direct appeal, expunged by executive order,
> > declared invalid by a state tribunal authorized to make such
> > determination, or called into question by a federal court's issuance
> > of a writ of habeas corpus, 28 U.S.C. § 2254.  A claim for damages
> > bearing that relationship to a conviction or sentence that has not
> > been so invalidated is not cognizable under § 1983.
>
> As the Court remarked a little later in the opinion,

> We do not engraft an exhaustion requirement upon § 1983, <u>but rather deny the existence of a cause of action</u>. Even a prisoner who has fully exhausted available state remedies <u>has no cause of action</u> under § 1983 unless and until the conviction or sentence is reversed, expunged, invalidated, or impunged by the grant of a writ of habeas corpus....[A] § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence <u>does not accrue</u> until the conviction or sentence has been invalidated.

<u>Boyd</u>, 31 F.3d at 282-83 (quoted <u>Heck</u>) (citations omitted) (emphasis added).

Pursuant to <u>Heck</u>, when a complainant brings a § 1983 action seeking damages, as in this case, the trial court must first ascertain whether a judgment in favor of the plaintiff in the § 1983 action would necessarily imply the invalidity of his conviction or sentence. <u>Boyd</u>, 31 F.3d at 283 (citing <u>Heck</u>, 114 S. Ct. at 2372). If such judgment would necessarily imply the invalidity of the conviction or sentence, the prisoner must show that his conviction has been "reversed, expunged, invalidated, or impunged by the grant of a writ of habeas corpus" in order to state a claim. <u>Id.</u> at 283 (quoting <u>Heck</u>, 114 S. Ct. at 2373). If the § 1983 plaintiff has <u>not</u> satisfied the <u>Heck</u> requirement, his claims have <u>not</u> matured and he has no cause of action. <u>See Hudson v. Hughes</u>, 98 F.3d 868, 871-74 (5th Cir. 1996) (dismissing allegations of false arrest and malicious prosecution); <u>Ott v. Mitchell</u>, 792 So. 2d 332 (Miss. 2001).

It is undisputed that the plaintiff's claims pertain to his May 24, 2014 arrest. However, the validity of the arrest was confirmed by virtue of Plaintiff's conviction on 2 charges of disorderly conduct. Plaintiff's allegations challenge the validity of his convictions, one of which still stands. His claims are not cognizable under § 1983 or state law and should be dismissed for failure to state a claim.

## THE MISSISSIPPI TORT CLAIMS ACT IS THE EXCLUSIVE REMEDY FOR PLAINTIFF'S STATE LAW CLAIMS

Furthermore, the County is also entitled to judgment as a matter of law on Plaintiff's state

law claims pursuant to the limitations and immunity provisions in the Mississippi Tort Claims

Act.  The Mississippi Tort Claims Act, (MTCA) provides the exclusive civil remedy against a

government entity or its employees for acts or omissions which give rise to a suit.  Miss. Code

Ann. §11-46-7(1); City of Jackson v. Sutton, 797 So.2d 977, 980 (Miss., 2001). The "exclusive

remedy" provision of the Mississippi Tort Claims Act found at § 11-46-7(1) states in pertinent

part:

> The remedy provided by this chapter against a governmental entity or its
> employee is exclusive of any other civil action or civil proceeding by reason of the
> same subject matter against the governmental entity or its employee . . . for the act
> or omission which gave rise to the claim or suit; ...Miss. Code Ann. § 11-46-7(1).

There is no personal liability for individuals under the MTCA.  Pursuant to the MTCA,

an individual defendant cannot be held personally liable for acts occurring within the course and

scope of his/her employment; thus, a municipality may not be sued under the MTCA for an

employee's actions occurring outside of the scope of his employment.  Bridges v. Pearl River

Valley Water Supply District, 793 So.2d 584, 590 (Miss. 2001);  Craddock v. Hicks, 314 F.Supp.

2d 648, 654 (N.D. Miss. 2003).  Section 11-46-7(2) is clear in that regard.  Id.  Further, section

11-46-5(2) provides that an employee is not considered to be acting within the scope of

employment if the employee's conduct constituted fraud, malice, liable, slander, defamation or

any other criminal offense other than traffic violations.  Miss. Code Ann. § 11-46-5(2); Pearl

River Valley Water Supply District v. Bridges, 878 So.2d 1013, 1018 (2004); Bridges, 793 So.2d

at 590.

   In this case, Mr. Kasper has asserted a claim for malicious prosecution.  Of course,

malicious prosecution is not an alleged injury or form of damages, but rather is a state law tort

action. Notably under federal law, there is no "freestanding § 1983 claim for malicious

prosecution." <u>Bloss v. Moore</u>, 269 Fed. Appx. 446 at *448 (5th Cir. 2008) (citing <u>Castellano v. Fragozo</u>, 352 F.3d 939 (5th Cir. 2003)).

However to the extent that the Plaintiff seeks to hold the County liable for malicious prosecution, such claim is outside the scope of the MTCA.  A cause of action for the tort of malicious prosecution has the following required elements, which include malice: "(1) the institution of a proceeding, (2) by, or at the insistence of the defendant, (3) the termination of such proceedings in the plaintiff's favor, (4) **malice in instituting the proceedings**, (5) want of probable cause for the proceedings, [and] (6) the suffering of injury or damage as a result of the prosecution." <u>Condere Corp. v. Moon</u>, 880 So. 2d 1038 (Miss. 2004) (citing <u>McClinton v. Delta Pride Catfish, Inc.</u>, 792 So. 2d 968, 973 (Miss. 2001)).  Furthermore, such a claim must also fail under <u>Heck</u>, <u>supra</u>, due to Plaintiff's existing disorderly conduct conviction.

The Mississippi Tort Claims Act ("MTCA") one-year period of limitation. *See* Miss. Code Ann. § 11-46-11(3). The alleged incident that forms the basis for Plaintiff's state law claim occurred on May 24, 2014.  Plaintiff filed suit on August 21, 2015, approximately 15 months.

However to the extent Plaintiff's claims are outside of the MTCA, they are barred by the statute of limitations.  As Judge Aycock observed in <u>Woods v. Carroll County</u>, No. 2008WL4191738 at *3 (N.D. Miss. September 8, 2008), the statute of limitations under Mississippi law for certain intentional torts including malicious prosecution, abuse of process, false arrest, assault and battery, excessive use of force and false imprisonment are governed by the one year statute of limitations set forth in the Mississippi Code § 15-1-35.  <u>Id.</u> (citing <u>City of Mound Bayou v. Johnson</u>, 562 So.2d 1212-1218 (Miss. 1990)).  In addition under Mississippi law, actions for the state law torts of false arrest and false imprisonment accrue at the time of

arrest. Id. (citing City of Mound Bayou, 562 So.2d) at 1217; Parker v. Game & Fish Comm'n, 555 So.2d 725-727 (Miss. 1989)).  State law torts of assault and battery and excessive use of force accrue on the date of the subject incident.  Mound Bayou, 562 So.2d 1217.

A claim for intentional infliction of emotional distress claim is also barred by the one year statute of limitations in Miss. Code § 15-1-35. See, e.g., Lynch v. Lib. Mut. Ins. Co., 909 So. 2d 1289, 1292 (Miss. Ct. App. 2005) ("[D]eliberate rather than negligent acts ... fall within the one year statute of limitations for intentional torts."); see also Jones v. Fluor Daniel Servs. Corp., 32 So. 3d 417, 423 (Miss. 2010) ("[T]he tort of intentional infliction of emotional distress ... carries a one-year statute of limitations.").

Furthermore to the extent that Plaintiff asserts state law claims while in custody as a pretrial detainee, his claims fail under the "inmate exception" to the MTCA.  The Mississippi Supreme Court has unequivocally recognized that governmental entities are immune from "any claim of any claimant who was an inmate at the time the claim arose." Wallace v. Town Of Raleigh, 815 So.2d 1203, 1208 (Miss 2002).  The Court has rejected the argument that inmate status begins with a conviction. See also Liggans v. Coahoma Cnty. Sheriff's Dep't, 823 So.2d 1152, 1155 (Miss.2002).

More specifically, the MTCA provides for a limited waiver of sovereign immunity and permits the maintenance of only certain types of claims against a governmental entity, like the County. Miss.Code Ann. § 11-46-5 (Supp.2001). One of the exceptions to the waiver of sovereign immunity, the "jail inmate" exemption, is applicable to the allegations contained in the Plaintiff's Amended Complaint and protects the County from the claims asserted herein. The MTCA states in part:

(1) A governmental entity and its employees acting within the course and scope of

their employment or duties shall not be liable for any claim:

...

(m) Of any claimant who at the time the claim arises is an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution....

Miss.Code Ann. § 11-46-9(1)(m) (Supp.2001).

Thus, the MTCA preserves the government's sovereign immunity with regard to the claims of jail inmates. In <u>Wallace</u>, the Mississippi Supreme Court held, "[t]he language of the statute is unambiguous, and the intent of the Legislature is clear. Inmates have been specifically excluded from bringing such actions against governmental entities." <u>Wallace v. Town Of Raleigh</u>, 815 So.2d 1203, 1209 (Miss 2002). The Court elaborated and defined "inmate" as follows:

Inmate is defined as a person confined to a prison, penitentiary or the like. There is no restriction that the inmate must remain confined to the prison. The inmate remains an inmate while being transported, while participating in public service work programs or while on leave if a pass is granted.

<u>Id</u>. at 1207-08 (internal citations and quotations removed) (quoting Black's Law Dictionary 788 (6th ed.1990), <u>see also Love v. Sunflower Cnty. Sheriff's Dep't</u>, 860 So.2d 797, 800 (Miss.2003) (<u>en banc</u>) (holding pretrial detainee was inmate for purposes of MTCA). Consequently, the Mississippi Supreme Court has rejected the argument that inmate status begins with a conviction. <u>See also  Liggans v. Coahoma Cnty. Sheriff's Dep't</u>, 823 So.2d 1152, 1155 (Miss.2002) (holding the pre-trial detainee plaintiff's distinction between "convicted" and "non-convicted" inmates without merit).[1]

---

[1] Notably, the Mississippi Supreme Court has even go so far as to hold that the prisoner inmate exception withstands allegations of "reckless disregard," and has twice held that allegations brought under the 11–46-9(1)(c)  "reckless disregard" section do not trump section 11–46–9(1)(m) immunity because "a governmental entity, under the MTCA, is immune from all claims arising from claimants who are inmates at the time the claim arises." <u>See Liggans</u>, 823 So.2d at 1156; <u>Love</u>, 860 So.2d at 801–02. ¶ 12.

To the extent that Plaintiff wishes to challenge any conduct (e.g., a use of force, or a strip search) of the County's employees or officials while he was a pretrial detainee, those claims fail. Under the MTCA, it does not matter whether Kasper was detained lawfully or unlawfully. Longino v. Hinds County, Miss. ex rel. Bd. of Sup'rs, 2014 WL 4545943, at *3 (S.D.Miss. 2014) (Reeves, J.) citing Brooks v. Pennington, 995 So.2d 733 (Miss.Ct.App.2007) ("In granting immunity from claims brought by an inmate, Section 11–46–9(1)(m) does not distinguish between those lawfully and those unlawfully within the custody of the state.") Accordingly, Mr. Kasper's claims while a pretrial detainee are barred by section 11–46–9(1)(m) of the MTCA.

Next, the plaintiffs also request punitive damages. Such request fails against the County as a municipal defendant under both federal and state law and should be dismissed. Punitive damages are recoverable under § 1983 against an individual defendant. Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983); Hale v. Fish, 899 F.2d 390, 404 (5th Cir.1990). However, the awarding of such damages is not available against a municipal defendant. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 267, 101 S.Ct. 2748, 2760, 69 L.Ed.2d 616 (1981) ("A municipality ... can have no malice independent of the malice of its officials. Damages awarded for punitive purposes, therefore, are not sensibly assessed against the governmental entity itself."); Webster v. City of Houston, 735 F.2d 838, 860 n. 52 (5th Cir.1984); Walters v. City of Atlanta, 803 F.2d 1135, 1148 (11th Cir.1986).

Regarding the Plaintiffs' request for punitive damages under state law, the Mississippi Tort Claims Act, specifically excludes awards of punitive damages, pre-judgment interest and attorney's fees from being imposed against a governmental entity. Miss.Code Ann. § 11-46-15(2); see also Southwest Mississippi Regional Medical Center v. Lawrence, 684 So. 2d 1257, 1267 (Miss. 1996) (a governmental entity's purchase of liability insurance does not waive its

immunity from punitive awards even to the extent that it had obtained insurance coverage for such damages).  Thus as a final alternative, Plaintiffs' request for punitive damages should thus be dismissed.

### D.  <u>CONCLUSION</u>

Based on the foregoing, the Defendant respectfully submits that it is entitled to judgment as a matter of law as to the entirety of the Plaintiff's claims.  The Defendant requests such other and further relief as the Court may deem just and proper under the circumstances.

This the 13th day of July, 2017.

Respectfully submitted,

**BOARD OF SUPERVISORS OF LAUDERDALE COUNTY, MS, and SHERIFF WILLIAM SOLLIE, WESLEY STEVENS, RUSTON RUSSELL, JACOB MATHIS, ANDY MATUSZEWSKI AND DYLAN ANDERSON in their official capacities, Defendant**

BY:    /s/ Lee Thaggard
LEE THAGGARD (MSB #9442)
BARRY, THAGGARD, MAY & BAILEY, LLP
Post Office Box 2009
Meridian, MS 39302-2009
(601) 693-2393
thaggard@btmblaw.com

Attorney for Defendant

## <u>CERTIFICATE OF SERVICE</u>

      I, the undersigned attorney, do hereby certify that on this date I electronically filed the foregoing with the Clerk of the Court using the ECF system, which provided notice of such filing to:

      Joseph A. Denson
      Denson & Associates, PLLC
      1004 20th Avenue
      Meridian, Mississippi 39302

and I hereby certify that I have mailed by United States Postal Service the document to the following non-ECF participants:  None.

      This the 13th day of July, 2017.

                    /s/Lee Thaggard
                    LEE THAGGARD